# EXHIBIT B

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                                          SUPERIOR COURT
DEPARTMENT

| | |
|---|---|
| ANDRE BISASOR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) CIVIL ACTION NO.: |
| | ) 14-3606C |
| HARVARD EXTENSION | ) |
| SCHOOL/HARVARD UNIVERSITY; | ) |
| DANSLAV SLAVENSKOJ; | ) |
| ROBERT H. NEUGEBOREN; | ) |
| MICHAEL SHINAGEL; | ) |
| HUNTINGTON LAMBERT; | ) |
| SHIRLEY R. GREENE; | ) |
| MARGARET C. ANDREWS; | ) |
| ASHLEY R. POLLOCK; | ) |
| PHILIP HARDING, | ) |
| KRISHAN ARORA; | ) |
| KEN VEDAA; | ) |
| JENNIFER WEBB; | ) |
| JOHN AND JANE DOE; | ) |
| AFFILILATED COMPANIES OF | ) |
| EXTENSIONSTUDENT.COM; | ) |
| | ) |
| Defendants. | ) |

2015 JUN 18 PM 2:09
SUFFOLK SUPERIOR COURT
CIVIL CLERK'S OFFICE
MICHAEL JOSEPH DONOVAN
CLERK/MAGISTRATE

## PLAINTIFF'S AMENDED COMPLAINT AND JURY DEMAND

## INTRODUCTION

Plaintiff, Andre Bisasor, ("Mr. Bisasor" or "Plaintiff") brings this action of defamation, bullying/cyber-bullying and harassment against Danslav Slavenskoj ("Mr. Slavenskoj" or a.k.a "Catamount"), Ken Vedaa ("Mr. Vedaa"), Jennifer Webb ("Ms. Webb" or a.k.a "Girlygirl") and any other persons who have made, aided or abetted defamatory postings against Plaintiff (hereinafter "John & Jane Doe"), as well as and any and all companies, parent companies, and affiliates related to the website "ExtensionStudent.com" (hereinafter "Es.com Affiliated Companies"). Plaintiff also asserts that Defendants have used the defamatory and false statements to improperly interfere with Plaintiff's advantageous relations with current and prospective business and professional associates and contacts as well as students, alumni and other members of the academic community to which he belongs. Beyond damages, Plaintiff also seeks an injunction preventing continuation of the defamation and further interference by the Defendants.

In addition, Plaintiff also brings a claim of bullying/cyber-bullying, discrimination, harassment and hostile environment as well as other wrongs against Harvard Extension School (HES) or Harvard University (hereinafter together "Harvard"); Harvard Extension School Dean of Students Robert H. Neugeboren ("Mr. Neugeboren" or "Dean of Students"); former Harvard Extension School Division Dean Michael Shinagel ("Mr. Shinagel"); current Harvard Extension School Division Dean Huntington Lambert ("Mr. Lambert"); former Harvard Extension School Dean of Management Program Margaret C. Andrews ("Ms. Andrews"); current Harvard Extension School Dean Assistant Dean of Students Shirley R. Greene ("Ms. Greene"); Harvard Extension School Teaching Assistant Ashley R. Pollock and 2008-2009 Harvard Extension School Student Government President ("Ms. Pollock"); 2010-2012 Harvard Extension School Student Government President and 2013-2014 Harvard Graduate Council President Philip Harding ("Mr. Harding"); and 2012-2014 Harvard Extension School Student Government President Krishan Arora ("Mr. Arora"); and also for damages caused by their publication of, or their aiding and abetting or facilitation of defamatory and false statements that were maliciously publicized with the intent to harm the Plaintiff and by their deliberate indifference and failure to take steps reasonably calculated to end and prevent the defamation, harassment, and hostile environment, and to interfere with Plaintiff's contractual or advantageous relations. Plaintiff also seeks damages for unfair and deceptive practices in violation of Mr. Bisasor's rights as a consumer. (NB: all of the above defendants together collectively are hereinafter referred to as "Defendants")

This case is partly about how an online community forum for university students and alumni can quickly turn into a vehicle for ridicule, defamation, taunting, harassment and cyber-bullying. The Plaintiff in this case is Andre Bisasor who, for over 3 years, has suffered harm to his reputation by Defendants and where Defendants engaged in harassment of Mr. Bisasor particularly as it relates to his religious beliefs, and his religious associations as well as his race/ethnicity. Defendants, along with others, created a hostile environment not only for Mr. Bisasor but for all students, alumni and community members who held similar religious beliefs or religious associations. Furthermore, Defendants have sought to mischaracterize Mr. Bisasor's religious beliefs and, in some instances, made caricatures of his religious beliefs with the seeming objective of subjecting him to public ridicule/scorn, or to convince others to join in on the harassing activity.

This conduct, for the most part, took place in an online forum or blog that has claimed to be the main/largest online community forum for Harvard Extension School students called "Extensionstudent.com" (Es.com) and for which participation, membership or access is based on one's status as a Harvard student as evidenced by providing a Harvard email address (though the contents are largely viewable by the public at large). Mr. Slavenskoj is widely known to be the founder and main operator of this Es.com online forum.

A few examples of the numerous comments made by the Defendants include the following: calling Mr. Bisasor a "loon", an "ass", a "fool", an "embarrassment", a "pretentious prick", etc, because of his religious beliefs and associations, as well as ridiculing him as being part of a "nut job fringe". The Defendants even have gone as far as to mockingly encourage the suggestion that Mr. Bisasor has a loathsome condition requiring that seats used by Plaintiff and his associates needed to be wiped down with cleaning agents for bad odors.

However, such harassing activity was not enough for Defendants. Not content simply to harass Mr. Bisasor, Defendants worked to damage his reputation. In or around April 2011, the Defendants published and promoted a public online thread stating that Mr. Bisasor was kicked out of a conference for practicing witchcraft, which is false. They also accused him of being part of a mafia organization and that he falsely complained of racism as the reason for being kicked out of the event, which also is false. Mr. Bisasor was subjected to ridicule, contempt and humiliation. Defendants therefore not only ridiculed Mr. Bisasor for

his religious beliefs and mischaracterized his beliefs, and further called him insulting names based on his religion, but they crossed the line into defamation by making several assertions of fact that are untrue, false and defamatory. The clear intention of the Defendants was to mock, ridicule and to ultimately create harm to Mr. Bisasor and to diminish him in the eyes of the community at large.

This case is also about an educational institution that has stood by with deliberate indifference allowing others to disparage and defame Mr. Bisasor, and has in other ways failed to protect Mr. Bisasor as it should, and has discriminated/retaliated against Mr. Bisasor when he, among other things, reasonably raised concerns about the handling of his complaints. Harvard deliberately stood indifferent to the existence of a racially hostile educational environment that negatively affected the plaintiff to the point where it affected both his academic life and his mental/emotional well-being. The Plaintiff was treated in a fashion that was biased, harassing and discriminatory and was further targeted, as Defendants waged a defamatory and malicious campaign of attacks against Mr. Bisasor. The damages have been and continue to be significant, damaging Mr. Bisasor's reputation and harming him emotionally.

This case is about the persistence of race discrimination in the upper echelons of higher education and about the retaliatory practices of Ivy League university administrators against students who object to the discrimination that they and others face. In this case, Mr. Bisasor, a black male, was one of the few blacks to rise to a leadership position at Harvard's School of Continuing Education. But he encountered subtle and not-so-subtle discriminatory conditions along the way, including but not limited to: stereotypic and damaging assumptions about his capabilities, restrictions on his work authority and autonomy as an elected student government leader that were not imposed on similarly-situated whites; disparate scrutiny of his activities and then disparate discipline, all of which escalated, as he served the community of Harvard students.

When he objected to discrimination on behalf of himself and for others, he faced retaliation. Mr. Bisasor alleges that racial bias adversely affected the terms and conditions of his educational pursuits and he contends that the treatment that he suffered speaks of a broader pattern and practice of race discrimination at this institution of higher learning. He also alleges retaliation for opposing illegal practices and that he found himself further marginalized. He therefore prays in equity for affirmative relief to effect change in Harvard's policies and practices. He also seeks relief for damages including punitive.

In addition to the issues of discrimination based on religion and race/gender as well as retaliation related to raising concerns about discrimination and mistreatment based on race and/or religion, this complaint also involves unfair and deceptive practices, breach of contract, breach of the covenant of good faith and fair dealing, unjust enrichment, infliction of emotional distress, civil conspiracy, violation of Massachusetts Civil Rights Act, 93A consumer protection violations, and violations of Title VII, Title IX and other wrongs, on the part of Harvard University and Harvard Extension School ("Harvard"), and its deans and/or other employees.

Although the problems of religious and gender discrimination also are important to address as outlined in this complaint, it is worthy of note that the Plaintiff has found that the problem of racial discrimination is the most elusive and difficult to solve and address. Given the repeated and continuous biased, harassing and discriminatory manner in which Mr. Bisasor has been treated and targeted (including a defamatory and malicious campaign of attacks against Mr. Bisasor), it is important to recognize the "intersectional" dimensions of the problem, which this complaint attempts to do. The conduct described herein also amounts to a breach of contract rights, defamation, libel, an invasion of privacy, civil conspiracy, unfair and deceptive practices, interference with contract and business advantage, and the wrongful infliction of emotional distress, among other things, all of which have caused Mr. Bisasor injury and substantial damages as outlined in this complaint.

## PARTIES

1. Plaintiff Andre Bisasor is an individual located at 3000 Presidents Way #3413, Dedham, MA 02026. He is a Black Jamaican male. He emigrated from Jamaica and is a naturalized United States Citizen.

2. Defendant "Harvard Extension School" is an educational non-profit institution located at 51 Brattle Street, Cambridge MA.

3. Defendant President and Fellows of Harvard College ("Harvard") is and represents a corporation organized under the laws of the Commonwealth of Massachusetts with its principal place of business in Cambridge, Massachusetts. At all times relevant, Harvard operates the Harvard Extension School and is responsible for its conduct as described herein.

4. Defendant Robert H. Neugeboren is an individual residing at 18 Tenney Street, Cambridge, MA 02139. He is the Dean of Students of Harvard's Division of Continuing Education or Harvard Extension School. He is a white male.

5. Defendant Michael Shinagel is an individual residing at 22 Grozier Rd Apt 2, Cambridge, MA 02138. He was the Dean of Harvard's Division of Continuing Education or Harvard Extension School from 1975 until 2013. He is a white male.

6. Defendant Huntington Lambert is an individual located at 51 Brattle Street, Cambridge, Massachusetts. He is the current Dean of Harvard's Division of Continuing Education or Harvard Extension School since 2013. He is a white male.

7. Defendant Margaret C. Andrews is an individual located at 56 Indian Hill Road, Medfield, MA 02052. She was the former Dean of the Management Program at Harvard's Division of Continuing Education or Harvard Extension School. She is a white female.

8. Defendant Shirley R. Greene is an individual located at 51 Brattle Street, Cambridge, Massachusetts. She is the current Assistant Dean of Students at Harvard's Division of Continuing Education or Harvard Extension School. She is a black female.[NB: Dean Greene has been designated, among other things, to run interference on any racial discrimination complaints that involve blacks and to protect her White superiors. This has been a strategic move by Harvard Extension School administrators to try to immunize from criticism or claims of illegitimacy any dismissal of racial discrimination concerns directed at administrators. However, the fatal flaw in this strategy has been that her White superiors have dispatched her to investigate complaints against them which calls into question her partiality since she is not able to investigate her bosses without bias or a conflict of interest. The facts here will be proven at a later time.]

9. Defendant Danslav Slavenskoj is an alumnus of the Harvard School of Continuing Education/Harvard Extension School. He is an individual residing at 2 Greenough Ave., #8 Boston, MA 02130. He is a white male.

10. Defendant "Es.com Affiliated Companies" includes all companies, parent companies and affiliates related to ExtensionStudent.com including companies, sole proprietorships or DBAs unknown, hidden or undisclosed to Plaintiff and that are to be determined at trial.

11. Defendant Jennifer Webb is an alumnus of the Harvard School of Continuing Education/Harvard Extension School. She was a regular poster on Es.com and goes by the alias "Girlygirl". She is a white female.

12. Defendant Ashley R. Pollock is a Harvard Extension School Teaching Assistant Ashley Pollock ("Ms. Pollock"). She was also the 2008-2009 Harvard Extension School Student Government President. She has also held various administrator positions at Harvard including Assistant Dean for Harvard Summer School. She is a white female.

13. Defendant Philip Harding is an alumnus of the Harvard School of Continuing Education/Harvard Extension School and Harvard Kennedy School. He was the 2010-2012 Harvard Extension School Student Government President and 2013-2014 Harvard Graduate Council President. He is a white male.

14. Defendant Krishan Arora is an alumnus of the Harvard School of Continuing Education/ Harvard Extension School. He was the 2012-2014 Harvard Extension School Student Government President. He is a male, believed to be, of East Indian descent.

15. Defendant Ken Vedaa is an alumnus of the Harvard School of Continuing Education or Harvard Extension School. He is a white male.

16. Jane & John Doe are those Defendants who have made, aided or abetted certain derogatory and defamatory postings relating to Plaintiff on Es.com and who have chosen to hide behind pseudonymous user names, who have yet to be identified. These postings made by these defendants have either originated in or been directed at those who live in the state of Massachusetts. Plaintiff also seeks to discover the identities of these John and Jane Doe Defendants and hold them accountable for their actions.

## JURISDICTION AND VENUE

17. The Massachusetts Superior Court has jurisdiction over this action pursuant to Massachusetts General Laws and the amount in controversy exceeds $25,000, exclusive of interest and costs. Venue in this forum is proper.

## BACKGROUND OF PLAINTIFF

18. Mr. Bisasor is an alumnus of the Harvard School of Continuing Education or Harvard Extension School (which is one of 12 degree-granting schools at Harvard University). Mr. Bisasor was a student in a graduate program at Harvard's School of Continuing Education and graduated in 2012. He was also involved in campus life as a Harvard student leader since 2007.

   a. Mr. Bisasor applied and was accepted into the graduate program in management at the Harvard School of Continuing Education in January 2006.

   b. Since his enrollment at Harvard, Mr. Bisasor demonstrated his academic ability and seriousness as a student while taking challenging classes in law, economics, finance, negotiation, etc, taught by Harvard instructors/professors, and had maintained a GPA between 3.8 and 3.9 for most of his time at Harvard.

c. By May 2007, Mr. Bisasor was elected the VP of HESA, within his first semester at Harvard.

d. Mr. Bisasor never sought, on his own, to be a leader in these circumstances. Mr. Bisasor was asked by his peers to get involved in student government in 2007 as the VP of student government.

e. Mr. Bisasor was then asked again by his peers to run for student government president in 2009. When the call for public service came, he put his own interests and personal goals aside and stepped up to serve the student body and the school with excellence and distinction. He was the first black male, the first Jamaican and the first Evangelical/Pentecostal-Charismatic Christian to be elected student government president at Harvard's Division of Continuing Education/Harvard Extension School.

f. He has also served as a student organization leader for several student clubs and was the pioneer of several groundbreaking conferences, events and program both at Harvard Extension School as well across Harvard as a whole.

19. Mr. Bisasor has also been a contributing and upstanding member of the local Boston and surrounding communities for over 8 years.

20. Mr. Bisasor also has done work on a non-profit basis to help underprivileged youth learn about leadership and entrepreneurship. He has worked with non-profit organizations in the Boston community and has served as a mentor and judge for business plan competitions for underprivileged youth in the Boston community.

21. Plaintiff operates as a self-employed small business consultant within the Greater Boston region but he uses the web and other media to reach a national and international audience of prospective clients and business contacts including the Caribbean, Africa, Asia and Europe. Plaintiff's business frequently involves prospective clients, business associates and other professional contacts looking him up on the internet in order to determine if they will do business with or associate with him.

22. Plaintiff also does work as a professional speaker and/or Christian minister at conferences in and outside of Massachusetts and in other parts of the US where he has been invited to speak on either business-related topics or on topics related to the Christian religion. He also has been invited to speak or lecture in the university setting on similar topics.

23. Mr. Bisasor has also developed a strong reputation as an effective conference organizer, particularly in the fields of negotiation and leadership. He has also organized or chaired large-scale conference events both in and outside of Massachusetts. In his capacity as a conference organizer, Mr. Bisasor was known for his ability to persuade, recruit and attract high-profile speakers and notable figures to events he organized, including Nobel Prize winners, celebrities & newsmakers, high-ranking diplomats, Fortune 500 senior executives and

multimillionaire/billionaire entrepreneurs. Mr. Bisasor also had a track record of being able to persuade such speakers to agree to significantly reduced or fully-waived speaking fees.

24. Mr. Bisasor has also organized Christian events and conference for local, national and international audiences and has also again been able to attract nationally and internationally renowned speakers on the subject. Mr. Bisasor has received recognition within the larger Christian community for organizing such events.

25. Mr. Bisasor is also the founder of the Negotiation and Leadership Conference, which is broadly recognized as one of the most influential gatherings of thought leaders on negotiation in the world. He is also the president and founder of a Boston-based social-enterprise/non-profit focused on equipping underprivileged youth and disadvantaged communities with negotiation skills as an economic empowerment tool. Mr. Bisasor is also an independent consultant who advises fortune 500 corporations, governments and private individuals on negotiation strategy and international business issues.

## CONTEXT OF PLAINTIFF'S CLAIMS

26. When Mr. Bisasor was elected as the first black male to be president of the Harvard Extension Student Association in 2009-2010, he raised concerns during his term (through an initiative that he launched called the Ethics & Diversity Initiative) about the overall number of blacks (both male and female) in leadership positions at the Harvard Extension School, whether as deans, administrators, staff or instructors. At that time, to his knowledge, there was only one black female, Donna Clark who was a junior staff person in the management program. Regarding instructors, he had heard of one or two black instructors at the time.

27. On information and belief, HES had engaged in a cynical practice of hiring one or at most two black females in order to create the appearance of diversity without providing actual equal opportunity.  Their policy disfavors employees of color, particularly black males, and denies them equal opportunity.

28. Mr. Bisasor also pointed out to administrators that these **"very low numbers of black deans, senior administrators, staff and faculty at HES is indicative of a culture that, whether unintentionally or otherwise, excludes black leadership"**.

29. Mr. Bisasor had therefore pointed out to administrators that **"given the numerous instructors that teach at the Extension School, having a very small number of black instructors to serve a student body of approximately 15,000 students is still a dismal representation of diversity"**, especially given the values that the University as whole had been trying to foster and encourage throughout all Harvard schools.

30. That aside, Mr. Bisasor has since further indicated to the administration that the most important change to be had relates to the processes and procedures for complaints about racial discrimination by students. Mr. Bisasor has repeatedly championed the issue of **the lack of clearly articulated policies in a written format for the benefit of students and to protect students from the capricious application of standards.** This was a major weakness at HES. The processes of the Harvard Extension School, particularly as it relates to race discrimination, had seemed to be either non-existent or arbitrary.  This results in a denial of due process for students. Mr. Bisasor has tried repeatedly to get answers to questions about the process previously but much of it has still not been provided. Mr. Bisasor has argued that the

Extension School would greatly benefit from having explicit written policies which would help and protect both administrators as well as students. The processes currently in place are unclear or confusing. There is no standard process that can be discerned. In order for any student to intelligently go about making complaint, they need to be able to understand the process better.

31. Mr. Bisasor has also pointed out to administrator that "much of the entire staff at Harvard Extension School appears ill-equipped to truly handle these issues in a fair, impartial and above-board manner. An investment in proper training for staff is much needed".

32. As part of the larger context, it is important that, in today's society, though there has been tremendous progress, the prevailing attitude among a significant segment of the American population, as exemplified by recent cases of police shootings of unarmed black males, still reflects an underlying bias against black males that demonstrates that the black male is still, to some extent, "under attack" in our society. The fact that blacks males of all walks of life, even educated and progressive ones, are not immune to this dynamic was reinforced by the recent example of Henry Louis Gates (an eminent black professor at Harvard), being arrested in his own home in Cambridge, Massachusetts by an overly aggressive police officer, who was called by neighbors after Mr. Gates was mistaken as an intruder to his own home.

33. On the other side of the spectrum, many astute observers agree that the bias against black males has played out in both subtle as well as blatant ways with how President Barack Obama has been treated as the first Black US President. The unprecedented ways in which he has been attacked and undermined as well as the relentless attempts to discredit him, no matter what he does or the successes he has, reinforces the sense that black male leadership in America is in a state of crisis. If a black US president can suffer these subtle and not-so-subtle roadblocks to success, then how much more is it possible for everyday black American males to suffer racially-inspired roadblocks that can derail their careers, their hopes and dreams, and their path to success. If black male leaders are given the opportunity to lead but yet they are setup to fail, this reinforces the idea (whether consciously or unconsciously) that black males should not be in leadership in the first place and this scenario only serves to undermine a central goal underscored in Martin Luther King's dream of a truly equal society. But it is even a worst outcome if black male leaders are not given the opportunity to lead in the first place, as is the case at HES.

34. The work of esteemed Harvard professor Mahzarin Banaji, and others, has shown that implicit bias is rampant in our society and **that many people carry an unconscious racial bias against blacks but particularly against black males**. This implicit bias can be manifested in different ways: 1) the attempt to view blacks with suspicion more quickly and easily, 2) the denial of the benefit of the doubt in circumstances where credibility is being assessed, 3) the ease with which disrespect and indignities directed towards black males are assumed to be acceptable, 4) the jealousy and resentment that is easily aroused when blacks achieve success or promotion, 5) the behind-the-scenes attempts to use informal networks to assassinate the character of black leaders, 6) the ease with which subordinates become disloyal and undermine black leaders, etc. Research has also shown that implicit bias has implications for a variety of situations from a jury verdict in a criminal trial to an assessment for a job promotion. It also has an impact on mundane things like the price one pays for a car or a home to life-and-death issues like receiving an organ transplant or quality medical care.

35. Since Harvard Extension School is at the forefront of adult continuing education and online education, HES will likely interface with more and more African-American students in the community as these learning options become more popular. As such, it is predictable that the racial issue is going to become a growing management concern at Harvard Extension School as there could potentially be more instances of racial complaints and racial tensions in the future among students as well as between students and administrators/faculty. As a result, HES must be prepared to manage these issues well because the price of mismanagement will potentially be heavy. **One key strategic way for HES to manage these potential issues is to select a more diversified staff including deans, senior administrators and faculty as well as to encourage the formation of a student group at HES that focuses on advancing the progress of black extension students.**

36. Research has shown that our society has much more of a problem with covert or implicit bias that it is willing to admit and it is no less true at Harvard Extension School (and at Harvard University as well). This will be demonstrated with more detail in this complaint and in subsequent documentation to follow.

37. The covert, implicit, and sometimes unconscious nature of the problem is the core essence of the racial discrimination problem in the 21st century especially in an intellectually sophisticated environment such as at Harvard. The issue of covert racial bias or implicit bias is only recently beginning to be better understood. The ability to analyze, quantify and articulate these issues is a difficult and sometimes elusive task. Only recently have we begun to even understand, for example, the impact on psychological and even physical health that racial stress can have on Blacks.

38. Furthermore, the black male historically has been the center of racial assault (whether overtly or covertly, whether physically or psychologically) in American culture for centuries. Ever since slavery, the quintessential "outspoken black male", with innate leadership ability, was targeted. The objective by white slave owners was to "break" them in front of others in order to keep the masses of black slaves subdued. In later times after slavery was abolished, such as during reconstruction and even as late as the 50's and 60's during "Jim Crow", Black males were especially targeted for lynching. Those who spoke against wrongs or were defiant to injustices were made to be "examples" in particularly brutal ways.

39. Today, the types of violence that black males suffer occur not only in the more obvious context of police shootings but also, in more subtle ways in the pursuit of their education and their careers; and this is informed also as part of the oppression by a society and institutions that ignore or don't take seriously the concerns about racial discrimination and harassment that black males bring to their attention.

40. Professor Max Bazerman at Harvard Business School, explains in his recent book the "Power of Noticing" how several large corporations fail to notice when wrongdoing is occurring within their organization. He attributes this to a cognitive error that causes executives to look the other way when their own people are engaged in wrongdoing. Similarly, Harvard Extension School has looked the other way in the matter related to this complaint because they would rather protect their own people instead of holding them accountable and they would rather not believe that their own people could be guilty of discrimination, retaliation and unfair/deceptive acts. It is for these same reasons that there was an Enron scandal, a Worldcom debacle, a Penn-State scandal, a Texaco scandal and any number of scandals involving

management and boards of large corporations, who ignore the cry of whistleblowers who bring wrong doing to their attention.

41. The racial injustices that are at the center of recent protests in Ferguson and elsewhere in the nation are not only indicative of systemic problems with police policies and training but they are also indicative of a larger problem of racial bias that operates both overtly and implicitly and that pervades all of our institutions. Organizations and people are way more sophisticated today than to go around carelessly blurting out obviously offensive racial epithets. Yet it is known that bias can be imbedded into systems, policies and culture; and that racial bias and white privilege can be codified into practices that show up in micro-attitudes and processes that disfavor treating blacks equally, fairly and with the same benefit of the doubt as any white person. These indicators are more hidden, more covert, less easy to detect and sometimes are unconscious or unintentional.

42. When it said that "black lives matter", it is not only relevant to police violence and unjust police killings; it is all relevant to black lives in the context of education and corporate America. When someone interferes with and discriminate against a black male, they fight against his chance to make his life matter. They set him back from achieving his potential, which not only robs society of a productive contributor but also a positive role model for future blacks to follow and aspire to; they rob society of the ingenuity, the intellect and diverse thinking that our society and organization need in order to become better and stronger. In Mr. Bisasor's case, rather than nurture and support his intellectual development, Harvard Extension School has sought to impede, block, and undermine it, whether consciously or unintentionally. This is a wrong approach and it exemplifies how Harvard Extension School has from the very beginning squandered an opportunity to develop and support a potential black male leader who could be an example of how the school can help black males achieve their full potential.

## COUNT I - DEFAMATION
### (Defendants)

43. Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

44. In or about April 2011, Mr. Dan Slavenskoj (an alumnus and an agent of Harvard Extension School) created and launched an online message thread entitled **"Andre Bisasor Kicked Out of Conference"** ("Online Thread") on a Harvard Extension-affiliated website named "ExtensionStudent.com", with several postings wherein Mr. Slavenskoj asserted certain facts as follows:

    a.  *"Andre Bisasor was reportedly kicked out of the Social Transformation Conference after it was revealed he secretly practices what was termed by some as "witchcraft"."*

        i.  Mr. Bisasor practices witchcraft

        ii.  Mr. Bisaor secretly practices witchcraft

        iii.  Mr. Bisasor was kicked out of a conference because it was revealed that he secretly practices witchcraft

    b. *"Andre has issued a statement claiming that the removal was due to racism, and is set to join the protesters outside the conference today. http://socialtransformation2011.org/witchcraft.html"*

        i. Mr. Bisasor claimed that he was really kicked out of the conference due to racism.

    c. *"Hmmm... Was it discovered that Andre is a member of the Harvard Mafia?"*

        i. Mr. Bisasor is insinuated to be part of the Harvard mafia, implying criminality and shadowy associations.

45. These facts asserted by Mr. Slavenskoj were completely made up and manufactured by Mr. Slavenskoj and had no basis in reality.

46. Without reason or provocation Mr. Slavenskoj also arbitrarily injected race into the thread and falsely accused Mr. Bisasor of introducing the issue of race into Mr. Slavenskoj's manufactured assertions. This insertion of race by Mr. Slavenskoj stirred up racial tensions with Mr. Slavenskoj's followers and friends on ExtensionStudent.com and served to incite further vitriol against Mr. Bisasor. Mr. Slavenskoj also poked fun at Mr. Bisasor in the process as Mr. Slavenskoj sought to falsely create the impression that Mr. Bisasor had arbitrarily and baselessly complained about race as the cause for his being kicked out of the event referenced. This false assertion by Mr. Slavenskoj invokes and invites attack upon Mr. Bisasor's credibility and character as a Black male, as a professional businessperson and as a responsible citizen in society. Mr. Slavenskoj engaged in a racial mocking that made light of the issue of racism while also intending to intimidate Mr. Bisasor and other Blacks. Although Mr. Bisasor had not himself injected race into this situation in any way, Mr. Slavenskoj's instigation of race into Mr. Slavenskoj's manufactured assertions was an attempt to engage in a racial mocking in his posting, which serves to create a chilling effect on any Black person who could in good faith be concerned that they could be targeted because of race, and that if they ever do so in any way, they will be attacked, mocked and defamed in the way it was done to Mr. Bisasor.

47. Mr. Slavenskoj has also made or encouraged other postings on ExtensionStudent.com that created a racially hostile environment for Blacks on ExtensionStudent.com. This was not the first time that Mr. Slavenskoj or his followers has instigated or encouraged disparaging attacks against other Black students at Harvard Extension School.

48. On information and belief, Mr. Slavenskoj also sought to stereotype Mr. Bisasor (as a Black male originating from the Caribbean island of Jamaica) as a person associated with witchcraft and the fact that Mr. Slavenskoj injected race into the equation indicated that his intent was to imply this stereotype. [NB: In some communities, accusations of witchcraft are a very serious matter as practitioners of witchcraft are seen or understood to be the epitome of evil and the

cause of misfortune, disease and death. In Africa and some parts of the Caribbean, for example, practitioners of witchcraft are hated persons in society and subjected to punishment, torture and even death.]

49. In or about November 18, 2011, Mr. Bisasor discovered these defamatory statements for the first time when it was brought it to his attention.

50. In or around the same time, Mr. Bisasor spoke with Mr. Slavenskoj after an on-campus meeting for the Harvard Extension Student Association (HESA), the student government of the Harvard Extension School. Mr. Bisasor brought to Mr. Slavenskoj's attention a number of online threads and postings on ExtensionStudent.com that Mr. Bisasor believed to be derogatory and defamatory as it pertain to him including ones about his religious beliefs. Mr. Slavenskoj agreed that he would take down the online threads with such postings.

51. On November 18, 2011, Mr. Bisasor emailed Mr. Slavenskoj reminding him to take down the online threads as he agreed, as follows: *"Hi Dan, It was a good discussion tonight. I appreciate your willingness to accommodate my request. As discussed, here are the threads that were brought to my attention. Please remove these threads (as well as any other threads that attempt to disparage my name in any way). Many thanks, Andre"*…

52. On December 2, 2011, Mr. Bisasor reminded Mr. Slavenskoj again as follows: *"I have asked you politely and I am asking you again to take down or, at the very least take from from public view, threads that have negative and disparaging comments about me. You indicated to me and my wife at the HESA meeting on Nov. 18 that when others in the past ask you to take down disparaging material about them, you usually would immediately accommodate their request. As such, you indicated that you would accommodate my request for the same thing just as you have done in the past for others or would do in the future for others with similar requests. It has been two weeks now since I asked and you gave me your word that you would act on my request and this disparaging information is still unchanged on your website as of today. This is creating harm for me in my due course of business interactions with others and is damaging to my name and reputation. Please remove this material asap so as to stop further harm from occurring…"*

53. However, Mr. Slavenskoj refused to take down the online threads/posts and made clear that his intentions were to interfere with Mr. Bisasor's online profile and perception and to defame him in his personal and professional capacity.

54. In or around this same time Mr. Slavenskoj and other students began a campaign to interfere with Mr. Bisasor's speaking engagements. An attempt was also made by Mr. Slavenskoj and other students to have Mr. Bisasor shunned, banned, and/or removed as a student leader at Harvard Extension School, simply because of his religious beliefs and associations. His religious beliefs were attacked, misrepresented and caricaturized in order to subject him to ridicule, contempt, hatred and ostracism.

55. On December 4, 2011, Mr. Slavenskoj responded indicating his refusal to take down the aforementioned threads/postings as follows: "*I have reviewed the material you reference on the site. As a public figure, you must be aware that there exist differences of opinion on the controversial matters you have made yourself to be a spokesman for. The forum serves as a venue where these differences may be aired and made public. This is to your advantage, as by familiarizing yourself with opposing views, you gain valuable feedback and increase your understanding of those who's opinion differs from your own. There is value to this discourse in and of itself, regardless of the specific issues involved. I would be happy to meet with you in person to discuss this so that any misunderstanding may be resolved in a convivial atmosphere.*"

56. On December 8, 2011, Mr. Bisasor responded asking Mr. Slavenskoj again to take down the threads/postings. Mr. Bisasor also laid out the reasons why Mr. Slavenskoj should do so including that it was harming his professional reputation and his business as follows:

> Dan,
>
> I am a bit puzzled by your reply.
>
> You gave me your word that you would accommodate my request. Now you are going back on your word. What is the reason for this?
>
> I am not a public figure and I am not a spokesman for anything, contrary to your assumptions. I have not spoken about anything publicly in a way that would me make a spokesman, nor am I recognized as a public figure by any traditional media standards. My being elected the president (3 years ago) of a relatively small student association at HES with an exclusive and limited student voter base of degree candidates only in a non-public internal student-based election for a student organization (at a continuing education program) that does not have its own public charter nor is it officially recognized as an organization by the state of Massachusetts, would hardly make me a public figure.
>
> Moreover, it is unclear why (even if I were to entertain your arguments for a moments) you must make threads that contain derogatory posts about me "public, for the whole world to see" rather than simply for the internal group of registered users.
>
> This seems particularly intentional on your part to try to create more traffic to your site at the expense of my personal name and reputation, which is to your "advantage", not mine. Or otherwise, it seems personal to me, that you dislike me personally and thus treat me differently for some personal reason.
>
> One thread in particular that you started was entitled "Andre Bisasor kicked out of conference", which basically mocks my religious beliefs and cast aspersions upon my name and my religious practices. What benefit is this thread to public discourse, other than to subject me to public ridicule? And why would it need to be placed anywhere other than in the confidential thread, though it really should be removed?

Lastly, I am not obliged to go to your site to "get feedback" on anything. You do not have the right to dictate to me how and where I should seek to "increase my understanding" of anything. But you do have an obligation to ensure that you are not facilitating libel, defamation, intentional infliction of emotional distress, cyber-stalking, cyber-bullying, online harassment (particularly those based on protected classes such as religion or race), all of which are contained in one form or another in the threads that i brought to your attention and, which also, by the way, create liability for you, personally.

And I should not be forced to have to go on your site to defend myself against derogatory insults and disparaging attacks on my name, which will only spur on more insults and attacks to your advantage as you attempt to gain commercial advantage from the uptick in traffic and membership due to such controversies made public by you.

Your policies for what is moved to "confidential" seems arbitrary at best or, at worst, intentional in treating me differently for your own purposes or reasons.

Take for example your moving the recent HESA censorship campaign thread to "confidential". Why move this particular thread but not accommodate my requests? It seems the answer has to do with protecting the image of your site (the thread was making your site look bad) and so you remove threads or posts that are damaging to your site. You also remove posts or threads from public view that criticize you in your role as owner and administrator, assumably to protect your image and reputation (yet one could argue that as the notorious owner and administrator of your site, you are a public figure of sorts by your own standards, aren't you?)

When other HESA presidents have asked you to remove disparaging posts, you have done so. When school administrators ask you to remove certain negative posts about them, you do so. When other students or student leaders ask you to remove damaging posts, you do so. You even told me that if negative stuff was posted about Drew Faust, you would remove it especially if asked. So why am I being treated differently?

So am I asking you again politely. Please remove the aforementioned threads or at the very least, move them from public view to the confidential section of the site.

Please let me know when this is done. I am asking for this to be done expeditiously as your site has and is currently creating harm in my present professional and/or business dealings and so time is of the essence.

I look forward to your reply:

Andre

57. On December 8, 2011, Mr. Slavenskoj responded indicating once again his refusal to take down the threads/postings. Mr. Slavenskoj did not provide any information which supported the defamatory claims. When confronted with questions that undermined his position, Mr. Slavenskoj was evasive and intentionally ambiguous. Mr. Slavenskoj also tried to justify his malicious campaign on the basis that Mr. Bisasor was a public figure, as follows:

Andre,

You obviously misunderstood. What I did say, is that I would remove comments about private students that I found harassing. Public figures, on the other hand, deserve to be debated. Please be mindful not to attempt to twist my words in the future.

You are a public figure, and you will be discussed in public.

I hope you have a nice holiday season, and take some time to reflect on this matter.

Regards,
D.S.

58. In or around December 8, 2011, Mr. Slavenskoj chose to reopen the thread conversation **"Andre Bisasor Kicked Out Of Conference"** that he started in April 2011, with a new effort at harassing and disparaging Mr. Bisasor. Mr. Slavenskoj published an inaccurate and edited version of Mr. Bisasor's private email to Mr. Slavenskoj in order to mislead readers and subject Mr. Bisasor to public ridicule and humiliation and spur on further disparaging attacks by Mr. Slavenskoj's followers. Mr. Slavenskoj here makes light of the idea that defaming Mr. Bisasor as a witchcraft practitioner is harmful to him and his professional reputation. Mr. Slavenskoj also falsely states that Mr. Bisasor claimed that Mr. Slavenskoj made the posting due to racism, again inserting race into the public discussion. Mr. Slavenskoj did this to poke fun at Mr. Bisasor and to subject him to ridicule and contempt. Mr. Slavenskoj followed up by making several individual message postings that sought to ridicule and defame Mr. Bisasor. Mr. Slavenskoj knew that these statements were false and defamatory.

This just in, from Andre Bisasor. Apparently, an April Fool's joke post that claims he is practicing witchcraft is harming his business. And in typical Andre fashion, he is also claiming racism.

From: xxxxxxxxxxxxxxx
Subject: Re: Andre Bisasor
Date: December 8, 2011 2:41:00 AM EST
To: ***************@extensionstudent.com
Cc: xxxxxxxxxxxxxxx

One thread in particular that you started was entitled "Andre Bisasor kicked out of conference", which basically mocks my religious beliefs and cast aspersions upon my name and my religious practices. What benefit is this thread to public discourse, other than to subject me to public ridicule? And why would it need to be placed anywhere other than in the confidential thread, though it really should be removed?

Lastly, I am not obliged to go to your site to "get feedback" on anything. You do not have the right to dictate to me how and where I should seek to "increase my understanding" of anything. But you do have an obligation to ensure that you are not facilitating libel, defamation, intentional infliction of emotional distress, cyber-stalking, cyber-bullying, online harassment (particularly those based on protected classes such as religion or race), all of which are contained in one form or another in the threads that I brought to your attention and, which also, by the way, create liability for you, personally.

And I should not be forced to have to go on your site to defend myself against derogatory insults and disparaging attacks on my name, which will only spur on more insults and attacks to your advantage as you attempt to gain commercial advantage from the uptick in traffic and membership due to such controversies made public by you.

So am I am asking you again politely. Please remove the aforementioned threads or at the very least, move them from public view to the confidential section of the site.

Please let me know when this is done. I am asking for this to be done expeditiously as your site has and is currently creating harm in my present professional and/or business dealings and so time is of the essence.

I look forward to your reply

Andre

59. The above statements by Mr. Slavenskoj about Mr. Bisasor are allegations of fact presented in a manner that was either intentionally or carelessly misleading. Mr. Slavenskoj has selectively chosen to edit Mr. Bisasor's private email to Mr. Slavenskoj in a way that excluded other statements made in Mr. Bisasor's email, with the goal of casting Mr. Bisasor in a negative and false light. Mr. Slavenskoj essentially edited his statements as part of a manipulated piecemeal message woven together to intentionally or recklessly deceive and misinform readers.

60. Shortly thereafter, several of Mr. Slavenskoj followers/members joined in on the harassment, including also another ExtensionStudent.com website manager (Mr. Ken Vedaa), who not only ridiculed Mr. Bisasor for his religious beliefs and mischaracterized his beliefs, but further called him insulting names. The clear intention was to mock and ridicule Mr. Bisasor and subject him to public scorn, ridicule and contempt and to diminish Mr. Bisasor's esteem in the community and beyond.

61. Several other Mr. Slavenskoj's followers/members joined in on the harassment, making further disparaging attacks on Mr. Bisasor and levied vitriol at Mr. Bisasor including a number of personal insults.

62. Mr. Slavenskoj later further laid out a case to show that in fact Mr. Bisasor is a believer in and promoter of witchcraft.

63. By defaming him, and creating confusion over whether Mr. Bisasor secretly practiced witchcraft, Mr. Slavenskoj sought to publicly humiliate Mr. Bisasor and force/resign him to live with a continual question mark over his "secret" religious practices and worship.

64. The net effect was that Mr. Bisasor was intimidated into not sending any more private emails to Mr. Slavenskoj for fear that he would publish them in an edited/inaccurate way to present Mr. Bisasor in a false light. Mr. Bisasor was also made to feel as though he could not continue any attempt to communicate with Mr. Slavenskoj about these issues nor defend himself publicly because of the threat from Mr. Slavenskoj that he would pile on the attacks. Mr. Bisasor was left in a state of fear, intimidation, and emotional distress.

65. Mr. Bisasor also discovered other posts on ExtensionStudent.com, made by followers and friends of Mr. Slavenskoj, suggesting that Mr. Bisasor was an "Apostle of Satan" and was "guided by Satan".

66. Mr. Bisasor has also been subjected to other defamatory statements made on ExtensionStudent.com including comparisons of Mr. Bisasor to Former US President Richard Nixon and to Adolf Hitler.

67. These defamatory comments can easily be found using a search on the internet search engine Google. By entering a person's name into the search engine, the engine will list various threads in which that name appears as a result. As of Friday, November 7, 2014, within the top two results for "Andre Bisasor" was the thread and comments that had been posted on extensionstudent.com relating to the accusation of witchcraft. A Google search of Mr. Bisasor's name reveals that this online thread is the number two headline in the search results. This means that since its initial posting in April 2011, with the titillating and controversial title "Andre Bisasor Kicked Out of Conference", the online thread has been viewed by many people over the years, making it a top ranking Google search result of Mr. Bisasor's name on the internet. This has devastating effects for Mr. Bisasor's business and professional dealings because the nature of his business require that prospective contacts, associates and business collaborators and customers check him out on the internet as part of a validation and authentication process.



68. Defendants have maliciously and systematically attacked the Plaintiff on Extensionstudent.com message boards in other ways over the course of almost 3 years. All of these comments relating to Mr. Bisasor as well as those involving his religious practices, the accusations of witchcraft and the related issues have affected Mr. Bisasor's reputation in the community as a businessperson and in the community as a devout Christian and rising Christian leader. It has created psychological, emotional, and financial trauma for the Plaintiff.

69. On information and belief, when members of the public at large reads content on ExtensionStudent.com, they are led to believe or conclude that the statements are made by actual Harvard students in a legitimate online Harvard university forum, thereby giving it the credibility of being factual and truthful and thereby increasing the probability that the public would treat the statements seriously and thereby cementing the impact of any defamatory statement. Mr. Slavenskoj trades on this impression of a Harvard affiliation in order to leverage and enhance site membership, site traffic and revenues for the site as well as his own notoriety.

70. In or about January 25, 2012, Mr. Bisasor's family who lives in Jamaica found the online thread by accident when his younger sister was researching information online and found that the last name "Bisasor" brought up this unseemly information about the accusations of witchcraft. Mr. Bisasor's younger sister, as well as his entire family, was deeply disturbed and embarrassed by the fact that not only was their family member being accused of witchcraft but now the family name, which is a unique name, was associated with witchcraft. Being her older brother, she had looked up to Mr. Bisasor, as someone to be respected and admired, but this was now being undermined by the harassing and defamatory activity of the Mr. Slavenskoj and his cohorts:

> Sent: Wed, Jan 25, 2012 4:56 pm
> Subject: FW: Distressing Comments
>
> Andre, the following link was sent to me by your sister Jordanne.....she was researching information on the net and found this most unfortunate site which contains some rather serious allegations and comments about you which are the source of much embarrassment and concern to us.  What exactly is going on?....who are these people...and why are they persecuting you like this?.   Please read and explain to us as soon as possible.
>
> Dad.
>
> http://extensionstudent.com/comments.php?DiscussionID=2562&page=1
>
> Sent: Wed, Jan 25, 2012 5:09 pm
> Subject: FW: Distressing Comments
>
> Andre,
> Here is another link...these people are certainly trying to sully your good name. If they are students at Harvard as it appears to be the case...then something must be done immediately to get them to stop this mud-slinging and character assasination.  Have you brought the matter to the school's administration?...this situation is untenable and is a poor reflection on this noble institution.  Please call me as soon as possible to discuss this matter that is causing the entire family pain at this time.
>
> Dad.
>
> http://extensionstudent.com/comments.php?DiscussionID=2640

71. On information and belief, Mr. Slavenskoj has also conspired with other employees of Harvard Extension School (as well as with other students) to engage in a defamatory campaign against Mr. Bisasor.

72. Mr. Slavenskoj is also himself very active as a poster on ExtensionStudent.com and is not simply a neutral behind-the-scenes administrator of the site. He has been involved in directing discussions on the site especially those involving student government elections.

73. Mr. Slavenskoj has also previously engaged in manipulation to prevent Mr. Bisasor (and those who would support him) from responding to smears directed at Mr. Bisasor. Mr. Slavenskoj has even gone as far as creating text and attributing it to Mr. Bisasor, making it appear as if Mr. Bisasor wrote text that he did not. It was unprecedented that any person would edit text of any student much less that of a student government president. Mr. Slavenskoj has targeted Mr. Bisasor for such unfair and deceptive editing and manipulation of text being presented to the public.

74. Mr. Slavenskoj has also previously prevented Mr. Bisasor from deleting or removing his account from ExtensionStudent.com. On one occasion Mr. Slavenskoj not only blocked Mr. Bisasor's attempt to remove his account but also prevented him from removing prior posts of Mr. Bisasor, when others were allowed to do so, and Mr. Slavenskoj went as far as to restore posts that were deleted by Mr. Bisasor when Mr. Bisasor attempted to remove or deleting his account in protest to Mr. Slavenskoj's unfair and deceptive acts. Mr. Bisasor was further locked out of the ExtensionStudent.com site and was prevented from any further ability to edit, remove or control any text associated with his posts. Other students (at least 3 in particular, including longstanding and respected posters on the site) who came to Mr. Bisasor's defense or otherwise sought to express their concern with what was happening themselves became subject to smears or otherwise had their posts removed or deleted by Mr. Slavenskoj.  This is unfair and deceptive practice as unwitting students and members of the public were presented with a manipulated message, one where they were unaware that text being written was done by someone else other than the account-holder, and one where threads of replies were deleted or manipulated in order to drown out criticism of the site or site owner.

75. Mr. Slavenskoj has also mis-characterized Mr. Bisasor replies and made false statements about the reason that Mr. Bisasor tried to delete his account from ExtensionStudent.com (e.g. insinuating that it was because Harvard Extension School administrators got involved, which was false).

76. Mr. Slavenskoj also has worked in collusion with others to present Mr. Bisasor in a false and negative light and prevented Mr. Bisasor from replying to such smears by locking Mr. Bisasor out of certain threads but still allowing other posters to insert comments against Mr. Bisasor in those same threads. On other occasions, Mr. Slavenskoj has blatantly removed posts by those who try to give the other side of a story in defense of Mr. Bisasor in order to leave a one-sided skewed version without any chance or opportunity for Mr. Bisasor or others who supported

him to correct the record. This is particularly malicious, vindictive, unfair and deceptive behavior.

77. Mr. Slavenskoj has also sought to commercialize the ExtensionStudent.com site with the introduction of affiliate advertising, buy-sell-trade categories, etc, indicating a clear interest in turning the ExtensionStudent.com site into a commercial interest, which is an endeavor beyond its original purpose for discussion. As a result, traffic and increasing traffic became of paramount interest to Mr. Slavenskoj with the consequence that any controversy or drama instigated would have likely the effect of increasing traffic. The ExtensionStudent.com thus devolved into a "tabloid-like" forum with private agendas driven by Mr. Slavenskoj and his collaborators, including attempts at influencing and/or undermining student government elections at the Harvard Extension School.

78. Mr. Slavenskoj was untruthful about his promise to remove disparaging postings about Mr. Bisasor.

79. Mr. Slavenskoj has a policy of removing disparaging posts upon request of the affected person and has chosen to remove several disparaging posts of others including those about himself, but Mr. Slavenskoj has refused to do so for Mr. Bisasor, treating him in an unequal and disparate way.

80. Mr. Slavenskoj also was untruthful in stating that Mr. Bisasor was a public figure. There is absolutely no evidence Mr. Bisasor was a public figure at the time the statement was made by Mr. Slavenskoj. Moreover, Mr. Bisasor was not in a position to rebut such defamatory statements and had no access to public communication, as truly public officials typically are.

81. Mr. Slavenskoj has intentionally placed the setting of the above-referenced online threads as "public view" rather than "member only view" thus keeping it in a public space when he could have easily put it into a private members only space.

82. Mr. Slavenskoj promoted disdain of Mr. Bisasor and harmed Mr. Bisasor's reputation in the community and beyond.

83. On information and belief, Mr. Slavenskoj's publication was designed to harm Mr. Bisasor and motivated by a desire to punish and harass him for his religious faith.

84. Mr. Slavenskoj clearly misled his readers with his posts. When Mr. Bisasor asked him to remove the post, Mr. Slavenskoj chose to ignore his request and instead stepped up his relentless campaign against Mr. Bisasor. Mr. Bisasor has received feedback that his speaking opportunities have been affected by these public posts that call into question his credibility and stature as a speaker. Mr. Slavenskoj's campaign produced his desired results. Mr. Bisasor was the subject of more attacks by other members of the community, receiving angry, threatening

and disturbing messages from Mr. Slavenskoj's followers. Mr. Bisasor's reputation has been severely and adversely impacted.

85. Under the Massachusetts libel law, libel/defamation is committed when: (1) the defendant published a written statement; (2) of and concerning the plaintiff; that was both (3) defamatory, and (4) false; and (5) either caused economic loss, or is actionable without proof of economic loss.

86. That the statements are defamatory is clear. The statement can reasonably be read as discrediting Mr. Bisasor in the minds of any considerable and respectable class of the community, especially the Christian community. Moreover, these words have that the effect of heaping disparagement upon Mr. Bisasor when viewed contextually, i.e. in the light of attendant circumstances.

87. The Mr. Slavenskoj communicated the defamatory statements about Mr. Bisasor to many third parties.

88. These statements are false, were made with malice, were not honestly held opinion, were not made accidentally or disseminated accidentally and were intended to be made public.

89. Mr. Slavenskoj ignored repeated requests by Mr. Bisasor to remove the websites posts including clear notice that these statements were harming his reputation and his business. Mr. Slavenskoj was also put on notice that his assertions were false, which also bears on the issue of malice. Mr. Slavenskoj's actions betray a malevolent intent and ill-will towards the Plaintiff.

**Harvard's Involvement with Defamation Towards Plaintiff**

90. On information and belief, ExtensionStudent.com is operated as a school-affiliated online forum with the blessing and approval of Harvard Extension School and as an online university community forum that is closely associated with Harvard Extension School in the following ways:

a) ExtensionStudent.com provides certain benefits to the Harvard Extension School and to its students;

b) Harvard Extension School administrators enjoy indirect or direct control over the content and postings on ExtensionStudent.com;

c) Harvard Extension School has benefitted from ExtensionStudent.com as a news source for information on classes, events, networking, socializing and other activities at Harvard Extension School;

d) the Harvard Extension Student Association (the official student government of Harvard Extension School) initially sanctioned ExtensionStudent.com as an endorsed community forum for Harvard Extension students in order to help it get started and to grow its membership and user-base and continues to use it to publicize elections, events, etc;

e) Mr. Slavenskoj has worked in collusion with Harvard Extension School administrators and/or Harvard Extension Student Association leaders towards certain objectives;

f) Mr. Slavenskoj has stated and announced publicly that ExtensionStudent.com is comparable or equivalent to the Harvard Crimson online newspaper;

g) Mr. Slavenskoj has used, in describing or promoting ExtensionStudent.com, certain words, names, insignia and other indicia for Harvard Extension School that signifies or implies affiliation with Harvard Extension School, with the intent to create the impression in the minds of the public that ExtensionStudent.com is in fact Harvard-affiliated;

h) Harvard Extension School has not publicly stated or denied that ExtensionStudent.com is not so affiliated with Harvard Extension School, or that ExtensionStudent.com does not represent Harvard Extension School, or that ExtensionStudent.com is not approved by Harvard Extension School, even when faced with controversies made public by ExtensionStudent.com or when Complaints about ExtensionStudent.com have been made to Harvard Extension School administrators;

i) Harvard Extension School has refused to publicly (or otherwise) denounce or disapprove of the methods, tactics and actions of ExtensionStudent.com as it relates to how some students and alumni are mistreated by the users and moderators of ExtensionStudent.com.

j) Dean Neugeboren has stated that he is able to and does direct Mr. Slavenskoj to edit the website.

k) Other Harvard Extension Administrators uses the website to deliver news and data to Extension students.

l) Harvard Extension School uses the website as a resource for recruiting potential students.

91. Because Harvard exercises editorial control over ExtensionStudent.com, it is liable for the defamatory content targeted at Mr. Bisasor, especially Harvard was explicitly made aware of this conduct.

92. The speech that takes place on ExtensionStudent.com is "on-campus" speech as its content is widely read and received by the Harvard Extension School community, especially since a large component of Harvard Extension School consists of online distance education students.

93. On information and belief, when members of the public at large reads content on ExtensionStudent.com, they are led to believe or conclude that the statements are made by real Harvard students in a legitimate online Harvard university forum, thereby giving it the credibility of being factual and truthful and thereby increasing the probability that the public would treat the statements seriously and thereby cementing the impact of any defamatory statement. Mr. Slavenskoj trades on this impression of a Harvard affiliation in order to leverage and enhance site membership, site traffic and revenues for the site as well as his own notoriety.

94. ExtensionStudent.com was launched by Mr. Slavenskoj in April 2007 while he was still a student at Harvard Extension School. The site was started with the goal of providing an online discussion forum for Harvard Extension students.

95. Mr. Slavenskoj solicited the support of Harvard Extension School students as well as Harvard Extension School student government administrations in promoting the site.

96. The Harvard Extension School student government (HESA) lent its credibility to and endorsed the site as a neutral open forum for Harvard Extension students, particularly distance students, to stay connected and share information. As a result of significant promotion by HESA, ExtensionStudent.com gained significant mind-share of the Harvard Extension School student body. Without the critical support of HESA, ExtensionStudent.com would not have gained the traction it did. For the most part, in initial year of its existence, the ExtensionStudent.com site facilitated civil discussion and analysis of issues facing Harvard Extension School students. However, this subsequently changed as Mr. Slavenskoj began to get involved in directing and influencing discussion surrounding HESA student government elections.

97. Harvard is responsible for the harm created by ExtensionStudent.com to its students. They either aid or facilitate the defamation and harassment produced by the forum.

98. Therefore, Defendants' published statements that Mr. Bisasor practices witchcraft is false and untrue and has defamed Mr. Bisasor.

99. Defendants' published statements suggesting that Mr. Bisasor was an "Apostle of Satan" and is "guided by Satan" is false and untrue and has defamed or was intended to defame Mr. Bisasor and to diminish the esteem with which Mr. Bisasor is held.

100. Defendants' published statements comparing Mr. Bisasor to Former US President Richard Nixon and to Adolf Hitler are defamatory per se and intended to diminish the esteem with which Mr. Bisasor is held.

101. Defendants' published statements suggesting that promoted the message that Mr. Bisasor unjustifiably inserted racism into the situation, is untrue. This is harmful to Mr. Bisasor as it presents Mr. Bisasor as one who frivolously and groundlessly inserted race and racism into Mr. Slavenskoj's manufactured assertion.

102. By publishing these statements on Extensionstudent.com, Defendants published defamatory statements to a wide range of persons to the extent that they claim to have thousands of members and to the extent that site analytics reveal that this site has at least approximately 1200 visitors per day and is open to unfettered public view on the internet.

103.   By its above described conduct, *inter alia,* Defendants have published or allowed to be published false, disparaging, defamatory, and materially misleading statements about Mr. Bisasor.

104.   As described herein above, *inter alia,* Defendants have intentionally and with malice published false, disparaging, defamatory, and materially misleading statements about Mr. Bisasor with the intent to damage his professional and personal reputation.

105.   As described above, *inter alia,* Defendants have negligently published or allowed to be published malicious, false, disparaging, defamatory, and materially misleading statements about Mr. Bisasor.

106.   Defendant's false, disparaging, defamatory, and materially misleading statements are not privileged.

107.   Defendants published or allowed to be published the false and defamatory statements with malevolent intent, ill-will and/or with the knowledge that the statements were false, or with reckless disregard as to the falsity of the statements.

108.   Defendants' false, disparaging, defamatory, and materially misleading statements have subjected and continue to subject Mr. Bisasor to contempt and tended to and continue to tend to diminish the esteem, respect, goodwill and/or confidence in which he is held.

109.   These statements are untrue and are harming Mr. Bisasor so long as they remain public.

110.   These statements made by the Defendants are defamatory per se and have injured Plaintiff's reputation and exposed Plaintiff to public hatred, contempt, ridicule, and/or financial injury. These defamatory statement(s) requires no proof of its injurious character because it was obviously hurtful to the Plaintiff, because Defendants falsely accused the Plaintiff of committing a serious violation of moral conduct (at least within the Christian and certain other communities), and because Defendants injured Plaintiff in his or her profession and/or occupation.

111.   The statements are online and Plaintiff does not have another means of seeking removal of such statements, representing an ongoing harm to Plaintiff.

112.   Any statements made will continue to exist online and be not only searchable but also constitute a significant aspect of the online image of Plaintiff.

113.   Plaintiff does not know if the posters who use pseudonyms to make defamatory posting about Plaintiff are in fact other users or simply alter egos for the Defendants. The identities of such posters should therefore be uncovered.

114.    Plaintiff has been harmed by Defendants' actions including lost professional opportunities, insult, mental pain and suffering, being placed in fear and anxiety, mental anguish, emotional distress, loss of enjoyment of life, anxiety, lack of energy, mood swings, and sleep disturbances in addition to impairment to the Plaintiff's reputation and standing in the community, and personal humiliation, shame, and disgrace.

115.    As a result of the malicious defamatory conduct on the part of the Defendants, Plaintiff has suffered economic and consequential damages.

116.    Defendants' actions were malicious and showed intentional disregard for Mr. Bisasor's rights, and accordingly punitive damages are appropriate against Defendants.

117.    Defendant exhibited particularly egregious conduct and acted with malice or fraud. Defendants maliciously and willfully calculated its actions to harm Plaintiff.

118.    As a direct and foreseeable consequence of Defendants' defamation, Mr. Bisasor has suffered damages, emotional distress and an unquantifiable and irreparable harm in the form of injury to his reputation.

119.    As a result thereof, Mr. Bisasor has been and continued to be injured and suffer damages, including but not limited to economic losses, loss of reputation and professional opportunity and emotional distress.

## COUNT II - DISCRIMINATION, HARASSMENT, HOSTILE ENVIRONMENT BASED ON RELIGION
### (Defendants)

120.    Plaintiff hereby realleges and incorporates by reference each of the preceding paragraphs as if fully stated herein.

121.    Defendants, through the acts and omissions described above, *inter alia*, has aided, abetted, incited, compelled and/or coerced others into discriminating unlawfully against Mr. Bisasor because of his religion, or attempted to do so, in violation of both federal and state law.

122.    As a result of Defendants' discriminatory conduct, Mr. Bisasor has suffered and continues to suffer damages including, but not limited to, loss of professional opportunities, financial losses, loss of personal and professional reputation, pain and suffering, and emotional distress.

123.    In or around mid-December 2011, Mr. Bisasor brought the matter to the attention of Harvard Extension School.

   a.    Mr. Bisasor contacted Dean of Students of the Harvard Extension School, Robert Neugeboren, and told him about the derogatory and defamatory postings on ExtensionStudent.com including those by Defendant.

   b.    Mr. Bisasor was asked to name any current students who had participated in the harassing activity. Because the ExtensionStudent.com online forum users generally adopted pseudonyms, Mr. Bisasor was only able to clearly identify at the time one

current student involved in the harassing activity, who used their real name and that was a current student. This was Mr. Ken Vedaa who also was a manager and moderator for ExtensionStudent.com. On information and belief, Mr. Vedaa was specifically contacted by Mr. Neugeboren and was asked about the matter.

c. Although Mr. Bisasor also identified Mr. Slavenskoj, Mr. Neugeboren told Mr. Bisasor that there was not much he would do about those who were not current students. However, Mr. Neugeboren also told Mr. Bisasor that he had a relationship with Mr. Slavenskoj, that he had the ability to influence him regarding content issues on ExtensionStudent.com (i.e. that he wielded editorial control) and that he could give Mr. Slavenskoj a call to discuss the matter because he had a relationship of some sort with Mr. Slavenskoj.

d. Yet Mr. Neugeboren told Mr. Bisasor that he should instead focus on Mr. Vedaa since Mr. Vedaa was a current student and is the best place to start addressing the matter. Therefore, Mr. Bisasor proceeded to describe, to Mr. Neugeboren, Mr. Vedaa's statements about Mr. Bisasor including use of words such as "loon", "ass", "fool", "embarrassment" relating to Mr. Bisasor's religious beliefs, which are quite obviously intended to denigrate Mr. Bisasor.

e. Mr. Bisasor specifically highlighted to Mr. Neugeboren that Mr. Vedaa and others went as far as to assert or insinuate that Mr. Bisasor (and a certain group of Christians associated with Mr. Bisasor including his wife) have some kind of loathsome condition or disease causing bad odors that requires their seats to be disinfected.

f. Mr. Bisasor also specifically highlighted to Mr. Neugeboren the ExtensionStudent.com thread that accused Mr. Bisasor of witchcraft and that mocked his religious beliefs.

g. Mr. Bisasor also asked Mr. Neugeboren for assistance in not only stopping the disparaging and harassing assaults but in having these statements removed as it was creating a severe and pervasive hostile environment for Mr. Bisasor which was affecting his ability to pursue and enjoy his educational experience at Harvard.

h. Mr. Neugeboren was initially belittling to Mr. Bisasor regarding his concerns but after much persistence, Mr. Neugeboren eventually acknowledged that Mr. Bisasor had raised legitimate concerns.

124.   The details of these concerns were further described in a formal written complaint that was sent by Mr. Bisasor to Mr. Neugeboren on or around December 16, 2011 as follows:

Dear Dean Neugeboren,

As discussed by phone on Thursday of last week, I am following up with you to put in writing the substance of the items I brought to your attention including my initiating the process of filing a formal complaint (as a student at the Harvard Extension School) regarding another student in the ALM-IT program at Harvard Extension School, named Ken Vedaa.

This complaint refers to Ken Vedaa's engagement in activity/behavior/speech that I believe constitutes harassment of me particularly as it relates to his targeting of my religious beliefs, and my religious associations. He, along with a few other students, therefore have created an ongoing hostile

environment not only for me but for all students who hold similar religious beliefs or associations. Furthermore, he, and others, have mischaracterized my religious beliefs and, in some instances, made caricatures of my religious beliefs with the seeming objective of subjecting me to public ridicule/scorn, or to convince others to join in on the harassing activity.

This conduct has for the most part taken place in an online forum or blog that claims to be the main/largest online community forum for Harvard Extension School students called "extensionstudent.com" and for which participation, membership or access is based on one's status as a Harvard student as evidenced by providing a Harvard email address (though the contents are largely viewable by the public at large). I believe Ken Vedaa is also a moderator (with administrator privileges) for this online forum.

A few examples of the numerous comments that exist as evidence of the above includes the following: calling me a "loon", an "ass", a "fool", an "embarrassment", etc, because of my religious beliefs/associations, as well as ridiculing me as being part of a "nut job fringe". He even has gone as far as to mockingly join in along with another student in suggesting that the room (that was used by those religious persons who were part of the social transformation conference) needs to be wiped down with cleaning agents for bad odors.

This kind of conduct, I believe, is in violation of the university's policy against discrimination and harassment based on religion. It is, I believe, also in violation of state and federal requirements (per the department of education, etc) regarding the protection of students from being the targets of hostility and harassment based on religion.

Also, some of Ken Vedaa's activities, I believe, can also be construed as cyber-stalking and cyber-bullying that appears largely to be related to his disdain for my religious beliefs, practices or affiliations. I also have additional evidence of an overall pattern of his consistent stalking behavior online regarding me/my name in which he tenaciously attempts to ridicule, mock, excoriate, deride, and humiliate me over and over again, even after being warned by others to stop with his obsessive fixation in attacking me publicly online. Based on my understanding of the matter, cyber-stalking/cyber-bullying activity can also considered to be criminal harassment in the state of Massachusetts. If Ken Vedaa's conduct could fall under this category, then the University should be made aware of this and the appropriate steps should also be taken to address this matter to protect students from harmful behavior by other students who behave as cyber-stalkers and cyber-bullies. With the increase in suicides by students subjected to such conduct, this behavior has increasingly been deemed to be a serious matter by law enforcement as well as by university officials across the country, especially where motivated by discrimination against those in protected classes.

Given the fact that the University has stated in its policies that it takes seriously such matters and because of the potential ongoing nature of the harm created by the above items mentioned in this Complaint, I am hereby requesting that the university intervenes to ensure protection from religious discrimination, harassment and hostile environment for myself as well as every other student who has these religious beliefs or associations.

I would like Ken Vedaa to be made aware that I have initiated this process so that he can be on immediate notice to discontinue the above activities directed at me and so that I can get some immediate relief.

I have several pieces of documentation that I believe would be considered evidence of the above-referenced items for this complaint, a sample of which I have attached below in this email as screenshots. Because these are screenshots, it only represents a snapshot of the extent and the full context of the kind of conduct that I have referenced herein but they contain examples of statements sufficient to illustrate the basis for my Complaint. For your convenience, I have also attached a copy of this complaint as a PDF file.

If necessary, I can compile more comprehensive evidence related to my complaint and submit them to you by email or as hard copy depending on your preference. I can also make myself available to discuss any items related to this Complaint by phone or in person.

In the meantime, if there is a set of procedures that governs a Complaint such as this, including next steps, please let me know.

Sincerely,
Andre Bisasor

**Screenshots related to my above Complaint against Ken Vedaa**
1) Below, Ken Vedaa (posting as kvedaa on a website called extensionstudent.com) insults me in relation to what he perceives to be my religious beliefs and my religious associations.
2) Here Ken Vedaa joins in with another student who directly targets my religion. Ken proceeds to explain the religious nature of his opposition to what he considers to be my religious beliefs/practices. He also uses that as a basis to call me pejorative names (i.e. an ass) and to insult me.
3) In this screenshot, Ken Vedaa joins in with others who are ridiculing my religious beliefs and mischaracterizing my beliefs. He calls me an insulting name (i.e. fool) as he mocks any sense that I should be protected from harassment based on my religion.
4) In this screenshot, Ken Vedaa joins in with another student on the pejorative and demeaning ridicule of my religion and as they suggest that the rooms should be purified after used by certain religious persons.

125.   On December 16, 2011, Mr. Neugeboren acknowledged receipt of Plaintiff's written complaint and told Plaintiff that he would be in touch in the near future with a fuller response.

126.   On information and belief, Mr. Shinagel, who was Mr. Neugeboren's boss at the time, was also notified of the complaint by Mr. Bisasor. Mr. Shinagel is generally made aware (whether formally or informally) of such matters by Mr. Neugeboren and is consulted for advice, guidance and approval of actions taken or not taken.

127.   On December 22, 2011, Mr. Neugeboren told Mr. Bisasor that he will try to meet or talk with Mr. Vedaa, who, on information and belief, was an administrator of ExtensionStudent.com, who was a current Harvard Extension School student and who engaged in pejorative attacks on Mr. Bisasor because of his religious beliefs.

128.   On December 22, 211, Mr. Vedaa engaged in further disparaging and harassing activity on ExtensionStudent.com towards Mr. Bisasor in retaliation for Mr. Bisasor bringing the matter to the attention of Harvard Extension School.

129.   On or about this same time, calls for the resignation or removal of Mr. Bisasor from student activities at Harvard were also made on Extensionstudent.com, and this sent the signal that no one should dare express such religious beliefs (or complain) as one could lose rights and privileges of opportunity and access while at Harvard and beyond.

130.   Shortly thereafter, Dean Neugeboren implemented covert/subtle attempts to try to block or impede Mr. Bisasor or his wife from serving or contributing to HES student activities.

*131.*   There were also further attempts to create such a hostile environment based on religion for Mr. Bisasor so that, by their own admission, Mr. Bisasor would have little choice but to withdraw from being involved in any way as a student contributor or leader at Harvard.

132.   On January 5, 2012, Mr. Bisasor brought the matter to the attention of Harvard Extension School once again after Mr. Vedaa continued his disparaging and harassing activity towards Mr. Bisasor and retaliated against Mr. Bisasor.

133.   Although Mr. Neugeboren told Mr. Bisasor he would also address the retaliation issue with Mr. Vedaa, Mr. Bisasor did not receive any further follow-up or resolution from Mr. Neugeboren regarding this.

134.   Mr. Neugeboren also refused to address Mr. Bisasor's concerns regarding the role and actions of Mr. Slavenskoj including the thread accusing Mr. Bisasor of witchcraft.

135.   On information and belief, Mr. Neugeboren failed to follow-up with Mr. Bisasor or provide final resolution to the matters because of Mr. Neugeboren's conflict of interest with Mr. Slavenskoj, and because of Mr. Neugeboren's shared Jewish identity, background and affinity with Mr. Slavenskoj and other posters on the ExtensionStudent.com site who also have disparaged Mr. Bisasor.

136.   On information and belief, Mr. Vedaa and Mr. Slavenskoj were thus emboldened to continue with their online attacks, defamation and harassment of Mr. Bisasor subsequent to Mr. Bisasor's request for relief and assistance from Harvard Extension School.

137.   On January 18, 2012, Mr. Slavenskoj "greyed out" the ExtensionStudent.com site and put up a home page for the site that promoted a defamatory attack against Mr. Bisasor on the front page of the site stating: a) that Mr. Bisasor was a supporter of the Stop Online Piracy Act (SOPA), a statement that is false, and b) insinuations that Mr. Bisasor was an enemy of free speech on the entire internet, which is also false. Mr. Slavenskoj intended to ensure that every person who viewed the ExtensionStudent.com site that day, whether they heard of Mr. Bisasor or not before, would associate Mr. Bisasor with such negativity.

138.   On or about March 2012, another thread was started by Mr. Vedaa with the title **"Former HESA President Andre Bisasor in Spiritual Warfare Against Students at Harvard"**, which was intended to further disparage Mr. Bisasor and subject to him more contempt, ridicule and harassment and to continue to create a hostile environment for Mr. Bisasor. On information and belief, Mr. Vedaa also made this posting specifically in retaliation for Mr. Bisasor's request for relief and assistance from Harvard Extension School.

139.   Mr. Neugeboren has himself also made separate derogatory and defamatory statements about Plaintiff to other third parties. Mr. Neugeboren's actions are based on, among other things, religious and other biases against Mr. Bisasor.

140.   Mr. Neugeboren has also previously encouraged others to make disparaging comments about Mr. Bisasor and stood by with deliberate indifference allowing other students to make

disparaging remarks about Mr. Bisasor, eventhough Mr. Neugeboren knew in advance that
these students were going to make disparaging comments about Mr. Bisasor.

141.    Mr. Neugeboren has in other ways sought to use his position and his influence to
        assassinate the character of Mr. Bisasor and to diminish the esteem with which he was held in
        the community.

142.    Plaintiff has also experienced associational discrimination. Plaintiff's wife has also
        experienced numerous instances of religious hostility directed at her because of her association
        with Plaintiff and because of her own religious beliefs. She became a target of various threats
        and harassment by other students who were responsible for the hostility based on religion. The
        hostile conduct ranged from "cold shoulder", to defamatory online attacks as well as denial of
        funding for student-led activities, removal from student leadership position and denial of
        access to graduate program of study.  She was also discriminated against in the way how she
        had been allowed to operate as a student leader and the way that she was prevented from
        finishing her term as a student club leader. His wife was thus subjected to a hostile
        environment based on her association with Plaintiff and based on her religion.

143.    Dean Neugeboren has stated that there is a problem with evangelical Christian
        events/activity that was "not broad enough" and was too narrowly focused on Christianity.

        a.  Dean Neugeboren sought to also shut down another Christian student club at HES
            called the campus bible study club.

        b.  Dean Neugeboren told Mr. Bisasor and his wife that Dean Shinagel will not allow
            administrators to send an email regarding a Christian conference (that they had
            organized) to the student body. Mr. Bisasor and his wife asked for even one line to be
            included with other announcements but they refused.

        c.  HES Student Affairs Coordinator Ian Jackson said that the concerns being raised and
            the adverse actions being taken were because the event is themed "Social
            Transformation by the Power of God". Dean Neugeboren said that "because it is a faith
            event, we have to be especially clear that school is not in any way involved".

        d.  Harvard Extension School did not send an email announcement to the student body for
            this Christian Conference though it was repeatedly requested.

        e.  Harvard Extension School has in the past sent emails to the student body to alert the
            student body about large-scale student conferences.

        f.  Harvard Extension School created new guidelines for Mr. Bisasor and his wife
            including new forms for approval after the fact, new guidelines for the website and
            requiring the removal of the standard university rendering of the Harvard shield and
            name from the Harvard live-stream platform that was used by the event. Dean

Neugeboren threatened to lock down the event minutes before the event if it was not changed. Not even a Harvard podium was allowed to be used.

    g.   Mr. Bisasor and his wife were forced to do things that other students or student groups were not required to do before, thus experiencing disparate treatment with respect to or as compared to other student/student group events.

    h.   Subsequently, there was an attempt to shut down the student club. Eventually this was accomplished through lies, deceit and subterfuge. Mr. Bisasor's wife has also been harmed as a result.

144.   Defendants are required to refrain from discriminating against any student on the basis of religion in the terms, conditions, or privileges of education. It is also unlawful for an educational institution to discriminate against a student based upon the school's perception that the student is a member of a protected class. e.g. is an adherent to a religious faith or creed. It is also unlawful for a school to discriminate against a student based upon the school's perception that the student is taking or has taken certain actions because the student is a member of a protected class, i.e. because the student professes or adheres to a religious faith or creed. Mr. Bisasor falls within the protected category as an individual subjected to adverse action on account of religious creed.

145.   Educational institutions shall not treat their students differently in terms, conditions, access, privileges and benefits because of religion.

146.   Pursuant to federal and state law, educational institutions have the responsibility to prevent discrimination and investigate allegations of discrimination.

147.   In its stated policies (including its handbook), Harvard promises that "Harassment or discrimination based on race, color, religion, gender or any other classes protected by law against any student is unlawful", and that such harassment or discrimination "will not be tolerated by this organization". Harvard policies also state that "Harassment includes verbal or physical conduct that may or does offend, denigrate or belittle any individual because of or due to race, color, religion, gender, national origin, or any other classes protected by law. Such conduct includes, but is not limited to, pictures, jokes, comments, innuendos or any other behavior which creates an environment that is hostile, offensive, intimidating, or humiliating. Further, any retaliation against an individual for complaining about harassment or discrimination, or retaliation against individuals for cooperating with an investigation of a harassment or discrimination complaint, is similarly unlawful and will not be tolerated".

148.   On information and belief, Harvard has a predominant intellectual culture that disapproves of those who hold an Evangelical/Pentecostal-Charismatic Christian worldview (i.e. a worldview that is theologically conservative and that, among other things, espouses supernatural reality including the possibility of modern-day miracles and a faithful adherence to a conservative biblical worldview).

149.    Defendants discriminated against Plaintiff on the basis of religion because they perceived him to be a member of a religious class of which they disfavor and because he was not shy in openly expressing his faith.

150.    Mr. Neugeboren has previously singled out and discriminatorily targeted other students whose religious beliefs he disagrees with or disfavors, including those who are adherents to the Church of Christ denomination as well as Muslims; Mr. Bisasor was a witness to these acts while he was the elected student government president at Harvard's Division of Continuing Education and Harvard Extension School. Ironically, Mr. Neugeboren tried to get Mr. Bisasor to agree to be his mouthpiece for these acts, as HESA President, but Mr. Bisasor refused [NB: Mr. Neugeboren also engaged in disability discrimination against a student in a wheelchair and Mr. Bisasor was obliged to oppose such acts, until he relented].

151.    Prior to the spring of 2012 but after spring of 2008, Mr. Neugeboren and other employees of Harvard Extension School had engaged in acts that were discriminatory against Mr. Bisasor and/or those associated with him including disparate treatment as it relates to certain events and activities that were organized or led by Mr. Bisasor and/or his wife as student leaders (including those that involved the Christian faith).  This has been ongoing and continuing since spring 2008 and has culminated in additional events taking place as recently as in the spring and fall of 2014.

152.    Since Mr. Lambert has taken over as Division Dean for Harvard Division of Continuing Education and Harvard Extension School in 2013, he has been made aware of the above issues and has continued the same patterns of behavior as his predecessor Mr. Shinagel and has sought to ignore or otherwise cover-up the wrongdoings of Mr. Neugeboren.

153.    Mr. Neugeboren, Mr. Shinagel, Mr. Lambert and Harvard Extension School have failed in their duty to stop or prevent further and continuing defamation, cyber-bullying, harassment and other misconduct from happening to Mr. Bisasor.

154.    Mr. Neugeboren, Mr. Shinagel, Mr. Lambert, Ms. Andrews and Ms. Greene have failed to follow Harvard policies regarding discrimination, harassment and hostile environment based on protected classes of religion, when it relates to Mr. Bisasor.

155.    On information and belief, Mr. Neugeboren has acted specifically to intervene in similar matters involving other of his favorite/preferred students to prevent defamation of such students on the ExtensionStudent.com forum. His intervention has been effective in such cases. He has also acted to prevent or stop disparaging comments about himself or other Harvard administrators on ExtensionStudent.com. His intervention has also been effective in those instances, resulting either in the correction, retraction or removal of the relevant posts.

156.    Mr. Neugeboren, Mr. Shinagel, Mr. Lambert, Ms. Andrews and Ms. Greene and Harvard Extension School also have failed to properly address, investigate and resolve other concerns

raised by Mr. Bisasor. On more than one occasion, they have turned a blind eye to the wrongs suffered and the concerns raised by Mr. Bisasor.

157.    Mr. Neugeboren, Mr. Shinagel, Mr. Lambert, Ms. Andrews and Ms. Greene and Harvard Extension School also have acted in a discriminatory and/or retaliatory manner with Mr. Bisasor and have breached their duty to protect Mr. Bisasor while he has been a Harvard student and/or a member of the Harvard community.

158.    Mr. Neugeboren also conspired with others to deny Mr. Bisasor and those associated with him the benefits of participating in certain program and activities afforded to other students and community members of the Harvard Extension School. Also, Mr. Bisasor and those associated with him have suffered further disparate and unfair treatment in retaliation for raising concerns about discrimination.

159.    Harvard Extension School has offered pre-textual reasons for such denials and unfair treatment of Mr. Bisasor and/or those associated with him.

160.    Harvard also surreptitiously sought to offer Mr. Bisasor "quid-pro quo" incentives (or what could be considered a "bribe") to coerce Mr. Bisasor to drop and no longer pursue his complaints/concerns, which is a deceptive practice. On information and belief, this is not the first time that Harvard administrators have committed such acts. This included a promise to one day be brought back to be in a potential dean-level role if concerns were dropped.

161.    Defendants engaged in further religious discrimination by failing to properly investigate Mr. Bisasor's claims. Plaintiff has repeatedly asked for a proper, thorough, complete and impartial investigation but Defendants have repeatedly refused. Plaintiff has contacted Defendants on several occasions (including in the months of November and December of 2014) to request relief and to resolve these issues but to no avail. This has caused much emotional distress for Plaintiff. This is also a breach of contract.

162.    Defendants have therefore violated Title VII, and other federal statutes, as well as other Massachusetts laws prohibiting discrimination, and have thus discriminated against Plaintiff and his wife based on religion.

163.    Under Title VI of the Civil Rights Act of 1964 and its implementing regulations, no individual may be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination on the grounds of religion under any program or activity that knowingly receives federal funds. In addition, the existence of a religious hostile environment that is created, encouraged, accepted, tolerate or left uncorrected by a recipient also constitutes different treatment on the basis of religion in violation of Title VII.

164.    Defendants had notice of the existence of a religious hostile environment at the university attended by Plaintiff.

165.   Defendant failed to respond adequately to redress the religious hostile environment.

166.   The religious hostile environment taken together with the deliberate indifference of Defendants effectively deprived Plaintiff of equal access to educational opportunities and benefits provided by the university.

167.   Defendants violated Plaintiff's civil rights when they failed to properly and thoroughly investigate his complaint of religious discrimination. A swift, thorough, complete, and impartial investigation would have prevented further discrimination against Plaintiff.

168.   Plaintiff has thus been subjected to derogatory and threatening comments based on his religion by students and employees at Harvard Extension School and Harvard University. Defendants have failed to address this hostile environment for Mr. Bisasor.

169.   Defendant's conduct constituted adverse action and represented a materially adverse change in the terms of Plaintiff's experience as a student.

170.   Defendants violated Plaintiff's civil rights because they disfavor Plaintiff's actual or perceived religious beliefs, associations and expression.

171.   Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiff, from an evil and improper motive amounting to malice, and in conscious disregard of his rights in that Defendants' disfavor Plaintiff's actual or perceived religious beliefs, associations, and expression. Thus, Plaintiff is entitled to recover punitive damages from Defendants.

172.   Defendants, through the acts and omissions described above, *inter alia*, has aided, abetted, incited, compelled and/or coerced others into discriminating unlawfully against Plaintiff because of religion, or attempted to do so, in violation of both federal and state law.

173.   As a result of Defendants' discriminatory conduct, Plaintiff has suffered and continues to suffer damages including, but not limited to, pain and suffering, and emotional distress.

174.   As a further direct and proximate result of these Defendants' conduct, Plaintiff has suffered losses, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his detriment and damage in amounts not fully ascertained.

## COUNT III - RACE DISCRIMINATION IN VIOLATION OF CIVIL RIGHTS ACT OF 1866, (42 .S.C. §§ 1981 AND 1982), AND TITLE VII
### (Defendants)

175.   Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs of the Complaint as if fully stated herein.

176.   Plaintiff is an African-American and is a member of a protected class under 42 U.S.C. §
83604 (a), (b) and (d).

177.   Plaintiff has suffered discrimination, disparate treatment and mistreatment based on his
race/nationality as a student at Harvard Extension School.

178.   Defendants are required to refrain from discriminating against any student on the basis of
race, ethnicity or national origin in the terms, conditions, or privileges of education. It is also
unlawful for an educational institution to discriminate against a student based upon the
school's perception that the student is a member of a protected class.

179.   Educational institutions shall therefore not treat their students differently in terms,
conditions, access, privileges and benefits because of race, ethnicity or national origin.

180.   Pursuant to federal and state law, educational institutions have the responsibility to prevent
discrimination and investigate allegations of discrimination.

181.   Under Title VI of the Civil Rights Act of 1964 and its implementing regulations, no
individual may be excluded from participation in, be denied the benefits of, or otherwise be
subjected to discrimination on the grounds of race, color or national origin under any program
or activity that knowingly receives federal funds. In addition, the existence of a racially hostile
environment that is created, encouraged, accepted, tolerate or left uncorrected by a recipient
also constitutes different treatment on the basis of race in violation of Title VII.

182.   Defendants had notice of the existence of a racially hostile environment at the university
attended by Plaintiff.

183.   Defendant failed to respond adequately to redress the racially hostile environment.

184.   The racially hostile environment taken together with the deliberate indifference of
Defendants effectively deprived Plaintiff of equal access to educational opportunities and
benefits provided by the university.

185.   In its stated policies, Harvard promises that *harassment or discrimination based on race,
color, religion, gender or any other classes protected by law against any student is unlawful,
and  that such harassment or discrimination will not be tolerated by this organization.* Harvard
policies also state that *harassment includes verbal or physical conduct that may or does
offend, denigrate or belittle any individual because of or due to race, color, religion, gender,
national origin, or any other classes protected by law. Such conduct includes, but is not
limited to, pictures, jokes, comments, innuendos or any other behavior which creates an
environment that is hostile, offensive, intimidating, or humiliating. Further, any retaliation
against an individual for complaining about harassment or discrimination, or retaliation
against individuals for cooperating with an investigation of a harassment or discrimination
complaint, is similarly unlawful and will not be tolerated.*

186. Prior to the spring of 2012 but after spring of 2008, Mr. Neugeboren and other employees of Harvard Extension School had engaged in acts that were discriminatory against Mr. Bisasor and/or those associated with him. This has been ongoing and continuing since spring 2008 and has culminated in additional events taking place as recently as in the spring and fall of 2014.

187. Since Mr. Lambert has taken over as Division Dean for Harvard Division of Continuing Education and Harvard Extension School in 2013, he has been made aware of the above issues and has continued the same patterns of behavior as his predecessor Mr. Shinagel and has sought to ignore or otherwise cover-up the wrongdoings of Mr. Neugeboren.

188. Mr. Neugeboren, Mr. Shinagel, Mr. Lambert, Ms. Andrews and Ms. Greene and Harvard Extension School have failed in their duty to stop or prevent further and continuing defamation, cyber-bullying, harassment and other misconduct from happening to Mr. Bisasor.

189. Mr. Neugeboren, Mr. Shinagel, Mr. Lambert, Ms. Andrews and Ms. Greene have failed to follow Harvard policies regarding discrimination, harassment and hostile environment based on protected classes of race, when it relates to Mr. Bisasor.

190. On information and belief, Mr. Neugeboren has acted specifically to intervene in similar matters involving other of his favorite/preferred students to prevent defamation of such students on the ExtensionStudent.com forum. His intervention has been effective in such cases. He has also acted to prevent or stop disparaging comments about himself or other Harvard administrators on ExtensionStudent.com. His intervention has also been effective in those instances, resulting either in the correction, retraction or removal of the relevant posts.

191. Mr. Neugeboren, Mr. Shinagel, Mr. Lambert, Ms. Andrews and Ms. Greene and Harvard Extension School also have failed to properly address, investigate and resolve other concerns raised by Mr. Bisasor. On more than one occasion, they have turned a blind eye to the wrongs suffered and the concerns raised by Mr. Bisasor.

192. Mr. Neugeboren, Mr. Shinagel, Mr. Lambert, Ms. Andrews and Ms. Greene and Harvard Extension School also have acted in a discriminatory and/or retaliatory manner with Mr. Bisasor and have breached their duty to protect Mr. Bisasor while he has been a Harvard student and/or a member of the Harvard community.

193. Mr. Neugeboren also conspired with others to deny Mr. Bisasor and those associated with him the benefits of participating in certain program and activities afforded to other students and community members of the Harvard Extension School. Also, Mr. Bisasor and those associated with him have suffered further disparate and unfair treatment in retaliation for raising concerns about discrimination.

194. Harvard Extension School has offered pre-textual reasons for such denials and unfair treatment of Mr. Bisasor and/or those associated with him.

195. Harvard administrators have also surreptitiously sought to offer Mr. Bisasor "quid-pro quo" incentives (or what could be considered a "bribe") to coerce Mr. Bisasor to drop and no longer pursue his complaints/concerns, which is a deceptive practice. On information and belief, this is not the first time that Harvard administrators have committed such acts. This included a promise to one day be brought back to be in a potential dean-level role, if concerns were dropped.

196. Defendants engaged in further racial discrimination by failing to properly investigate Mr. Bisasor's claims. Plaintiff has repeatedly asked for a proper, thorough, complete and impartial investigation but Defendants have repeatedly refused. Plaintiff has contacted Defendants on several occasions (including in the months of November and December of 2014) to request relief and to resolve these issues but to no avail. This has caused much emotional distress for Plaintiff. This is also a breach of contract.

197. Defendants have therefore violated Title VII, Section 1981 and other federal statutes, as well as other Massachusetts laws prohibiting discrimination, and have thus discriminated against Plaintiff and his wife based on race.

198. Under Title VI of the Civil Rights Act of 1964 and its implementing regulations, no individual may be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination on the grounds of race, color or national origin under any program or activity that knowingly receives federal funds. In addition, the existence of a racially hostile environment that is created, encouraged, accepted, tolerate or left uncorrected by a recipient also constitutes different treatment on the basis of race in violation of Title VII.

199. Defendants had notice of the existence of a racially hostile environment at the university attended by Plaintiff.

200. Defendant failed to respond adequately to redress the racially hostile environment.

201. The racially hostile environment taken together with the deliberate indifference of Defendants effectively deprived Plaintiff of equal access to educational opportunities and benefits provided by the university.

202. Defendants violated Plaintiff's civil rights when they failed to investigate his complaint of racial discrimination. A swift, thorough, complete and impartial investigation would have prevented further discrimination against Plaintiff.

203. It is worthy of particular note that Dean Shirley Greene was designated to run interference on race claims against the administration. She was new to the job at the time when she was dispatched to address Mr. Bisasor's complaints. She showed signs that she really did not want to hear Mr. Bisasor's complaints in totality and she was rude and stern and negative towards him the first time she met him, eventhough Mr. Bisasor was polite and friendly in that first

meeting. She gave him no benefit of the doubt – for example she refused to believe that he previously reported the matter to others such as to Lisa Coleman, Harvard's Chief Diversity Officer (which was later proven that he did). She also told him wrong information about the process which created confusion and ambiguity. All of this was done even-though she was subordinate to Dean Neugeboren, who was her direct boss, making it impossible for her to impartially investigate complaints against him. Dean Shinagel was eager to have her handle anything have to do with Mr. Bisasor's complaints, even after Mr. Bisasor challenged her impartiality and suitability to investigate her boss(es) and even after Mr. Bisasor requested that she was recused on that basis. It was clear that she was there at the behest of her white bosses to deflect racial issues and complaints away from them and to try to block Mr. Bisasor's racial concerns. She appeared not to be trained in Title VII investigation methods and even refused to document or listen to Mr. Bisasor's concerns about a bribe that was offered to him to drop pursuit of his complaints, all the while naively purporting that "there is no racial discrimination at Harvard" and at the same time also declaring that she does not want to "know" about any corrupt bribe because she does not want to have to follow-up on that. On information and belief, she was instructed to squash Mr. Bisasor's complaints.

204.    Defendant's conduct constituted adverse action and represented a materially adverse change in the terms of Plaintiff's experience as a student.

205.    Defendants committed the acts alleged herein oppressively and maliciously, with the wrongful intention of injuring Plaintiff, from an evil and improper motive amounting to malice, and in conscious disregard of his rights. Thus, Plaintiff is entitled to recover punitive damages from Defendants.

206.    Defendants, through the acts and omissions described above, *inter alia*, has aided, abetted, incited, compelled and/or coerced others into discriminating unlawfully against Plaintiff because of race/ethnicity, or attempted to do so, in violation of both federal and state law.

207.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and continues to suffer damages including, but not limited to, pain and suffering, and emotional distress.

208.    As a further direct and proximate result of these Defendants' conduct, Plaintiff has suffered losses, peace of mind and future security, and has suffered embarrassment, humiliation, mental and emotional pain and distress and discomfort, all to his detriment and damage in amounts not fully ascertained.

209.    Defendants have engaged in further racial discrimination as follows:

    a.    Mr. Bisasor was barred from participating, enjoying or benefiting from the programs, resources and activities of Harvard Extension School in retaliation for bringing his race discrimination and other complaints.

b. Mr. Bisasor was offered what was effectively a bribe by Harvard/Harvard Extension administrators to drop his racial discrimination complaint. This was an egregious example of abuse of authority and corruption at Harvard Extension School. Moreover, on information and belief, this is a covert practice at Harvard Extension and is not the first time that this sort of thing was attempted with students. Certain other students have been offered quid pro quo incentives in exchange for favors by Harvard Extension School administrators. This is a corrupt and unethical practice.

c. Mr. Bisasor also has other examples of wrongful acts by Harvard Extension administrator Robert Neugeboren engaging in retaliation against students who are associated with Mr. Bisasor or who have supported Mr. Bisasor. One example is of a student who assisted Mr. Bisasor in the past. Robert Neugeboren engaged in outright mocking and excoriation of the student who reported that she was sexually harassed at Harvard Extension School. She was told by Robert Neugeboren that she was mentally ill when she reported the matter to him at Harvard Extension School. She was punished by having her academics threatened and interfered with.

d. On information and belief, there has been inappropriate sexual relationship/contact between Harvard Extension administrators and students (where one such student was also an employee) and those students received preferential treatment and were not held accountable for their wrongful behavior and a blind eye was turned to their wrong behavior including being allowed to harass, discriminate, retaliate against Mr. Bisasor and defame Mr. Bisasor personally. One such Harvard Extension School administrator is Dean Michael Shinagel.

e. Mr. Bisasor was further retaliated against for raising concerns or reporting concerns about bias by several Harvard Extension administrators/staff who engaged in attempts to prevent another black male from running for or winning the Student Government presidency at Harvard Extension School.

f. There is also a culture of repression (similar to a "blue wall of silence") and a "blame the victim" approach at Harvard Extension School when it comes to concerns raised about discrimination, harassment and hostile environment i.e. a "turn the tables on the victim" approach. It is thus not a safe environment to report such concerns at Harvard Extension School. There have been no advocates for victims and there has been no staff that is properly trained or sensitive to these issues.

g. There is also a culture of silence and cover-up, retaliation, and brinkmanship where Dean Robert Neugeboren is the main designated "fixer" who works to squash, undermine or minimize complaints about discrimination, especially as it relates to those that could expose the school or administrators to liability. It requires tremendous courage and bravery to advance any complaint in this kind of environment as one will suffer wrath, ostracism and strategic passive-aggressive measures calculated to undermine and destroy one's credibility. This in fact has been what has happened to Mr. Bisasor. It has also happened to other students who have complained about racial discrimination.

h. On information and belief, there has also been collusion between Harvard Extension School administrators and other students, alumni and employees of Harvard to wage a

campaign of defamation and retaliation against Mr. Bisasor and another Black male student as well, creating a hostile environment for black male students at Harvard Extension School.

i. Mr. Bisasor was subjected to outright lies and defamation by Harvard Extension School administrators to other students and student leaders as well as other staff members as part of a discriminatory/retaliatory campaign.

j. Mr. Bisasor has suffered the breach of his academic records by Harvard Extension School administrators and the violation of his FERPA rights by Harvard Extension School administrators who revealed his private records to other students who then broadcasted it to the student body and on the internet, creating much harm and damage to Mr. Bisasor. Mr. Bisasor's rights here were severely trampled upon in a retaliatory and discriminatory manner.

k. Harvard Extension administrators have refused to protect Mr. Bisasor from harassment based on race and religion by other students.

l. Racially-coded epithets and racially-coded language have been used by students/employees at Harvard Extension against other black students at Harvard Extension School.

m. There has been a pattern of certain students being protected by Jewish administrators at Harvard Extension School. For most of the recent history at Harvard Extension School, there has been a majority of White-Jewish Administrators/Deans at Harvard Extension. Dean Shinagel, Dean Neugeboren, Dean Schopf, Dean Henry Leitner are a few examples. Some of these Deans have given unusual preferential treatment and assistance to other White-Jewish students including discriminating against Black students in favor of such White-Jewish students.

n. There have been other systemic patterns of discrimination at Harvard Extension School including the fact that there are no black male employees in Harvard Extension School anywhere except for a lowly maintenance person named Franz. There has been a systemic exclusion of Black males from any leadership position at Harvard Extension School as well as in the staff at Harvard Extension School.

o. There was a civil conspiracy (including Harvard Extension School administrators) to interfere with and damage Plaintiff's academics and to set him up to fail.

p. There was a civil conspiracy to create a hostile environment for Mr. Bisasor by using certain preferred students and an online forum to do so.

q. There was a civil conspiracy by Dean Robert Neugeboren and other employees along with certain preferred students to create enmity between Mr. Bisasor and other students as part of a larger effort to discredit Mr. Bisasor.

r. Mr. Bisasor, as a student government president, was banned by Dean Robert Neugeboren from speaking to other administrators about student advocacy issues,

while other white student government presidents/leaders were allowed to do so both during and after Mr. Bisasor's term as student government president.

s.  Mr. Bisasor was not given any recognition for his appointment as an HGC (Harvard Graduate Council) representative.

t.  Mr. Bisasor had certain ideas (i.e. for activities, programs, policies to benefit students while he was student government president) that he proposed to Dean Neugeboren which were rejected by Dean Robert Neugeboren but later these same ideas were adopted when non-black student government leaders proposed them.

u.  Mr. Bisasor's proposal for a student club that focused on the needs and betterment of Black students at Harvard Extension School was ignored and rejected in a discriminatory manner.

v.  Mr. Bisasor, as student government president, was not invited to certain events (which was customary for student government presidents to be invited to) while other white student government leaders were invited. Mr. Bisasor was systemically excluded from certain activities as a student government leader.

w.  Mr. Bisasor was denied proper financial assistance while other similarly-situated white students received full and proper financial assistance.

x.  Mr. Bisasor was forced by Dean Neugeboren to take certain persons onto his student government administration board while other non-black student government presidents were allowed to have their choice of officers on their board – these officers were set up to watch and monitor Mr. Bisasor or otherwise obstruct Mr. Bisasor. No other student government president past or present was ever subjected to these terms and conditions.

y.  Mr. Bisasor was subjected to a host of other micro-aggressions and other covert and subtle racial discriminatory acts by Dean Neugeboren and others, that were designed to conceal its intent but nonetheless intended to marginalize, undermine, target and damage Mr. Bisasor. Dean Neugeboren has made demeaning, condescending, disparaging and defamatory remarks about Mr. Bisasor including to other students and staff. He continually favored white students over Mr. Bisasor at almost every turn and gave other white students the benefit of the doubt over Mr. Bisasor on almost every issue. Mr. Bisasor was subjected to ridicule, sarcasm and contempt by Dean Neugeboren including in front of other students and staff.

z.  NB: From Mr. Bisasor's experience and perspective, Dean Neugeboren is a fundamentally corrupt administrator. He targets those he does not like and/or those he does not share certain affinities with; he discriminates against those who speak up or blow the whistle; and he uses his power in an unfair and abusive way but tries to cover his tracks with his intellect as a game theory economist. Dean Neugeboren has set a bad example for student leaders at Harvard Extension School for some time now and Harvard will be doing an injustice to the students who are exposed to his machinations and corrupt ethics. This is a fair warning to the university that Dean Neugeboren is a major problem to the school. This is not the first time that Dean Neugeboren has been

the center of controversy as he was cited for certain shortcomings while teaching at Harvard College. See http://www.thecrimson.com/article/2002/10/30/econ-lecturer-removed-amid-complaints-in/ ]. However, on information and belief, ever since Dean Neugeboren he has been taken in by Dean Shinagel at Harvard Extension School, he has been shielded and protected. He also served as Dean Shinagel's "fixer". He was setup to be the most powerful administrator at Harvard Extension School, aside from Dean Shinagel himself. There is no proper mechanism for holding Dean Neugeboren accountable at Harvard Extension School as he apparently is able to hold himself accountable to himself. An investigation by HMS Ombudsman, Melissa Broderick, after I sought her advice and assistance on these and related matters in 2012, revealed that there is really no way around the involvement of Dean Neugeboren in any investigation or accountability mechanism at Harvard Extension School, even if he himself is the subject of a complaint.

aa. Mr. Bisasor has further evidence that shows that Dean Neugeboren is corrupt, unethical, and prejudiced. He plays favorites and discriminates against students of color, particularly Black males such as Mr. Bisasor. He uses his education and intelligence for wrong purposes against certain unsuspecting and unwitting students, such as Mr. Bisasor. In particular, he uses his background in game theory and strategy (as an economist) against certain students (such as Mr. Bisasor) in clever but malevolent ways. He politicizes many of his decisions regarding certain students and student leaders, such as Mr. Bisasor. He uses deceptive means to achieve his ends and disregards the rights of students such as Mr. Bisasor. He uses informal means to assassinate the character of certain students that he does not like and tries to use his clout and position to turn people against certain students such as Mr. Bisasor. He creates and looks for opportunities to drive wedges between certain students in order to isolate the targets of his discrimination and bias. He operates with blatant and sometimes subtle contempt, and aggression towards certain students such as Mr. Bisasor, depending on the circumstances of whether he thinks he can get away with it. He maligns certain students' character with impunity and sends signals to other students that it is acceptable to disrespect, disregard, dismiss, or ignore certain students such as Mr. Bisasor. He sets a bad example of leadership for upcoming future leaders teaching them by example that it is acceptable to use manipulation, deception, intimidation, character assassination and racial micro-aggression/invalidation against students of color. He also teaches that it is acceptable to suppress votes and to manipulate elections in order to push through one's agenda. He lacks the integrity and honor that is commensurate with a Dean of Students Office. He has shown special disdain and contempt for Mr. Bisasor as an outspoken Black Jamaican male.

bb. NB: These observations are based on Mr. Bisasor's personal knowledge as a kind of "an insider" at Harvard Extension School. He became somewhat of an "insider" because of his rise to leadership through his abilities and results that he generated that brought him close to the inner workings of power at Harvard Extension School (as well as Harvard in general). Mr. Bisasor has had a close up view of how things operate at Harvard Extension School in particular. Mr. Bisasor was not invited into this position by Harvard Extension Administrators (in fact, attempts were made by these Harvard Extension administrators to block him from rising to certain leadership positions) but Mr. Bisasor was elected by the students on a grassroots basis. So Mr. Bisasor can hereby speak with authority on these matters as an insider or at least a quasi-insider. Mr. Bisasor knows firsthand many of things that he has stated herein. Because of his

direct experiences as well as his access to certain information while Mr. Bisasor was student government president and a student leader for many years, he is privy to facts that very few people are privy to. He is not some outside person who does not know what he is talking about. He has intimate knowledge of the facts and evidence that he has been pointing to or alluding to. If given a chance to present his evidence, Mr. Bisasor will demonstrate that his concerns and assertions are valid and well-founded.

cc. Mr. Bisasor has had to endure a severe and pervasive racially hostile environment which was affected his ability to pursue and enjoy his educational experience at Harvard. It also affected his ability to concentrate on his academic studies including adverse impact on his otherwise stellar academic record at HES.

dd. Mr. Bisasor has many more examples of discriminatory, retaliatory and other wrongful acts that have occurred that he would have liked to have put into a proper form for submission so that it conforms to any criteria required by Harvard Extension School. But he has not been given the requisite instruction or otherwise has been rebuffed or ignored when he has asked for the appropriate instruction, process and procedures.

210.    The discrimination Mr. Bisasor suffered has caused him much harm including emotional distress and other consequential damages.

211.    Mr. Bisasor has also been discriminated against by Harvard Extension School in other ways.

212.    Dean Neugeboren has repeatedly given favoritism treatment to certain other white students over against Mr. Bisasor and in contrast to his unfair treatment of Mr. Bisasor.

213.    Dean Neugeboren has been repeatedly hostile in his tone towards Mr. Bisasor and is emblematic of a pattern of hostile and condescending treatment that Mr. Bisasor experienced at the hands of Dean Neugeboren.

214.    Throughout Mr. Bisasor's term as student government, Dean Neugeboren administrators did not apply consistent standards to Mr. Bisasor that had been or was supposed to be applicable to every HESA President. Instead Dean Neugeboren repeatedly found pretextual reasons, excuses, and defenses to explain or explain away his favoritism treatment of other white student government leaders and his disparate treatment of Mr. Bisasor. There are many examples of disparate treatment between Mr. Bisasor and other prior as well as subsequent non-black HESA Presidents, which highlights how poorly Mr. Bisasor was treated as HESA President including:

a.  the improper handling of the transition to his term as HESA President.

b.  removing the opportunity to participate in any of the Alumni Banquets whether as incoming HESA President or as outgoing HESA President which is a clear example of disparate treatment between Mr. Bisasor and other past and subsequent HESA Presidents.

c.  failure to feature Mr. Bisasor in articles and write-ups at Harvard Extension School as had been done for past and subsequent non-black HESA presidents.

d.  the immediate interference with his term as HESA President.

e.  the unprecedented undermining of HESA President authority by Dean Neugeboren while Mr. Bisasor was in office.

f.  disparate treatment with Mr. Bisasor's advocacy related to an Online Teaching Evaluation Survey.

g.  the escalation of contemptuous and disrespectful behavior by Dean Neugeboren towards Mr. Bisasor

h.  his work as a student government leader scrutinized more critically than non-Black student government leaders, and he has been reprimanded for no reason despite his excellent performance and significant contributions as a student leader while other white student leaders were defended by the administration.

i.  Mr. Bisasor was subjected to harsher discipline and closer scrutiny than his white counterparts.

j.  Mr. Bisasor was subjected to the unnecessary calling of police against him for his scheduled participation in a student government meeting where he expressed unpopular views and his freedom of speech stifled. He was humiliated and embarrassed and treated like a criminal. Harvard Extension Administrators ignored his complaints about the matter and instead tried to turn his complaint around on him. Video of the incident was placed online causing Mr. Bisasor further humiliation. Harvard administrators have ignored his complaints about this matter to this very day, refusing to hold perpetrators accountable. Mr. Bisasor was therefore provided different terms and conditions as a student government president because of his race.

k.  Mr. Bisasor suffered a deep lack of support from the HES administration while he was student government president at HES, something that no other student government president at HES has ever suffered before or since Mr. Bisasor's term as the first black male HESA president in HES history. He was left out in the cold, given the cold shoulder and roadblocks were put in his way to make his management/leadership task much harder. HES administrators attempted to prevent him from succeeding and erected barriers to his success (some obstacles were subtle and some were blatant). Even to this day, HES administrators either refuse to or otherwise grudgingly recognize his contributions and have sought to erase evidence of his contributions. HES administrators wanted to keep him in his place and wanted him to fail. The attitude, the disgust, the scowl, the animosity, the jealousy that were all directed at Mr. Bisasor by Dean Neugeboren and others were indicative of Mr. Bisasor's affront to white privilege and they wanted to cut him down to size and "put him in his place". They were searching for a way to sabotage his administration. They spied on him, lied on him, assassinated his character with lies, innuendo, and coded language. There was an active attempt to hold him back and punish him, not wanting him to be too successful or powerful (one student leader said that she was told that they were threatened by the power he garnered from his successful events and leadership).

l.  And many more examples.

215.   At meetings, Dean Neugeboren undercut Mr. Bisasor' authority as student government president and otherwise sought to minimize his ideas/contributions. Dean Neugeboren has not treated other non-black student government presidents with similar disregard in public as he generally supported other white student government presidents, even when making difficult personnel decisions, and he made every effort to not undermine their authority. Not so, with Mr. Bisasor.

216.   In general, non-black student government presidents received full support from Dean Neugeboren but Mr. Bisasor did not receive such support.

217.   Mr. Bisasor has suffered the indignity and embarrassment of having campus police called on him, while he was on the floor of a student government meeting and speaking about unpopular things that needed to be addressed including national origin discrimination in voting at HES. Not only was his free speech/academic freedom (as promised by university policy) stifled and violated but he was also publicly humiliated in a way that no previous or subsequent by non-black student government president was. When Mr. Bisasor reported the matter to Dean Neugeboren (and to Dean Shinagel), Dean Neugeboren sought instead to protect the perpetrators of these wrong acts and insisted on trying to turn the tables back on Mr. Bisasor. Also, when another former student government president, who was white, sought to take over a meeting being presided over by Mr. Bisasor (while he was a sitting student government president) and also sought to publicly embarrass him by usurping his authority in front of a large meeting of approx 200 people, Dean Neugeboren and Dean Shinagel did nothing about it. In fact, when Mr. Bisasor reported the matter, he was told to "bend with the wind or else you will break"). Such incidents suggested that Mr. Bisasor, as the first Black male and first Jamaican in history to be elected student government president, could be treated abusively with no consequences.

218.   Mr. Bisasor's activities were monitored in a fashion not imposed on prior or subsequent non-black student government presidents. Dean Neugeboren actively encouraged certain subordinates of Mr. Bisasor to report Dean Neugeboren with any complaints about Mr. Bisasor. This eventually resulted in a number of frivolous complaints and even more frivolous appeals (from certain persons who were hostile towards Mr. Bisasor) for the removal of Mr. Bisasor from office. This kind of thing was never encouraged by Dean Neugeboren for previous or subsequent non-black student government presidents. In fact, Dean Neugeboren has gone out of his way to defend and protect all other non-black sitting student government presidents. In one example, Dean Neugeboren even asked a student who wanted to make a complaint about a student government president to keep it quiet because such complaints reflect badly on the school. Yet, not only was it never considered by Dean Neugeboren that complaints about Mr. Bisasor would reflect badly on the school, but in fact Dean Neugeboren actively encouraged it and even he himself participated in spreading negative, discrediting information about Mr. Bisasor to others including students and to even those subordinates of Mr. Bisasor.

219.   Dean Neugeboren actively sought to demean Mr. Bisasor and his work, and sought to discredit and harm his reputation. Mr. Bisasor's responsibilities as student government president was thus limited, his functions reduced, and he was effectively marginalized.

220.    As student government president, Mr. Bisasor was not introduced to other administrators nor oriented in any way (i.e. he was not introduced to key persons/administrators with whom he would or might have contact with as a student government president) but instead was banned from speaking with other administrators and was ordered to only speak to the Dean of Student's office. This was unprecedented and laced with racial implications.

221.    Mr. Bisasor was also not provided access to office space as other non-black student government presidents had been given. Dean Neugeboren refused to offer full support for Mr. Biasor's initiatives. He refused to provide concrete resources to assist Mr. Bisasor and in fact, took away certain resources from him while student government president.

222.    Despite this treatment and these obstacles, Mr. Bisasor still excelled at bringing major improvement to the student government and to the school in an unprecedented way including being the first student government president at HES to ever be invited on a local NBC new show. Mr. Bisasor was ambitious in his goals and raised the bar for organization as a whole by all objective accounts.

223.    Strikingly, Mr. Bisasor was also subjected to racially tinged and pejorative terms like "you people" and "boy". He also received deliberately indifferent dismissals of his complaints and concerns where he was told that he was in need of "psychological help", that he was "too sensitive" or otherwise that he should "bend with the wind so as not to be broken" or that he was to stop whining and bugging about his concerns, among other things, or was callously told "who cares what you think". He was also told that "Jews take care of their own here" and "Jews are favored here". He was also warned that "you will be hurt" or "I don't want to see you get hurt" if Mr. Bisasor persisted in raising concerns and complaints. Other black male students were called "ghetto", "untrustworthy", and "not fit for office". Mr. Bisasor's ethnic origins through his name was also mocked, by being pejoratively heckled as "Bis-ASS-sor" as well as "Bitch-ASS-sor". These and other terms further establishes an objective racially hostile environment for Mr. Bisasor as a student.

224.    Mr. Bisasor was continuously subjected to rude, disrespectful and belittling treatment by Harvard Extension School administrators, and by certain students and employees who were close to the HES administration.

225.    Mr. Bisasor received very little if any benefit of the doubt and Mr. Bisasor was allowed no room for any mistakes while other white or non-black student leaders were treated differently.

226.    Defendants have been engaged in attempts to discourage, keep, prevent or stop black males from running for and/or winning the office of student government president.

227.    There has been a pattern of mistreatment and hostile treatment of black males at HES. The harassment has been both physical and verbal and has included offensive comments based on race and religion.

228.    Defendants have had other complaints lodged by black students, in especially as it relates to how they are being mistreated.

229.    One Harvard university administrator from Harvard Central told Mr. Bisasor that race and racial complaints had been a persistent problem at Harvard Extension School for many years.

230.    Harvard Extension administrators have allowed discriminatory/retaliatory, hostile and defamatory behavior against black students to continue unchecked. They have refused to put in place effective internal procedures to handle discrimination complaints, especially when it involves administrators.

231.    Black males are subjected to negative racial stereotypes at HES i.e. they are also treated with suspicion and with assumptions of criminality and are thus to be watched and monitored if they ever get into any position of student leadership. Black males in particular are seen as not to be trusted.

232.    Plaintiff has also experienced associational discrimination. Plaintiff's wife has also experienced numerous instances of racial hostility directed at her because of her association with Plaintiff. She became a target of various threats and harassment by other students and employees who were responsible for the racial hostility directed against Plaintiff and other black students. The hostile conduct ranged from "cold shoulder", to defamatory online attacks as well as denial of funding for student-led activities, removal from student leadership position and denial of access to graduate program of study. She was also discriminated against in the way how she had been allowed to operate as a student leader and how she was prevented from finishing her term in office as a student club leader. His wife was thus subjected to a racially hostile environment based on her association with Plaintiff.

233.    Defendants have allowed or facilitated systemic patterns of racial discrimination to take place as follows: Defendants have allowed or engaged in systemic racial discrimination at the upper management level of the school. In particular, Black males are conspicuously missing from the ranks of Deans, directors or other leadership positions.  The only positions that black males are allowed to have are largely lower-level positions either as maintenance or janitorial staff. On information and belief, this utter lack of diversity filters throughout the culture of the school and affects how black male students are treated.

234.    Defendants discriminated against Plaintiff because of their race and conspired to interfere with Plaintiffs civil rights to equal access to opportunities, programs, benefits, terms and conditions in education while at Harvard Extension School.

235.    Defendants' actions constitute a pattern of repeated harassment of Plaintiff which were designed and committed to interfere with Plaintiff's civil rights.

236.    Plaintiff has been subjected to derogatory and threatening comments based on his race by students, employees and administrators at Harvard Extension School and Harvard University. Defendants have failed to address this hostile environment for Mr. Bisasor.

237.    Defendants have discriminated against Plaintiffs because of their race, and have acted intentionally, willfully, and with reckless disregard for Plaintiffs' federally protected civil rights.

238.    Defendants have discriminated against Plaintiffs because of their race in violation of the
Civil Rights Act of 1866, 42 U.S.C. §§ 1981 and 1982 and Title VII; and have acted
intentionally, willfully, and with reckless disregard for Plaintiff's federally protected civil
rights.

239.    As a result of the Defendants' actions, Plaintiffs have suffered and are continuing to suffer
great harm and injury, including but not limited to economic loss, humiliation, embarrassment,
emotional distress, mental anguish, stress, depression, and the deprivation of the right to
education on an equal basis with other persons regardless of race.

240.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and continues to
suffer damages including, but not limited to, losses, pain and suffering, and emotional distress.

241.    Defendants have acted intentionally, willfully, and with reckless disregard for Plaintiff's
civil rights, and as a result, Plaintiff is entitled to actual and punitive damages.

242.    Defendants, through the acts and omissions described above, *inter alia*, has aided, abetted,
incited, compelled and/or coerced others into discriminating unlawfully against Mr. Bisasor
because of his race, or attempted to do so, in violation of both federal and state law.

243.    As a result of Defendant's discriminatory conduct, Mr. Bisasor has suffered and continues
to suffer damages including, but not limited to, professional opportunities, other losses, loss of
personal and professional reputation, pain and suffering, and emotional distress.

### COUNT IV - VIOLATION OF 20 U.S.C. § 1681 (TITLE IX)
(Defendants)

244.    Plaintiff hereby realleges and incorporates by reference each of the preceding paragraphs
as if fully stated herein.

245.    Title IX states in pertinent part: "no person in the United States shall, on the basis of sex,
be excluded from participation in, be denied the benefits of, or be subjected to discrimination
under any education program or activity receiving Federal financial assistance..." 20 U.S.C. §
1681(a).

246.    Harvard receives federal funding under Title IX, 20 U.S.C. §§ 1681-1688 (201 1).

247.    As a Title IX recipient, Harvard is required to comply with the requirements of Title IX as
well as those of the regulations promulgated thereunder by the Department of Education.

248.    These regulations require each school receiving Title IX funds to "adopt and publish
grievance procedures providing for the prompt and equitable resolution of student complaints
alleging any action which would be prohibited by Title IX or its regulations." 34 CPR. 106.8
(2010). (emphasis added).

249.    The regulations further require that "a school's procedures must accord due process to both
parties involved ...".

250.    Harvard's policies, as written and as implemented with respect to Mr. Bisasor's complaints about intersectional discrimination against him as a black male and other such grievances, are not equitable and do not accord due process to him as the Plaintiff.

251.    As a result of Harvard's enforcement of this policy and its failure to comply with the other requirements under Title IX with respect to its procedures, Mr. Bisasor has been denied the benefits of the school's educational program in Violation of Title IX.

252.    Mr. Bisasor has also experienced associational discrimination directed at his wife, a black female who was a student at Harvard Extension School.

253.    As a result of Defendant's discriminatory conduct and violations of Title IX, Mr. Bisasor has suffered and continues to suffer damages including, but not limited to, pain and suffering, and emotional distress.

## COUNT V - RETALIATION
### (Defendants)

254.    Plaintiff hereby realleges and incorporates by reference each of the preceding paragraphs as if fully stated herein.

255.    Defendants have retaliated against Plaintiff because Plaintiff raised concerns about race/ethnicity and/or religious discrimination.

256.    Subsequent to Plaintiff's complaints, Plaintiff was subjected to multiple attempts at retaliation by Defendants. Defendants have expressed anger on several occasions that Plaintiff made these complaints.

257.    There was also a substantial change in how Plaintiff was treated by Defendants.

258.    Plaintiff was subjected to further hostile environment after complaining about discrimination based on religion and based on race.

    a.    Defendants have yelled at Plaintiff; refused to communicate with him on important matters; failed to assist him while he was a student leader; interfered with his academic work; attempted to remove or strip him of his duties and responsibilities which fundamentally changed the nature of his position as a student leader; and engaged in an effort to get him and his wife out of student leadership positions or otherwise to defame, discredit or undermine him.

    b.    Plaintiff has also been denied participation in graduate program of study for which he qualified, as a result of retaliation for raising concerns about discrimination.

    c.    Mr. Bisasor had previously asked for a recommendation for law school based on his achievements as a student leader, but he kept getting stonewalled (on information and belief, other student leaders received such recommendations without a problem).

    d.    Mr. Bisasor was also barred from running the ALM Thesis Forum and it was given to other favored white students to run immediately subsequent to Mr. Bisasor's raising a

complaint about those white students involvement in a smear campaign against another black male student, and attempt to block that black male student from running for the office of HESA President. A student club leader told Mr. Bisasor explicitly that both of these white students had something planned for him in retaliation for his complaints on behalf of that black student.

e.  Another student explicitly posted online that Robert Neugeboren had shortly thereafter made derogatory remarks about Mr. Bisasor and threatened to shut down HESA because of Mr. Bisasor. When Mr. Bisasor confronted Dean Neugeboren about this, he refused to answer or address the matter. Instead Dean Neugeboren rewarded those white students who were the subject of the racial complaints and sought instead to malign and attack Mr. Bisasor. On information and belief, Dean Neugeboren and these white students conspired to defame Mr. Bisasor in retaliation and to subject him to a hostile environment.

f.  When Mr. Bisasor escalated his concerns upwards, Dean Neugeboren retaliated again by blaming Mr. Bisasor and revealing confidential email communications about his concerns to the white students who were involved in the retaliation.

g.  At around the same time. Mr. Bisasor was targeted for malicious online harassment in retaliation. Mr. Neugeboren and HES administrators did nothing to stop the harassment when Mr. Bisasor brought it to their attention.

h.  Shortly thereafter, Mr. Bisasor found himself in the cross-hairs of a disciplinary procedure that was headed up, controlled and steered by Dean Neugeboren, who had a conflict of interest, and Mr. Bisasor was erroneously found guilty, largely based upon the biases and the dislike that Dean Neugeboren and other HES administrators had for Mr. Bisasor.

i.  Dean Neugeboren and others also orchestrated the blocking of funding for events organized by Mr. Bisasor and his wife in order to sabotage the student club that they founded and to eventually shut it down.

j.  There are many other examples of retaliatory conduct.

259.  Defendants have allowed this retaliation to occur and have failed to act to prevent retaliation from occurring, even-though several attempts were made to appeal to the higher-ups and top leadership of the school as well as the board of directors for intervention. This failure to act impugns the entire organization from top to bottom and invites a cause for punitive damages. Defendants' actions and inactions have therefore been exhibited outrageous and reckless conduct. Society has an interest in rooting out willful and illegal retaliation in education matters and the Defendants are likely to continue such repugnant behavior without a finding for punitive damages.

260.  Defendants, through the acts and omissions described above, *inter alia*, retaliated against Plaintiff for exercising rights protected by both federal and state law.

261.  Defendants, through the acts and omissions described above, inter alia, aided, abetted, incited, compelled and/or coerced others to retaliate unlawfully against Plaintiff, or attempted to do so, in violation of both federal and state law.

262.   As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages.

263.   As a result of Defendants' retaliatory conduct, Plaintiff has suffered and will continue to suffer damages including, but not limited to, pain and suffering, and emotional distress.

## COUNT XI - BREACH OF IMPLIED CONTRACT
### (Defendants)
264.   Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

265.   Defendants have published materials containing policies, terms, guidelines, representations and promises which created an implied contract with Mr. Bisasor.

266.   Mr. Bisasor relied on the terms and conditions of the published policies, terms, guidelines, representations and promises of Defendants in seeking to become associated with Defendants and later in seeking to avail himself of all of the benefits, access, resources and protections available to him as promised by Defendants.

267.   Defendants breached this implied contract by refusing to follow their own policies, by treating Mr. Bisasor in an unfair, deceptive and disparate manner and by retaliating against Mr. Bisasor when he raised concerns about his treatment or about their adherence to their own policies.

268.   As a result of those actions, Mr. Bisasor has suffered and will continue to suffer damages including, but not limited to, pain and suffering, and emotional distress.

269.   Mr. Bisasor and Harvard had a contractual relationship, either express or implied.

270.   Such contract was formed on the one hand by Mr. Bisasor's payment of tuition and fees to the university and on the other, by the terms contained in the Student Handbook, the school catalog, and other school materials on its websites and other places.

271.   Mr. Bisasor had a reasonable expectation that Harvard would adhere to the terms of such contract.

272.   Mr. Bisasor further had a reasonable expectation that Harvard's stated procedures would comply with the requirement under the Title IX regulations to provide an equitable process.

273.   Harvard's procedural violations, acts and omissions as described herein rendered unfair the proceedings that Mr. Bisasor has been involved in.

274.   Such failures combined to cause Mr. Bisasor significant prejudice in that he was denied an even-handed assessment of the facts.

275.   As a direct and proximate result of Defendants' breach, Plaintiff has suffered damages.

## COUNT VII - BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Defendants)
276.   Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

277.  Massachusetts law recognizes an implied covenant of good faith and fair dealing in all contracts, either express or implied.

278.  Defendants owed to Plaintiff a duty of utmost good faith and fair dealing and thereby were obligated to consider the welfare of Mr. Bisasor, refrain from acting for purely selfish motives or private gain, and desist from destroying or injuring the right of the Plaintiff to receive the fruits of the contract.

279.  Through its actions and inactions, Defendants breached its duty of good faith and fair dealing to Mr. Bisasor, intentionally engaged in wrongful conduct, and did knowingly injure or otherwise harm Mr. Bisasor's rights and interests.

280.  By the conduct alleged herein, the College has breached the implied covenant of good faith and fair dealing, and caused harm to Mr. Bisasor.

281.  As a result, Plaintiff has suffered damages.

## COUNT VIII – VIOLATION OF MASSACHUSETTS GENERAL LAWS CHAPTER 93A UNFAIR AND DECEPTIVE PRACTICES
### (Harvard)

282.  Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

283.  Defendant Harvard are engaged in trade and commerce as defined by Massachusetts General Laws, Chapter 93A.

284.  The foregoing actions and inactions of Defendant Harvard constitutes unfair and deceptive acts and practices as defined by, and in violation of Massachusetts General Laws, Chapter 93A.

285.  In consequence of Defendant Harvard unfair and deceptive acts, Mr. Bisasor has suffered and will continue to suffer damages including, but not limited to, pain and suffering, and emotional distress.

286.  Defendant Harvard, in breaching Plaintiffs' rights, and discriminating against Plaintiffs in access to education, engaged in unfair and deceptive trade practices.

287.  Defendant Harvard has engaged in active concealment including but not limited to the fact that Defendant Harvard had a duty to disclose its policies and procedures. They actively concealed this same information by telling Plaintiff that nothing was available or otherwise refusing to provide it to Plaintiff.

288.  Defendant Harvard have engaged in misrepresentation and deception including but not limited to the following:

  a.  Defendant Harvard has engaged in other unfair and deceptive practices that have caused Plaintiff harm including making misrepresentations.

b. Defendant Harvard has engaged in lies, deception and unethical tactics.

c. Defendant Harvard has engaged in deception and deceptive acts. To the extent that such acts may be otherwise lawful, these acts are nevertheless unfair or oppressive acts. Defendant Harvard has engaged in lies and misrepresentation including lying by omission, deception by fine print, false advertising, dishonest communication/activity and non-transparency with Plaintiff as a student.

d. Defendant Harvard engaged in making implied threats and signaling that Plaintiff is unwelcome at Harvard Extension School.

e. Defendant Harvard has engaged in hostile, negative, uncooperative, antagonistic and unhelpful attitude towards Plaintiff in retaliation.

f. Defendant Harvard has refused, in bad faith, to appropriately investigate Plaintiff complaints, though initially leading Plaintiff to believe that they would.

g. Defendant Harvard knowingly caused Plaintiff emotional distress by retaliating against Plaintiff.

h. Defendant Harvard failed to inform all students of the opportunity available for voting for the 2012 HESA constitution.

i. Defendant Harvard has failed to investigate and root out unfair practices, discrimination, retaliation, which if done, would ensure ethical and honest leadership.

j. Plaintiff has suffered harm, including emotional distress. Plaintiff is also entitled to money damages including statutory damages or actual damages for each violation, with amounts doubled or trebled, since Defendant Harvard knew or should have known their acts were unfair or deceptive.

k. Defendant Harvard has engaged in deceptive marketing, including but not limited to, promising one thing to students to lure them to become students and then once they become students and have paid their tuition or have committed to a program of study, they then renege on these promises or otherwise treat students in subpar manner.

l. Defendant Harvard's conduct alleged herein in making false and misleading representations to Plaintiff constitutes unfair and deceptive practices within the meaning of Mass. Gen. L. ch. 93A, ##2 and 9.

289.    Defendant's actions, statements and omissions alleged herein were committed willfully and knowingly.

290.    As a result of the unfair and deceptive acts or practices alleged herein, Plaintiff sustained injury.

291.    In consequence of Defendant Harvard unfair and deceptive acts, Plaintiff has suffered and will continue to suffer damages including, but not limited to, pain and suffering, and emotional distress.

292.    Plaintiff has sent more than one written communications including demand letter to Defendant Harvard describing, in one form or other, the unfair acts or practices described above as well as demanding relief or that action is taken to remedy the situation by Defendant Harvard.

293.    Defendant Harvard has refused to grant relief or to make a reasonable offer of settlement to Plaintiff. This refusal to grant relief was done in bad faith with knowledge or reason to know that the acts of Defendant Harvard violated Massachusetts Laws.

294.    The unfair and deceptive practices include discrimination and retaliation, breach of contract, emotional distress and deceptive marketing, etc, and relief was demanded pursuant to the Massachusetts Consumer Protection Act, G.L. ch. 93A, s. 9. Defendant Harvard failed to make a reasonable, written tender of relief within thirty (30) days of the demand and as a result they are liable for multiple damages, costs, and reasonable attorney's fees.

295.    Plaintiff is entitled to an award of treble damages incurred in connection with this action pursuant to Massachusetts General Laws 93A.

## COUNT IX - UNJUST ENRICHMENT

### (Harvard)

296.    Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

297.    In the alternative, Mr. Bisasor also alleges Unjust Enrichment.

298.    Harvard received a substantial monetary benefit, in the form of several years' tuition and fees paid in full by Mr. Bisasor.

299.    As set forth above, due to gross and numerous violations of its own procedures and its policies, Mr. Bisasor has suffered significant prejudice and was subjected to inherently flawed and fundamentally unfair processes.

300.    Defendants have therefore been unjustly enriched by monies paid for education.

301.    By its wrongful acts and omissions, Defendants have been unjustly enriched at Plaintiff's expense, and conversely Plaintiff has been unjustly deprived.

302.    As a result, Mr. Bisasor has been caused significant harm.

303.    For the reasons set forth herein, under the circumstances it would be inequitable for the Harvard to retain the tuition it has received from Mr. Bisasor.

## COUNT X - VIOLATION OF MASSACHUSETTS CIVIL RIGHTS ACT

### (Defendants)

304.     Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

305.     By threats, intimidation and coercion, defendants have interfered and attempted to interfere with Mr. Bisasor's rights, causing him harm, all as proscribed by G.L. c. 12 $$11II, 11I.

306.     The foregoing actions and inactions of Defendants constitute a violation of Massachusetts Civil Rights Act.

307.     In consequence of Defendants actions, Mr. Bisasor has suffered and will continue to suffer damages including, but not limited to, financial losses, loss of personal and professional reputation, pain and suffering, and emotional distress.

## COUNT XI - CIVIL CONSPIRACY

### (Defendants)

308.     Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

309.     Defendants, acting in concert in furtherance of their scheme, committed unlawful acts and encouraged and enabled one another to do so to the injury of Mr. Bisasor.

310.     Defendants knew that their acts and the acts of each other were violative of Mr. Bisasor's rights.

311.     In consequence of Defendants civil conspiracy, Mr. Bisasor has suffered and will continue to suffer damages including, but not limited to, financial losses, loss of personal and professional reputation, pain and suffering, and emotional distress.

## COUNT XII - VIOLATION OF FERPA AND INVASION OF PRIVACY (BREACH OF CONTRACT & DEFAMATION)

### (Defendants)

312.     Plaintiff re-alleges and incorporates all paragraphs above as if fully set forth herein.

313.     Defendants have violated Plaintiff's FERPA and privacy rights by revealing to students Mr. Bisasor's private information in his educational record.

314.     One student reported that she was told this information by three separate Harvard Extension School Administrators. She also stated that this information was also in the possession of several other students, with the implication that this had become widespread, as a result of this malicious breach by HES administrators.

315.     False statements about Mr. Bisasor's record were also promulgated via the statements of these administrators.

316.     By knowingly and intentionally communicating and publishing such false statements, defendants have defamed and libeled plaintiff.

317.    As a result, there has been tremendous harm to Mr. Bisasor and have suffered public humiliation and embarrassment, particularly due to the very public revelation of Mr. Bisasor's private educational records via the Internet and otherwise. Mr. Bisasor has also suffered the tarnishing of his name and reputation at Harvard Extension School.

318.    When Mr. Bisasor asked for this to be investigated and remedied, Dean Robert Neugeboren sought to protect those involved with this breach of privacy and this violation of FERPA statutes, rather than appropriately address the matter, thereby trampling upon Mr. Bisasor's rights.

319.    This is also particularly troubling for Mr. Bisasor because he was subjected to an unfair administrative procedure because of racial bias and/or retaliation against him for filing a race discrimination-related complaint against school officials/staff). Mr. Bisasor was treated less favorably than another student who was involved in the process. This was also a breach of contract.

320.    Mr. Bisasor was not allowed the right to study in an educational environment free from racial and religious hostility and he had to endure an atmosphere so severe, persistent or pervasive that it interfered with and limited his ability to participate in and benefit from the programs and activities at Harvard Extension School.

321.    The HES administration also failed to take into account the fact that the discrimination that Mr. Bisasor experienced significantly affected his educational pursuit.

322.    Mr. Bisasor was not given any benefit of the doubt that would be given under normal circumstances, as would be given to similarly-situated students.

323.    To add insult to injury, the HES administration maliciously divulged Mr. Bisasor's educational records to students who then published it on the internet.

324.    HES administrators have also violated FERPA by failing to provide the Plaintiff access to Plaintiff's educational records (for review and inspection) within the 45 day timeframe mandated by FERPA.

325.    In consequence of Defendants violations, Mr. Bisasor has suffered and will continue to suffer damages including, but not limited to, pain and suffering, and emotional distress.

### COUNT XIII - INTERFERENCE WITH CONTRACT & ADVANTAGEOUS RELATIONS

(Robert Neugeboren, Huntington Lambert, Michael Shinagel, Danslav Slavenskoj, Ken Vedaa, Krishan Arora, Philip Harding, Ashley Pollock, Jane & John Doe)

326.    Plaintiff hereby realleges and incorporates by reference the foregoing paragraphs of the Complaint as if fully stated herein.

327.    Mr. Bisasor possesses a prospective economic advantage in the marketplace derived from his experience and background in conference planning and related activities including speaking, consulting and training.

328.    Defendants knew about Mr. Bisasor's continuing efforts to promote his services and experience to the marketplace through his business.

329.    Defendants also knew about Mr. Bisasor's visibility in the marketplace as a speaker and conference planner, including for faith-based Christian events.

330.    Defendants have intentionally interfered with the prospective advantages of his relationships with existing and prospective business and professional associates through improper motives or means

331.    As a result of Defendants misconduct, Mr. Bisasor's prospective business advantages may be irretrievably damaged. Mr. Bisasor has suffered and will continue to suffer substantial and irreparable harm.

332.    Furthermore, during times relevant to this matter, Mr. Bisasor and his wife enjoyed advantageous relationships with various persons and groups, including, *inter alia,* Harvard University's student groups as well as with students, alumni and community members of Harvard. Mr. Bisasor anticipated further advantageous relations with Harvard's community of students and alumni in the future.

333.    The conduct described above was the clear use of improper motives and means to accomplish the interference by these defendants with plaintiff's contract rights and advantageous relations secured by plaintiff in the community.

334.    This interference with contract rights and advantageous relations and prospective business advantage caused plaintiff injury and damages to the extent as will be shown at trial

335.    By its above described conduct, *inter alia,* Defendants have knowingly, improperly, and malevolently, and without lawful justification, intentionally and tortiously interfered with Mr. Bisasor's actual and potential advantageous relations.

336.    As a result of his intentional interference, Defendants has suffered and continues to suffer damages, including but not limited to loss of reputation, loss of professional opportunities, pain and suffering, and emotional distress and other losses.

### COUNT XIV
#### (Irreparable Injury to Plaintiff by Defendants)

337.    Plaintiff hereby realleges and incorporates herein all allegations contained in the foregoing paragraphs of this complaint as if fully set forth herein.

338.    The defamatory conduct that Plaintiff has experienced is highly damaging. They have and will continue to cost plaintiff professional opportunities and financial losses for the reasons explained above. Moreover, they have and will continue to cause plaintiff harm of a kind that cannot be fully compensated by money damages alone.

339.    All such defamatory or harmful statements should be ordered to be removed so as not to cause further harm to Plaintiff.

## COUNT XV – NATIONAL ORIGIN DISCRIMINATION
### (Defendants)

340.    Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs of the Complaint as if fully stated herein.

341.    Plaintiff is of Jamaican national origin and is a member of a protected class.

342.    Plaintiff has suffered discrimination, disparate treatment and mistreatment based on his national origin as a student at Harvard Extension School.

343.    Defendants are required to refrain from discriminating against any student on the basis of race, ethnicity or national origin in the terms, conditions, or privileges of education. It is also unlawful for an educational institution to discriminate against a student based upon the school's perception that the student is a member of a protected class.

344.    Educational institutions shall therefore not treat their students differently in terms, conditions, access, privileges and benefits because of race, ethnicity or national origin.

345.    Pursuant to federal and state law, educational institutions have the responsibility to prevent discrimination and investigate allegations of discrimination.

346.    In its stated policies (including its handbook), Harvard promises that *harassment or discrimination based on race, color, religion, gender or any other classes protected by law against any student is unlawful, and that such harassment or discrimination will not be tolerated by this organization.* Harvard policies also state that *harassment includes verbal or physical conduct that may or does offend, denigrate or belittle any individual because of or due to race, color, religion, gender, national origin, or any other classes protected by law. Such conduct includes, but is not limited to, pictures, jokes, comments, innuendos or any other behavior which creates an environment that is hostile, offensive, intimidating, or humiliating. Further, any retaliation against an individual for complaining about harassment or discrimination, or retaliation against individuals for cooperating with an investigation of a harassment or discrimination complaint, is similarly unlawful and will not be tolerated.*

347.    Defendants have discriminated against Plaintiff because of his national origin, and have acted intentionally, willfully, and with reckless disregard for Plaintiffs' federally protected civil rights.

348.    Defendants have also undertaken action that discriminated against other students based on their national origin.

349.    When Plaintiff brought these issues to the attention of administrators, he was rebuffed, ignored or experienced further retaliatory treatment.

350.    As a result of the Defendants' actions, Plaintiff has suffered and is continuing to suffer great harm and injury, including but not limited to economic loss, humiliation, embarrassment, emotional distress, mental anguish, stress, depression, and the deprivation of the right to education on an equal basis with other persons regardless of national origin.

351.    As a result of Defendants' discriminatory conduct, Plaintiff has suffered and continues to suffer damages including, but not limited to, financial and other losses, pain and suffering, and emotional distress.

352.    Defendants have acted intentionally, willfully, and with reckless disregard for Plaintiff's civil rights, and as a result, Plaintiff is entitled to actual and punitive damages.

353.    Defendants, through the acts and omissions described above, *inter alia*, has aided, abetted, incited, compelled and/or coerced others into discriminating unlawfully against Mr. Bisasor because of his national origin, or attempted to do so, in violation of both federal and state law.

354.    As a result of Defendant's discriminatory conduct, Mr. Bisasor has suffered and continues to suffer damages including, but not limited to, pain and suffering, and emotional distress.

## COUNT XVI – BULLYING/CYBERBULLYING, CYBERHARRASSMENT AND/OR CYBERSTALKING VIOLATIONS
### (Defendants)

355.    Plaintiff hereby re-alleges and incorporates by reference the foregoing paragraphs of the Complaint as if fully stated herein.

356.    In violation of Mass General Laws Cpater 265 section 43a, Defendants have willfully and maliciously engaged in a knowing pattern of conduct or series of acts over a period of time directed at Plaintiff, which has seriously alarmed the Plaintiff and has caused substantial emotional distress.

357.    Defendants have made written, verbal or electronic expressions directed at Plaintiff that have: (i) caused emotional harm to the Plaintiff; (ii) placed the Plaintiff in reasonable fear of harm to himself or those associated with him; (iii) created a hostile environment at school for the Plaintiff; (iv) infringed on the rights of the Plaintiff; and/or (v) materially and substantially disrupted the education process as it relates to Plaintiff.

358.    Defendants have used electronic and other means to:
   a.    Send hurtful, hateful, derogatory, harassing or threatening messages or rumors about the Plaintiff, and/or
   b.    Send personal or embarrassing information about Plaintiff to others - all with the intention of intimidating, frightening, ridiculing, or harming the Plaintiff.
   c.    Created websites that ridicule, humiliate, or intimidate the Plaintiff;

359.    Defendants have either acted intentionally/willfully and/or Defendants, through the acts and omissions described above, *inter alia*, have aided, abetted, incited, compelled and/or coerced others into bullying, cyber-bullying, cyber-harassment or cyber-stalking the Plaintiff in violation of both federal and state law.

360.   As a result of Defendants' conduct, Mr. Bisasor has suffered and continues to suffer damages including, but not limited to, pain and suffering, and emotional distress.

## COUNT XVII - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### (Defendants)

361.     Plaintiff hereby realleges and incorporates by reference each of the preceding paragraphs of this as if fully stated herein.

362.     Defendants have caused harm to Mr. Bisasor, including stress, loss of sleep, emotional upset, anxiety, and other losses, etc.

363.     Defendants caused or created emotional distress for Plaintiff.

364.     Defendants knew that discriminating/retaliating/threatening/harassing Plaintiff would cause emotional distress.

365.     Defendants intentionally inflicted emotional distress on Plaintiff when as a direct and proximate result of Defendants actions and inactions Plaintiff was caused to suffer severe emotional distress as the result of which a reasonable person in Plaintiff's position would have suffered similar emotional distress under like circumstances.

366.     Plaintiff has sustained damages as a result of Defendants intentional infliction of emotional distress on him.

WHEREFORE, Plaintiff respectfully prays that this Court:

Enter a judgment in his favor on all counts of this Complaint;

a) Award him damages in an amount to be determined at trial, plus his reasonable attorney fees and the costs of (and any interest associated with) this action.

b) Enter a Declaration that the defendants have published defamatory statements of and concerning the Plaintiff.

c) Enter a Temporary Restraining Order and a Preliminary Injunction, enjoining the defendants from:
   i.   Publishing further defamatory statements about Mr. Bisasor

   ii.  Publishing or causing to be published any statement about Mr. Bisasor without permission from this Court.

   iii. Destroying, altering, deleting or any other act that would impede or hinder their obligation to preserve any relevant information, including electronically stored materials such as email communications, relating in any way to the subject matter of this dispute including material that may be contained on any computer equipment or communication device

(including cell-phone, iPhone, Blackberry or similar device) within their possession custody or control.

d) Issue an Order of Notice requiring the defendants to appear and show cause why a preliminary Injunction on the Temporary Restraining Order should not be entered against them.

e) Enter judgment against the defendants in the form of a permanent injunction enjoining the defendants from the conduct described herein.

f) Cessation and prevention of all attempts to defame Plaintiff.

g) Cessation and prevention of all and any from harassing activities directed towards Plaintiff.

h) Refund of the costs of tuition and education expended while at the Harvard Extension School.

i) Affirmative relief, in equity, to effect change in the policies and practices of Harvard's School of Continuing Education including the hiring of more black males as deans, administrators, instructors and employees and including implementation of clearly written procedures specifically for the handling of race discrimination complaints by students.

j) Award him punitive damages; and,

k) Award him such other relief as the Court deems just and proper.

**PLAINTIFF REQUESTS A JURY TRIAL ON ALL MATTERS SO TRIABLE.**

Respectfully Submitted,

*Andre Bisasor*
**ANDRE BISASOR**
3000 Presidents Way #3413
Dedham, MA 02026

Dated: June 18, 2015