*BISASOR VS SLAVENSKOS*

*# 16 - CV - 10105*

## EXHIBITS

1. Exhibit 1- Notice of Appeal to US Court of Appeals

2. Exhibit 2 – Notice of Appointment of Trustee

3. Exhibit 3 -- Notice of Removal

4. Exhibit 4 – Excerpts from Emails Showing Attempts to Get My Concerns Addressed Internally at Harvard for a Long Period of Time.

5. Exhibit 5: Emails Relating to Settlement Meeting with Harvard Dean Lambert.

6. Exhibit 6 - Harvard Crimson News Articles (including referencing the Battenfield et al v Harvard University et al case in the Massachusetts Suffolk Superior Court (case#: 9181CV05089) and other recent similar cases against Harvard).

7. Exhibit 7 - Harvard Statement of Values

8. Exhibit 8 - Screenshot of Harvard's Motion to Remand on the electronic filing system with indication of 166 pages filed by Harvard

# Exhibit 1- Notice of Appeal to US Court of Appeals

FILED
IN CLERK'S OFFICE
2016 MAY 6 PM 4: 23
U.S. DISTRICT COURT
DISTRICT OF MASS.

## UNITED STATES FEDERAL COURT
### FOR THE DISTRICT OF MASSACHUSETTS

### CIVIL DOCKET NO: 16-CV-10105 - *DC*

ANDRE BISASOR
PLAINTIFF,

V.

DANSLAV SLAVENSKOJ,
HARVARD EXTESION SCHOOL/
HARVARD UIVERSITY,
ROBERT H. NEUGEBOREN,
MICHAEL SHINAGEL,
HUNTINGTON LAMBERT,
SHIRLEY R. GREEENE,
MARGARET C. ANDREWS,
ASHLEY R. POLLOCK,
PHILIP HARDING,
KRISHA ARORA,
KEN VEDAA,
JENNIFER WEBB,
JOHN AND JANE DOE,
DEFENDANTS

---

**NOTICE OF APPEAL ON DECISION BY JUDGE DENISE CASPER REGARDING MOTION TO STAY PROCEEDINGS OR IN THE ALTERNATIVE TO EXTEND TIME TO OBJECT MOTION TO REMAND; AND FOR SANCTIONS**

Notice is hereby given that Andre Bisasor, the Plaintiff in the above named case, hereby appeal to the United States Court of Appeals for the Federal Circuit from the order [ECF #19] by Judge Denise J. Casper denying Plaintiff's Motion to Stay, and denying Plaintiff's motion for sanctions against the "Defendants" (Harvard Defendants as well as Defendants Pollock, Arora and Harding), and denying Plaintiff's request in the alternative for an extension of time to file an opposition to Defendants' motion to remand, which was entered in this action on March 31, 2016. This notice is filed within the 30 day timeframe prescribed statute and in accordance with the rules governing computing time.

Respectfully submitted,

*Andre Bisasor*

Plaintiff Andre Bisasor
119 Drum Hill Rd, #233
Chelmsford MA 01824
781-492-5675

Dated: April 29, 2016

# Exhibit 2 – Notice of Appointment of Trustee

Case 1:16-cv-10105-DJC   Document 24-1   Filed 05/06/16   Page 6 of 54
Case 15-13369   Doc 131   Filed 01/07/16   Entered 01/07/16 06:21:26   Desc Notice of
Appt of Trustee   Page 1 of 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| In Re:   Andre Bisasor | Chapter: 7 |
|---|---|
| Debtor, | Case No: 15-13369 |
| | Judge Joan N. Feeney |

**CERTIFICATE OF APPOINTMENT OF INTERIM TRUSTEE
AND FIXING OF BOND**

Pursuant to 11 U.S.C. § 701(a)(1)

John Aquino
Anderson Aquino LLP
240 Lewis Wharf
Boston, MA 02110

is hereby appointed as Interim Trustee in the above–referenced proceeding and is designated to preside at the meeting of creditors. The Trustee's bond is fixed under the general blanket bond heretofore approved. The Trustee shall notify the United States Trustee immediately in the event that the liquid assets exceed $1,000,000.

Pursuant to FRBP 2008 the Trustee will be deemed to have accepted this appointment unless it is rejected within five (5) days of receipt of this notice. Unless another trustee is elected the Interim Trustee appointed herein shall serve as Trustee without further appointment as provided by 11 U.S.C. § 702(d).

Date:1/7/16             <u>William K. Harrington</u>
                                                 U.S. Trustee
                                                 (617) 788–0400

Original filed with Bankruptcy Court
Copy to trustee

**REJECTION**

I, John Aquino , hereby REJECT appointment as Trustee.
Dated: This day of _____ .

                                                        John Aquino

Original filed with Bankruptcy Court
Copy to United States Trustee

131

# Exhibit 3 -- Notice of Removal

UNITED STATES FEDERAL COURT
FOR THE DISTRICT OF MASSACHUSETTS

ANDRE BISASOR,
     Plaintiff,

v.

DANSLAV SLAVENSKOJ, ET AL,
     Defendants.

)
)
)
)
)
)
)
)
)
)

ORIGINAL CIVIL DOCKET NO. IN
SUFFOLK SUPERIOR COURT:
14-3606C

## NOTICE OF REMOVAL FROM STATE COURT TO FEDERAL COURT

Pursuant to 28 U.S.C. §§ 1441 and 1452, I Andre Bisasor the Plaintiff in the above-captioned case hereby give notice and remove this case to the United States District Court for the District of Massachusetts from the Suffolk Superior Court of Massachusetts. I respectfully submit the following grounds for removal:

In support of this Notice of Removal, I state as follows:

1.     [NB: I am pro se at this juncture and it is my understanding that all my statements and requests should be construed liberally and interpreted in a light most favorable.]

2.     I commenced an action in the Suffolk Superior Court on November 18, 2014 against the defendants but the complaint was not served. An amended complaint was filed on June 18, 2014 and the amended complaint served on June 19, 2015.

3.     Venue is proper in this Court because the State Court Action is pending in Massachusetts. See 28 U.S.C. § 1441(a).

### Basis for Removal

4.     I hereby remove the Action to this Court on two separate, independently sufficient bases:

        a) Under 28 U.S.C. § 1452, because the Action arises under the United States Bankruptcy Code (the "Bankruptcy Code"), and relates to a case under the Bankruptcy Code, as contemplated by 28 U.S.C. §1334(b):

            a. Removal of the Action is proper pursuant to 28 U.S.C. § 1452 because the Action "arises under" the Bankruptcy Code, and therefore this Court has original jurisdiction over Plaintiff's claims under 28 U.S.C. § 1334(b).

            b. The Action is also removable because it "relates to" a case under the Bankruptcy Code. Plaintiff is a chapter 7 debtor in

the bankruptcy court pursuant to the Bankruptcy Code. Thus,
Section 1334(b)'s "related to" standard is satisfied here.

b) Under 28 U.S.C. § 1441(b), because the case arises under federal law,
as contemplated by 28 U.S.C. §1331; This Court has original
jurisdiction over this matter pursuant to 28 U.S.C. § 1332. Further,
this matter is one that may be removed to this Court pursuant to 28
U.S.C. § 1441 because it involves a civil action that involves a federal
question i.e. regardless of the citizenship of the parties.

    a.  I have brought claims under federal and state law.

    b.  In addition, removal of this Action is proper under 28 U.S.C. §
1441(b) because this Court has federal question jurisdiction
over Plaintiff's claims under 28 U.S.C. § 1331.

    c.  This Action arises under the laws of the United States because
the Plaintiff has brought claims arising from Federal
discrimination and retaliation laws as well as under Title IX
among other federal statutes.

c) Given the federal question, this Court has jurisdiction over the causes
of action and claims asserted in the State Court Action pursuant to 28
U.S.C. § 1332, and this action properly is removable pursuant to 28
U.S.C. § 1441.

d) With respect to bankruptcy jurisdiction, Plaintiff's claims are
statutorily "non-core."

e) Plaintiff does not consent to entry of final orders or judgment by a
bankruptcy court and reserve all rights that the case should proceed in
district court rather than bankruptcy court.

f) Accordingly, this Court has both bankruptcy and federal question
jurisdiction—over the Action.

g) This Notice is being filed within 90 days of January 6, 2016, the date
that the bankruptcy court entered an order of relief pursuant to a
chapter 7 filing by Plaintiff.

h) Thus, this Notice is timely pursuant to 28 U.S.C. § 1446(b) (and Fed.
R. Bankr. P. 9027). A copy of this Notice will be promptly served on
opposing counsel and filed with the Suffolk Superior Court

i) This Notice is properly filed in this Court, the United States District
Court for the District of Massachusetts, as the district and division
within which Plaintiff filed the underlying state court action.

Wherefore, the action now pending before Suffolk Superior Court is to be removed to this Court.

Respectfully submitted,

Andre Bisasor

Plaintiff Andre Bisasor
119 Drum Hill Rd, #233
Chelmsford MA
781-492-5675

Dated: January 22, 2016

**Exhibit 5: Emails Relating to Settlement Meeting with Harvard Dean Lambert.**

## EXCERPTS OF EMAIL COMMUNICATIONS SURROUNDING SETUP OF RESOLUTION MEETING WITH DEAN HUNTINGTON LAMBERT IN RESPONSE TO MY APRIL 14 93A DEMAND LETTER

-----Original Message-----
From: Evans, Amie <amieevans@fas.harvard.edu>
To: Andre Bisasor <quickquantum@aol.com>
Cc: Evans, Amie <amieevans@fas.harvard.edu>
Sent: Fri, Jun 26, 2015 9:27 am
Subject: Re: From Dean Lambert's Office: proposal to set up a meeting

Dear Mr. Bisasor,

In light of the fact that you've now served Dean Lambert, and Harvard, with a lawsuit, he will need to confer with his attorneys about whether it is wise to meet with you while litigation is pending. I will be back in touch as soon as he's had a chance to get their advice, most likely next week.

Sincerely,
Amie

Amie M. Evans
Executive Assistant to the Dean
Harvard University
Division of Continuing Education
51 Brattle Street, Cambridge MA 02138-3722
617-998-8101
amieevans@fas.harvard.edu
http://www.dce.harvard.edu/

**From:** Andre Bisasor <quickquantum@aol.com>
**Date:** Thursday, June 25, 2015 at 4:05 PM
**To:** "quickquantum@aol.com" <quickquantum@aol.com>, Amie Evans <amieevans@fas.harvard.edu>
**Subject:** Re: From Dean Lambert's Office: proposal to set up a meeting

PS: correction..I meant to say "my 93A letter from mid-April", not mid-May.

-----Original Message-----
From: Andre Bisasor <quickquantum@aol.com>
To: amieevans <amieevans@fas.harvard.edu>
Sent: Thu, Jun 25, 2015 3:58 pm
Subject: Re: From Dean Lambert's Office: proposal to set up a meeting

Dear Amie, my email crossed paths with this below. I am disheartened to know that my meeting with Dean Lambert, which was previously scheduled for June 26, 2015 has been cancelled because I notified him of my suit. I thought that Dean Lambert wanted to resolve things amicably and that is why he proposed a meeting in response to my 93A letter sent in mid-May 2015. The fact that I served papers regarding suit should make no difference because Dean Lambert was put on notice about a potential suit from my 93A letter. In any event, I just wrote you a note (the one crossing paths with your email below) explaining why I had no choice but to serve papers now. My intention in doing so was not to eviscerate the chance of us having a meeting and resolving this matter; but my only intention was to comply with the rules of the court. I would like Dean Lambert to reconsider his decision to cancel our meeting. Please ask him to do so. I look forward to your reply.

Andre Bisasor

-----Original Message-----
From: Evans, Amie <amieevans@fas.harvard.edu>
To: Andre Bisasor <quickquantum@aol.com>
Cc: Evans, Amie <amieevans@fas.harvard.edu>
Sent: Thu, Jun 25, 2015 3:32 pm
Subject: Re: From Dean Lambert's Office: proposal to set up a meeting

Dear Andre,
Unfortunately, since you now have a pending lawsuit filed against DCE, Dean Lambert and Associate Dean Higgins are unable to speak with you directly.

Best,
Amie

Amie M. Evans
Executive Assistant to the Dean
Harvard University
Division of Continuing Education
51 Brattle Street, Cambridge MA 02138-3722
617-998-8101
amieevans@fas.harvard.edu
http://www.dce.harvard.edu/

**From:** Andre Bisasor < quickquantum@aol.com>
**Date:** Thursday, June 25, 2015 at 3:24 PM
**To:** Amie Evans < amieevans@fas.harvard.edu>
**Subject:** Re: From Dean Lambert's Office: proposal to set up a meeting

Dear Amie,

Would I then be able to keep my meeting that was previously scheduled for tomorrow?

-Andre

----Original Message-----
From: Evans, Amie <amieevans@fas.harvard.edu>
To: Andre Bisasor <quickquantum@aol.com>
Cc: Evans, Amie <amieevans@fas.harvard.edu>
Sent: Thu, Jun 25, 2015 3:13 pm
Subject: Re: From Dean Lambert's Office: proposal to set up a meeting

Dear Andre,

Apologizes for the delay in getting back to you.  Unfortunately, because of your pending lawsuit, we are unable to reschedule your meeting with Dean Lambert and Associate Dean Higgins.

Best,
Amie

Amie M. Evans
Executive Assistant to the Dean
Harvard University
Division of Continuing Education
51 Brattle Street, Cambridge MA 02138-3722
617-998-8101
amieevans@fas.harvard.edu
http://www.dce.harvard.edu/

**Exhibit 4 – Excerpts from Emails Showing Attempts to Get My Concerns Addressed Internally at Harvard for a Long Period of Time.**

**EXCERPTS OF EMAIL COMMUNICATIONS SHOWING ATTEMPTS TO GET MY CONCERNS ADDRESSED INTERNALLY AT HARVARD FOR A LONG PERIOD OF TIME.**

-----Original Message-----
From: Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>
To: lambert <lambert@fas.harvard.edu>
Cc: pres_ofc <pres_ofc@harvard.edu>; drew_g_faust <drew_g_faust@harvard.edu>; alan_garber <alan_garber@harvard.edu>; mike_smith <mike_smith@harvard.edu>; david_ellwood <david_ellwood@Harvard.edu>; wlee <wlee@law.harvard.edu>; susan.carney <susan.carney@yale.edu>; pfinnegan <pfinnegan@mdcp.com>; bacow <bacow@tufts.edu>; nkeohane <nkeohane@princeton.edu>; twells <twells@paulweiss.com>; jmathews <jmathews@ceip.org>; graham <graham@cs.berkeley.edu>
Sent: Mon, Apr 13, 2015 11:56 pm
Subject: Re: FOLLOW-UP | IMPORTANT COMPLAINTS & CONCERNS ABOUT RACIAL DISCRIMINATION/RETALIATION, ETC| ANDRE BISASOR

Dear Dean Lambert,

[with the President, the Provost, the Dean of FAS, the Fellows of the Harvard Corporation and the Board of Overseers cc'd]:

Please see my reply below to your last email dated December 5, 2014.

[NB: Please also see my attached 93A Demand letter and request for relief as it contains important information that provides clarification on my requests relating to complaints of discrimination based on race and religion, retaliation, unfair and deceptive practices as violation of 93A consumer protection statutes as well as other wrongs such as a breach of contract, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress and other wrongdoing at Harvard Extension School.]

My reply below addresses the two questions you asked me in your last email and it tries to bridge any misunderstanding or disconnect that may have occurred in our recent communications. It also seeks to make clear what I am asking versus what I am not asking for. Please read and review very carefully because the matters herein are very critical towards advancing a resolution to many of the issues raised. For your convenience, I have placed your last email comments in CAPS preceded by the caption [YOUR COMMENT]; and my comments are in regular font preceded by the caption [MY REPLY].

*********************************************************************************

[YOUR COMMENT]: WHY DO YOU KEEP SENDING THESE EMAILS?

[MY REPLY]: I am sending you these emails because 1) you have not addressed my questions, 2) you have also asked me questions in return, that I cannot leave unanswered, 3) you are the highest authority at the Harvard Extension School, 4) the Ombudsman told me to go to your office for assistance, 5) President Faust's office told me to go back to your office.

So one key reason I emailed you again is because you asked me a question in your response on Nov 12, 2014 (i.e. whether I contacted the Ombudsman previously, etc]. Hence I did not want to leave that un-addressed. Even in your last email dated December 5, 2014, you again asked me two questions [i.e. regarding why I keep emailing you and why am I cc'ing people on these emails]. So I am hereby addressing your questions in this reply, which is not an unreasonable thing to do. Yet on the other hand, It is not reasonable for you to ask me questions and then chide me when I answer them. Conversely, you refuse to answer my most basic of questions.

*********************************************************************************

[YOUR COMMENT]: WE HAVE TOLD YOU REPEATEDLY THAT THE CASE WAS INVESTIGATED, PROCESSED AND DECIDED PER OUR POLICY AND IS CLOSED HERE.

[MY REPLY]: First, you state here that the case was investigated, processed and decided per "our policy". What is this policy? I have not been told what this policy is. How can you decide something per your policy and never tell me what that policy is? Is this some big secret policy? This is unfair and unreasonable. Second, you state here that you have told me this repeatedly. But what you don't acknowledge is that I have repeatedly addressed this point and shown how you have not addressed what it is that I am requesting as follows:

1) Invalid, Biased, Mishandled And Incomplete Investigation of 2012 Complaint:

I have told you repeatedly that the investigation of the initial preliminary document that I submitted in 2012 was not valid because it was conducted by Assistant Dean of Students Shirley Greene who reports to Dean of Students Robert Neugeboren. This means that Dean Greene was tasked with investigating her boss, which creates an insurmountable conflict of interest and a biased investigation (or at least the appearance of a biased investigation). By any standard of fairness and accountability, it is invalid (on the face of it) for the Dean of Students Office to investigate itself especially when it involves a subordinate investigating his/her boss (a boss upon who he/she relies for gainful employment and a boss who has authority and control over him/her). I previously objected to this investigation being conducted by Shirley Greene on the grounds that Robert Neugeboren was her boss but she was still allowed to conduct the investigation. When I brought the matter to the attention of Ombudsman Lydia Cummings she agreed that there was a conflict of interest that would invalidate the investigation and consequently she advised me to go to your office for assistance, which is what I have been doing so far, to no avail. Also, please be advised that this is a violation of Title VII and is also a violation of 93A statutes.

Moreover, when I initially contacted you about this matter, you told me that you would hand this over to Dean Shirley Greene. I immediately objected on similar grounds as stated above and you implicitly indicated agreement that Dean Shirley Greene was disqualified as a proper investigator, by no longer asking her to handle the matter. You then took it upon yourself to review the matter (howbeit in a hurried manner) but instead of conducting a proper investigation, it appears that all you did was simply ask Dean Shirley Greene to summarize the biased, flawed, one-sided and incomplete investigation to you. You then relied on this summary to make the decision to close the investigation. You did this knowing fully well that there was a significant conflict of interest present in the matter and that the investigation and any result or findings from it, is therefore invalid and biased, by definition. Your course of action here is at once puzzling and can only be explained by the idea that you simply don't want to have to deal with the task of ensuring that a proper, full, fair and thorough investigation is conducted for fear that you find something that validates my concerns (including implications of Dean Neugeboren who you seem to be heavily relying on to help you in your transition into your new role as Division Dean and consequently you don't want to risk an investigation that could find that him culpable of wrong doing). If this is the case, this is unethical behavior on your part which results in the cover-up and perpetuation of a system of discrimination and corruption at Harvard Extension School and the disenfranchisement of my rights. Considering recent examples in the national news, such as the Penn State scandal where the certain administrators turned a blind eye and closed their ears to wrong-doing, it is evident that such an approach is ill-advised [See report summary on Penn State Scandal: http://progress.psu.edu/assets/content/Press_Release_07_12_12.pdf ]

2) Appeal:

I have told you repeatedly that I would like to appeal the decision to close the investigation of the 2012 complaint. You have not answered me as to whether appeals are allowed for grievance decisions at Harvard Extension School, especially where the investigation was flawed, biased and contained within it a serious conflict of interest. If other students are or have been allowed opportunities to submit an appeal, then denying me the right to do so is another example of disparate treatment and retaliation, because there is no reason why other students are allowed to submit an appeal but I am not. I have also told you that I have additional information relating to the 2012 complaint that I was not allowed to submit. This should be grounds enough for an appeal but yet you refuse to tell me whether I am allowed to submit an appeal. It sounds like you are outright denying me the right to submit an appeal. PLEASE NOTE THAT FOR THE 2012 COMPLAINT I was never told the process, given the criteria, or allowed to supplement my complaint although I asked to do so several times. Also, the matter was left open from December 2012 when Shirley Greene told me that she would get back to me. She never got back to me. She never asked me for follow-up information, nor about my witnesses. I was given the impression that the 2012 complaint was an initial document to get the ball rolling on a formal process and that there would be allowance of a full and thorough follow-up process but I was afforded none and left hanging and in the dark during this process until you closed now in 2014.

3) New Complaint After 2012:

I have repeatedly told you that I am also seeking to file a new complaint relating to acts of retaliation and other acts of discrimination and wrongdoing, etc, that occurred since my 2012 complaint. I have repeatedly told you that I would like to know the procedures for the filing and adjudication of this new complaint because I was never told clear procedures for the filing of and adjudication of such complaints. I don't know the criteria used to determine the adjudication of such complaints, the form that the complaint should be presented in; what information is required to be included in the complaint; what are the rules for the process of the adjudication of the complaint and the timelines/milestones that associated with the resolution of the complaint, etc. Furthermore, I was not given any resources or guidance or advice or directed to where I could go to get the same, though I asked several times. I was left on my own to try to figure everything out. I was not apprised of the next steps; I was not interviewed, nor were my witnesses interviewed; I was not allowed to submit evidence or additional information; I was not allowed to see the response of those who were the subjects of my complaint (including Dean Neugeboren) and so I have no idea how to rebut their responses if they made any. I have not seen the case materials and I have not been provided with the findings or a report or anything. Everything is kept from me and hidden from me, yet I am the complainant who filed the complaint. This again is a violation of Title VII and is also a violation of 93A statutes.

This is very unusual behavior, and seems indicative of a sham investigation intended to railroad me and to cover up the truth. So again, even if your position is that the 2012 complaint has been decided and is closed, this does not address my request to submit a new complaint with new facts not included in the 2012 complaint. So I am asking again clearly so that there is no misunderstanding: Am I allowed to file a new and separate complaint from the one submitted in 2012? What are the procedures for submitting a complaint of racial, religious or other discrimination and retaliation at Harvard Extension School against a staff member or a Dean, including the Dean of Students?

4) Some Examples of New or Additional Acts Subsequent To or Not Included in The 2012 Complaint That Forms Part of the Basis For A New Complaint:

I have experienced new or other acts of discrimination and retaliation at Harvard Extension School including:

• I was offered what was effectively a bribe by Harvard/Harvard Extension administrators to drop my racial discrimination complaint. This was an egregious example of abuse of authority and corruption at Harvard Extension School. Moreover, on information and belief, this is a covert practice at Harvard Extension and is not the first time that this sort of thing was attempted with students. Certain other students have been offered quid pro quo incentives in exchange for favors by Harvard Extension School administrators. This is a corrupt and unethical practice.

• I was barred from participating, enjoying or benefiting from the programs, resources and activities of Harvard Extension School in retaliation for bringing my race discrimination and other complaints.

• I also have other examples of wrongful acts by Harvard Extension administrator Robert Neugeboren engaging in retaliation against students who are associated with me or who supported me. One example is of a student who assisted me in the past. Robert Neugeboren engaged in outright mocking and excoriation of the student who reported that she was sexually harassed at Harvard Extension School. She was told by that Robert Neugeboren that she was mentally ill when she reported the matter at Harvard Extension School. She was punished by having her academics threatened and interfered with.

• I also have information regarding the inappropriate sexual relationship/contact between a Harvard Extension administrator and a student (who was also an employee) and that student received preferential treatment and was not held accountable for their wrongful behavior and a blind eye was turned to their wrong behavior including being allowed to harass, discriminate, retaliate against me and defame me personally.

• I was further retaliated against for raising concerns or reporting concerns about bias by several Harvard Extension administrators/staff who engaged in attempts to prevent a black male from running for or winning the Student Government presidency at Harvard Extension School.

There is also a culture of repression and a blame the victim approach at Harvard Extension School when it comes to concerns raised about discrimination, harassment and hostile environment i.e. a "turn the tables on the victim" approach. It is thus not a safe environment to report such concerns at Harvard Extension School. There are no advocates for victims and there is no staff that is properly trained or sensitive to these issues.

There is also a culture of silence and cover-up, retaliation, and brinkmanship where Robert Neugeboren is the main designated "fixer" who works to squash, undermine or minimize complaints about discrimination. studied game theory well-versed in strategy and out-maneuvering opponents, fixer type, squash complaints or minimize them. It requires tremendous courage and bravery to advance any complaint in this kind of environment as you will suffer wrath, ostracism and strategic passive-aggressive measures calculated to undermine you and destroy your credibility.

• I have information about the collusion between Harvard Extension School administrators and other students, alumni and employees of Harvard to wage a campaign of defamation and retaliation against me and another Black male as well.

• I was subjected to outright lies and defamation by Harvard Extension School administrators to other students and student leaders as well as other staff members.

• I have information regarding the breach of my academic records by Harvard Extension School administrators and the violation of my FERPA rights by Harvard Extension School administrators who revealed my private records to other students who then broadcasted it to the student body and on the internet, creating much harm and damage to me. My rights here were severely trampled upon in a retaliatory and discriminatory manner.

• I have information about the refusal of Harvard Extension administrators to protect me from harassment based on race and religion by other students.

• I have information about racially-coded epithets being used by students/employees at Harvard Extension against other black students at Harvard Extension School.

• I have information about a pattern of non-black students being protected by Jewish administrators at Harvard Extension School. For most of the recent history at Harvard Extension School, there has been a majority of White-Jewish Administrators/Deans at Harvard Extension. Dean Shinagel, Dean Neugeboren, Dean Schopf, Dean Henry Leitner. Some of these Deans have given unusual preferential treatment and assistance to other White-Jewish students including discriminating against Black students in favor of such White-Jewish students.

• I have information about other systemic patterns of discrimination at Harvard Extension including the fact that there are no black male employees in Harvard Extension anywhere except for a lowly maintenance person named Franz. There has been a systemic exclusion of Black males from any leadership position at Harvard Extension School as well as in the staff at Harvard Extension School.

• I have information about a conspiracy to Interfere with and damage my academics and to set me up to fail

• I have information about a conspiracy to create a hostile environment for me by using certain preferred students and an online forum to do so

• I have information about a civil conspiracy by Dean Neugeboren and other employees along with certain preferred students to create enmity between me and other students as part of a larger effort to discredit me

• I was banned by Dean Neugeboren from speaking to other administrators, while other white student leaders were allowed

• I was not given any recognition for my role as an HGC (Harvard Graduate Council) representative

• I had certain Ideas that I proposed to Dean Neugeboren were rejected by him but later these same ideas were adopted when non-black student leaders proposed them.

• My proposal for a student club that focused on the needs and betterment of Black students at Harvard Extension School was ignored and rejected in a discriminatory manner.

• I was not invited to certain events while other white student leaders were invited. I was systemically excluded from certain activities as a student leader.

• I was denied proper financial assistance while other similarly-situated white students received full and proper financial assistance

• I was forced by Dean Neugeboren to take certain persons onto my student government administration while other non-black student leaders were allowed to have their choice of officers on their board – these forced officers were set up to watch me and obstruct on me like no other student government president past or present.

• I was subjected to a host of other micro-aggressions and other covert and subtle racial discriminatory acts by Dean Neugeboren and others, that were designed to conceal its intent but nonetheless intended to marginalize, undermine, target and damage me. Dean Neugeboren has made demeaning, condescending, disparaging and defamatory remarks about me including to other students and staff. He continually favored white students over me at almost every turn and gave other white students the benefit of the doubt over me on almost every and any issue. I was subjected to ridicule, sarcasm and contempt by Dean Neugeboren including in front of other students and staff.

• NB: From my perspective, Dean Neugeboren is a fundamentally corrupt administrator. He targets those he does not like and/or those he does not share certain affinities with; he discriminates against those who speak up or blow the whistle; and he uses his power in an unfair and abusive way but tries to cover his tracks with his intellect as a game theory economist. Dean Neugeboren has set a bad example for student leaders at Harvard Extension School for some time now and Harvard will be doing an injustice to the students who are exposed to his machinations and corrupt ethics. This is a fair warning to the university that Dean Neugeboren is a major problem to the school. This is not the first time that Dean Neugeboren has been the center of controversy as he was cited for certain shortcomings while teaching at Harvard College. See
http://www.thecrimson.com/article/2002/10/30/econ-lecturer-removed-amid-complaints-in/

I have evidence that shows that Dean Neugeboren is corrupt, unethical, and prejudiced. He plays favorites and discriminates against students of color, particularly Black males. He uses his education and intelligence for wrong purposes against unsuspecting and unwitting students. In particular, he uses his background in game theory and strategy (as an economist) against students in clever but malevolent ways. He politicizes many of his decisions regarding students and student leaders. He uses deceptive means to achieve his ends and disregards the rights of students. He uses informal means to assassinate the character of students that he does not like and tries to use his clout and position to turn people against certain students. He creates and looks for opportunities to drive wedges between students in order to isolate the targets of his discrimination and bias. He operates with blatant and sometimes subtle contempt, and aggression towards students, depending on the circumstances of whether he thinks he can get away with it. He maligns students character with impunity and send signals to other students that it is acceptable to disrespect, disregard, dismiss, or ignore certain students. He sets a bad example of leadership for upcoming future leaders teaching them by example that it is acceptable to use manipulation, deception, intimidation, character assassination and racial micro-aggression/invalidation against students of color. He also teaches that it is acceptable to suppress votes and to manipulate elections in order to push through one's agenda. He lacks the integrity and honor that is commensurate with a Dean of Students Office. He has shown special disdain and contempt for me as a Black Jamaican male.

• NB: I say these things as an insider. I became somewhat of an "insider" because of my rise to leadership through my abilities and results that I generated that brought me close to the inner workings of power at Harvard Extension School (as well as Harvard in general). I have had a close up view of how things operate at Harvard Extension School in particular. I was not invited into this position by Harvard Extension Administrators (in fact, attempts were made by these Administrators to block me from rising to certain leadership positions) but I was elected by the students on a grassroots basis. So I am here speaking as an insider or at least a quasi-insider. I know firsthand many of things that I am saying here. Because of my direct experiences as well as my access to certain information while I was student government president and a student leader for many years, I am privy to facts that very few people are privy to. I am not some outside person who does not know what he is talking about. I have intimate knowledge of the facts and evidence that I am pointing to or alluding to. If you give me a chance to present my evidence, I will demonstrate that my concerns and assertions are valid and well-founded.

• I have many more examples of discriminatory, retaliatory and other wrongful acts that have occurred since my 2012 complaint that I would like to put into a proper form for submission so that it will be treated seriously and so

that it conforms to any criteria required by the procedures for filing and adjudicating such complaints formally at Harvard Extension School. THESE ARE NEW ACTS SUBSEQUENT TO OR OTHER ACTS NOT INCLUDED IN THE 2012 COMPLAINT THAT FORM THE BASIS FOR A NEW COMPLAINT. However, please note that I don't want to be setup for a trap where again I am not told anything about the process or the criteria, where I have no guidance or a shot at a fair process. That is why I need the information on the procedures so that the carpet is not pulled out from underneath me (based on some undisclosed technicality in the process) or so that my complaint is not shut down and dismissed without any due process. This should not be too much to ask.

Your statement that the matter has been investigated and is now closed does not address the fact that there are new acts since the time of the 2012 complaint. I am sure you understand what I am saying. Yet you keep repeating the same mantra (i.e. that the 2012 complaint is investigated and now closed), when it is abundantly clear what I am saying regarding the need and the request to file a new complaint. This seems to be a case of willful ignorance by acting as if you don't understand or are otherwise ignoring what I am saying. This comes across as unfair and deceptive as no reasonable person will believe that an educated Dean with a PHD (such as yourself) is lacking a clear understanding of what I am saying as outlined herein above.

5) Request To See The Results/Findings/Case Materials Of The Investigation of The 2012 Complaint As Well As My Entire Student File/Educational Records Under FERPA:

I would like to see the findings, the results, the case materials and the final report for the investigation of my 2012 complaint. Normally a student is allowed to see the case file. How can I be expected to be satisfied with this investigation of the 2012 complaint if no one will show me the case materials and the findings of the investigation? I have no idea who was interviewed or what was done or what the responses were by the subjects of the complaint. YOU HAVE NOT ANSWERED THIS QUESTION. EVEN IF YOU FEEL THAT THE INVESTIGATION IS CLOSED, WHY ARE REFUSING TO GIVE ME THE FINDINGS AND THE CASE FILES? You can't just wash your hands of any responsibility to ensure that the right thing is done here. I also would like to request that I see my entire student file/educational records as defined by statute, which is my right under FERPA and I am hereby making a formal request to do so under FERPA.

6) Request For An In-Person Meeting:

I have requested a meeting with you several times now and you have not addressed my request. Just so that it is clear, I would like to outline some of the items that I would like to discuss with you.

a. I would like to meet with you to discuss my future at Harvard Extension School.

b. I would like to also discuss a proposal for a course at Harvard Extension School that I think will be invaluable to students.

c. I would also like to discuss with you my academics.

d. I would also like to discuss with you issues that pertain to the student government at Harvard Extension School including items for improvement that began under my presidency as well as ideas for a more inclusive process as it relates to matters pertaining to student government and student clubs. There is also an issue of the wrongful and retaliatory closure of a student club, HESLS, that I would like to discuss with you and the issue of the 2012 student government constitution that was improperly passed and ratified.

e. I would also like to discuss with you issues that pertain to Harvard Extension School Alumni as well as other members of the Harvard community. This includes ideas for certain types of programming and events to enrich their experience.

f. I would also like to describe to you what I have experienced so that you can feel and understand what I have gone through. If you don't want to discuss my experiences, then simply tell me so - that is if you only want to focus on the other agenda items as listed above.

g. I would also like to discuss with you a proposal for increased diversity at Harvard Extension School and a strategic plan to better manage race relations issues at Harvard Extension School going forward, including the

need for sensitivity training and training for handling discrimination complaints better. If you don't want to discuss anything having to do with race or these related items, then simply tell me so – that is if you only want to focus on the other agenda items as listed above.

h. I would also like to discuss with you a plan to address the hostility towards conservative evangelical Christians (including Pentecostal-charismatic Christians) at Harvard Extension School and the issues of freedom of religion and freedom from religious harassment on campus. If you don't want to discuss anything having to do with religious freedom or harassment on campus, then simply tell me so – that is if you only want to focus on the other agenda items as listed above.

i. I would also like to try to reset the tone of our interaction if you are open to it.

So will you please meet with me? If so, please let me know a place and time. I can come to your office if you wish. If more convenient, I would also consider a phone-call but I would prefer a face-to-face meeting. Please let me know.

*********************************************************************************

[YOUR COMMENT]: IF YOU WANT TO PURSUE THE MATTER FURTHER, YOU ALREADY KNOW THE PATHS TO FOLLOW.

[MY REPLY]: You keep saying I know the paths – yet I don't know the paths. No-one seems to want to assist me. Because, as a Harvard Dean, you report directly to President Faust, I emailed President Faust after you indicated that you had no intention to address my concerns. However, President Faust's office responded saying essentially that I should go back to you with this matter and that I am to look out for a response from your office, which left me with the impression that you were put on notice that you should be handling this matter at the level of your Division. Yet, you turn around and say that you are not going to respond to my concerns. You then suggest that I go to the Ombudsman but yet the Ombudsman says that your office is where I should go – and then you seem to ignore this point in asking me to go back to the Ombudsman. As of this point, I seem to be bouncing around back and forth from person to person, with no-one willing to address my concerns.

Also, for the portion of this matter that involved Dean Ellwood's office, he did not respond to me at all. I also included Dean of FAS Mike Smith but I have heard no response. I do not know where else to go at this point in time and the reality is that I would prefer not to have to go all over the place to get my concerns addressed. However, as a last resort, I recently started to include the Board of Overseers and the Fellows of the Harvard Corporation, which is a signal of my utter frustration and is an attempt to figure out on your own how to get relief. Still no other path has been described for me, notwithstanding the fact that you stated in your last email that I supposedly know the path to follow. How am I am to know what path to follow if you don't tell me, if it is not written anywhere or if you don't publish it in a form and place easily accessible to students? What is this path that you say that I know of – would you care to tell me? Who should I go to? Where should I go? Everybody that I assume could assist me in this matter has been cc'd, yet no one has told me anything. The only thing that I have been told for certain is that your office is the key place to go to.

All in all, you are still my Dean. But if you are hereby telling me that you don't want to be my Dean, then I guess I can't force you to do your job and to uphold the responsibility of your office. Yet this is a simple matter – all I am asking is for you to provide me with the procedures for a fair process and to hear my concerns. That's all I am asking. Why would you be so intransigent on something so simple and that requires no unusual effort to do? This boggles the mind. It thus seems clear that the system at Harvard Extension School is very broken and there seems to be little or no room for justice when it relates to Black males. There is no sense of accountability or a solemn responsibility/duty to ensure that Black men, who say they have experienced discrimination or other wrongs, are fully heard and treated in a fair way.

Ignoring these concerns is a wholly inadequate response to my complaint of racial discrimination and this constitutes a breach in the duty of care. This is an act of social irresponsibility. It is beneficial to consider avoiding the tendency to offer premature and irrational denials in the face of race discrimination complaints and embrace the importance of hearing the concerns of race discrimination victims as something other than a barrage of empty complaints not to be taken seriously. This irrational defensiveness that is typical when some university officials respond to race discrimination allegations is highly irresponsible and inappropriate. My attempt to preserve the

public interest in deterring discrimination in the academic setting should be seen as an impetus to perform the type of monitoring that will uncover racism, even when it is subtle, covert, or unconscious.

*********************************************************************************

[YOUR COMMENT]: ALSO, WHAT ARE YOU INCLUDING SUCH A HUGE LIST OF PEOPLE IN THESE COMMUNICATIONS? I CAN'T SEE THAT MORE THAN A COUPLE ARE RELEVANT TO THE MATTER.

[MY REPLY]: Your comment here seems self-contradictory because first you say that you are not the person to contact about this and that I should go elsewhere other than to you, but yet on the other hand when I go elsewhere by including others such as the Board and the Fellows, you get upset and chide me for it. This appears to be an impossible "no-win" situation for me.

In any case, just to be clear, the persons that I have cc'd include the President, the Provost, the Dean of FAS, Dean Ellwood, the Fellows of the Corporation and the Board of Overseers. In answer to your question, please note that the reason I have included them is to ensure that the entire governing apparatus of the university is made aware of what is happening here and to provide oversight to how you are handling this matter. This matter has far-reaching implications for school-wide policy and procedures. It also has ramifications for the handling of issues relating to discrimination/retaliation in the context of federal government requirements for universities that receive Federal Funds.

These things also are relevant to issues of unfair and deceptive practices and a breach of promises made by the school to protect students from discrimination and retaliation. Hence, this matter is a governance issue. The Officers, the Board and the Fellows have a right to know and to intervene to prevent you and the Dean of Students office at Harvard Extension School from creating further harm to students like myself and stopping you from further exposing the university to liability. I am also trying to exhaust every avenue of remedy internally and by including the President, the Provost, the Dean of FAS, the Fellows and the Board, it allows them an opportunity to assist me in rectifying the situation. Because I am also acting in the capacity of a whistle-blower, I am requesting the protection and assistance of the university.

If the Board/Fellows/Officers of Harvard choose to do nothing in the face of clear wrongdoing or at least the appearance of wrongdoing by you/your Division, then this opens the university to charges of outrageous conduct and implicates the entire university's leadership in the matter. This, as you know, is one of the key purposes of Boards i.e. to ensure that the organizations correct brewing problems before they fully get out of hand and create irreparable damage to people's lives.

So to summarize: I am including the Board and the Fellows so that the entire governing edifice of Harvard can see real time if this matter is being handled properly because my contention is that it has not been so far. I thought that as the new incoming Dean, you would be amenable to taking an impartial posture towards the matter. But instead you have taken a fundamentally more hostile position against me as a student who is aggrieved. So my expectation is that the governing structure at Harvard will uphold its publicized commitment and promises of disapproving, rejecting and rectifying discriminatory, retaliatory and unfair/deceptive practices. These things are against the values of the university. I am simply doing my part to try to ensure that the values of this great university are upheld. Harvard is better than this [i.e. how I have been and am being treated as well as others associated with me]. My contention is that Harvard as an institution has a responsibility to ensure that individual rogue administrators, who do not represent well or otherwise violate the values of this university, are held accountable.

By involving the Board, it creates the opportunity for the entire university apparatus to intervene and weigh-in on this matter because I am assuming that there are members of the Board and the corporation who stand for justice, integrity and fair-play and who at least agree that I should be given a fair chance at having my concerns heard and adjudicated and resolved in the right way and in the right process. I cannot imagine that the entire university apparatus would stand by and watch this unfairness go on without intervening, so that is why I am ccing the Board and the Fellows. I hope that makes sense.

If you have no intention of being fair or reasonable, then I am hereby asking the Board and the Fellows of the Harvard Corporation to intervene. I am asking the Board and Fellows to please ensure that: a) I receive proper relief and assistance, b) the policies and procedures are disclosed to me, c) I am allowed a fair and impartial process to hear and address my concerns/complaints and that I am treated with dignity, respect and d) that I am protected from further retaliation, defamation and other wrongs or hurt. I am asking for a full and fair and thorough

investigation including the interviewing of my witnesses and allowance for me to include all of the evidence that I have or others have, that I am interviewed and that I am allowed to review the responses by those I have complained about, that there is an impartial panel that I can appeal to, that I be given the same rights that any other student in any Harvard school is given when it comes asserting a complaint of discrimination, whether based on race, national origin, religion, gender or sexual orientation or disability. I want the same rights as everyone else. I want the same access to remedies for internal redress that any or every other student, employee or member of the Harvard community has, and I would like it to be provided in writing and spelled out so that there are no surprises or misunderstandings.

I realize that the easiest thing to do is for you to wash your hands of everything; to not investigate and do nothing further. It is more difficult to fix things or address things. I did not think that this was why you were hired for the job. I certainly did not expect that you were hired to put up roadblocks and erect barriers to the cause of justice and progress in the matters at the Harvard Extension School. I know it is easy to assume that Dean Neugeboren is a perfect angel and could have done no wrong whatsoever, but you seem to fail to consider the possibility that he might have blind-spots or development opportunities. I know it is easy to paint a picture in your mind of me being some kind of frivolous agitator but even Martin Luther King Jr. was considered to be an agitator in the early stages of the civil rights movement.

The lesson of history is that when someone is as persistent as I am in trying to draw attention to certain wrongs as I have been trying to do for several years now, there is usually something there and you ignore it potentially to your own detriment. I know it is easier for you to turn me over to lawyers to shush me away. This seems like a complete abdication of duty and it is unfortunate because you have an opportunity here to provide some real leadership and to bring some positive change to the school, not just in the things that make for a good speech but in the things that are difficult and messy and unpleasant to deal with it. This is where real moral courage comes in. This is what tests character and integrity and this is what demands a commitment to defend the values that this great university espouses.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

[YOUR COMMENT]: IF YOU NEED TO CONTACT ME FURTHER, PLEASE DO SO THROUGH OUR GENERAL COUNCIL'S OFFICE.

[MY REPLY]: Why are you sending me to your general counsel? I am not a lawyer and it would be inappropriate for you to push me off to your general counsel. I am seeking to resolve the matter with you as Division Dean and to exhaust that path as much as is possible, which is my right to do. Moreover, everyone else that I have contacted seems to be either pointing to you or leaving this matter to you. I have not heard otherwise. No doubt this is because, at the end of the day, you are my Dean and I am asking you for your help and assistance on a simple matter. I am a student at the Harvard Extension School. You are the Dean of Harvard Extension School. You have a fiduciary duty of care to me as a student and a duty to protect me from harm as a Black student at Harvard Extension School. You are obligated under the charter of Harvard to so fulfill.

You do not have the right to ignore me or treat me in a disparate, disrespectful or dismissive manner. Your attitude seems to reflect the sense that I am bothering you with irrelevant stuff when in fact these issues are well within the scope of your duties.

There is clearly the need for diversity training at Harvard Extension School. You seem as if you don't know how to handle a racial discrimination complaint with sensitivity, tact, respect and an assurance of even-handedness. This is unacceptable and will only lead to trouble for the university and expose the university to liability.

Your angry reaction to me as a black Harvard Extension Student appealing to you for assistance with my racial discrimination and retaliation concerns is evident in your response and is not becoming of a Dean. What is required is a calm level-headed approach to this matter where I as a student and member of the Harvard community can be allowed to advocate for my rights and the rights of other students similarly situated as myself, without fear of retaliation, retribution, negative treatment, cold angry attitudes or being black-balled.

Given the way how this matter has evolved, it is evident that this has become a clear struggle between the perpetuation of oppressive acts by (along with an adherence to an oppressive mentality of) those in powerful positions at Harvard Extension School against the advocacy and change agency of those like me who are powerless, disadvantaged minorities.

Yet I am willing to be the voice of reason and change because these issues are too important, even if it means risking further retaliation and hurt to myself.

I have already been hurt and harmed by all of the totality of the acts of discrimination and retaliation suffered including in my academics, in my personal life and my professional life. I have not been allowed full access to the benefits and privileges in the pursuit of my education at Harvard and I have not enjoyed an educational environment free from discrimination and retaliation based on race and religion, etc. I would like these things to be rectified, for justice to be done and for no-one else to suffer these harms.

Your angry and impatient abruptness aside, it seems to me that a better way forward to diffuse this situation and seek an amicable path to resolution would be for you to, for example, accept my offer to meet you in person. You could have simply asked me to come in to meet with you. I am a former student government president at Harvard Extension School and I don't deserve to be treated with such disdain, disrespect, disregard and a dismissive attitude. If it were any other former student government president asking to meet with you, you would no doubt be happy to meet with them. Yet it appears the reason you don't want to meet with me is because I have raised concerns about discrimination and in so doing, you are denying me equal access in retaliation.

This is not only disappointing but also insulting because I, as much as or more than any other student, have helped to strengthen the Harvard Extension School student brand across the university and beyond by putting on groundbreaking events and first-class professional conferences that showcased for the first time the strength and caliber of leadership that Harvard Extension students can provide to the rest of the university. Check the history. I was the first person to do that at Harvard Extension School, through much personal effort and sacrifice, and then I trained others do the same including identifying, grooming and training those like Philip Harding to follow in my footsteps, and gave them the tools, the platform and the foundation to carry on that vision (see https://www.facebook.com/notes/philip-harding-for-hesa-president-2010/philip-announced-as-the-hesa-presidential-apprentice/10467191373687). I was also the first black male and first evangelical Christian to be elected president of the student government at Harvard Extension School against great odds, as a minority student from the island nation of Jamaica. These are not small achievements. (See the 2009-2010 annual report of the student government at: http://hesa.dce.harvard.edu/wp-content/uploads/2010/08/The-HESA-Presidents-Final-Report-2009-2010-Centennial-Year-2.pdf). I made these accomplishments while dealing with much jealousy and petty political opposition by those at Harvard Extension School who wanted to see me fail and also while dealing with major issues of discrimination and retaliation as well as making the most of very scarce support and resources from the Harvard Extension administration. Though I was helping the school in a tremendous way, there was a resentment that I, as a black male, was the one doing these things when others before did not or could not accomplish the same things.

I have done more than one else to make the Harvard Extension School look more embracing of diversity than it really is. For example, I organized and pioneered groundbreaking programs on race in negotiations (see Harvard Gazette story http://news.harvard.edu/gazette/story/2008/05/hesls-presents-discussion-on-%E2%80%98power-dynamics-in-negotiation%E2%80%99/).

Also, I have invited more black speakers to events at the Harvard Extension school in my time as a student leader (from 2007 to 2012) than the Harvard Extension school it self has done in its entire 100 year history (see Harvard gazette story: http://news.harvard.edu/gazette/story/2010/02/around-the-schools-harvard-extension-school/).

Also, the Lowell lecture, sponsored by the Dean's Office at Harvard Extension School, has never had a black speaker in all of its years. Dean Shinagel refused to invite any of the several black speakers that I recommended to be the Lowell Lecturer.

Additionally, I was the first Harvard Extension School student invited by NBC TV producers to represent the Harvard Extension School on the local NBC TV show "Urban Update", which gave a positive public impression of the embrace and support of black male leadership at Harvard Extension School (see https://www.youtube.com/watch?v=srRicMfG249). Yet in spite of all of this, Dean Neugeboren and the Harvard Extension School mishandled and squandered it's first real opportunity to properly embrace and support it's first black male student government president.

As student government President, I had a policy-making or policy-influencing role. For example, I had made efforts to improve diversity not only in the student life and student leadership but also throughout the entire Extension School including implementing an "Ethics & Diversity Initiative" that called for more hiring of black administrators and staff at Harvard Extension School and the appointment of a Harvard Extension School Ombudsman who could

assist in ensuring ethical compliance and an environment free from discrimination. I wanted to help the student association and I wanted the school to look good...and that was why I worked so hard to do an excellent job as a student government president and a student leader. Yet I was like the "Jackie Robinson" of the Extension School. I was the first black male to not only be elected student government president but I was the first student leader, who happened to be black, to successfully organize the most successful large-scale professional-level academic student-run conferences at HES, the first Harvard-wide conference on negotiations and the first Extension student leader to persuade other clubs and club leaders at other Harvard schools to join in under the leadership of a Harvard extension-student organized event. So I was helping the school with its reputation and doing groundbreaking work but at the same I was resented for my overwhelming success because I happened to be black.

It is same dichotomy that Jackie Robinson faced where he had sold-out events and where many were happy that the Dodger's was accomplishing so much but still Jackie Robinson was still subjected to racial animosity and resistance. It is a paradoxical relationship where there is a sense of pleasure related to the success for the group that was the result of Jackie Robinson's efforts but there still was a resentment and a hatred of Jackie Robinson because he was black.

It is a paradox in a similar vein of a situation like what I imagine that Jackie Robinson faced i.e. where certain people wanted or enjoyed the benefits of his talent but they hated him as a black male being so talented; while certain others could only tolerate him so long as he knew his place and would suffer in silence the indignities, the hostility and the discrimination that came his way.

This apparently was also another problem for me – Certain Harvard Extension administrators felt that I did not know my place as a black male. This apparently was a threat to those in positions of power at Harvard Extension School and so they sought to damage, undermine and hurt me and to "put me in my place".

Yet I never asked for any of this controversy or to be in the situation that I am in. In fact, I tried very hard to avoid being accused of playing the so-called "race card", so much so that I for several years avoided formally bringing up concerns about race discrimination against me, even to my own detriment. NB: By the way, the climate in Boston and at Harvard is such that Blacks are intimidated into not raising legitimate concerns about race for fear of ostracism and covert backlash by whites; Blacks are expected to be quiet about such things and to suffer in silence. So for the most part I attempted to exhibit a collaborative and cooperative approach and I tried to be diplomatic and statesman-like as much as possible for as long as was possible.

I only really spoke up about such things once I saw that other black males were being discriminated (while I was student government president) and that this was a pattern that only targeted me but other strong vocal black males as well; and so I felt no choice but to do the right thing and speak up on the behalf of other black males. This predictably resulted in my being retaliated against by certain administrators and staff at Harvard Extension School (as well as coordinated efforts to discredit me). Even when I went to the Ombudsman initially in 2008 and 2009, I told her that I did not want to be seen as "playing the race card" but that I had really serious concerns about how I was being treated, and that's why I was seeking informal advice on how to handle these matters in an effective manner. I also went to Dean Shinagel expressing my concern that Dean Neugeboren was discriminating against me and that I did not want a problem to ensue with him but to no avail. I told the Ombudsman the same thing and she said she did not want to see me get hurt because Dean Neugeboren was a very powerful person at HES and that he could hurt me (she even said that Dean Shinagel would never side with me over Dean Neugeboren). She also told me that I should focus on graduating first and then maybe afterwards I could bring up these issues. I tried to follow her advice but Dean Neugeboren and his cohorts kept discriminating/retaliating against me and seeking to set me up to fail to the point where it affect my ability to succeed and interfered with every aspect of my life.

There are more situations like this that I experienced as it relates to the intimidation I felt when trying to address these issues, but suffice it to say, that, after finally filing the 2012 document, I have experienced obstruction, obfuscation and bias in the handling of my complaint and during this process as outlined above. So whether I try to handle this informally or formally, whether by being quiet about it or vocal about it, I seem to be afforded no relief or justice. This represents either malicious or willful misconduct, or otherwise reckless disregard of the rights of black students such as myself.

I am asking for this stop and for my voice and my concerns to be finally and fully heard and adjudicated fairly and impartially. I would be only too happy to bring this matter to resolution and I am providing you with one more opportunity to do the right thing.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The above actions to date constitute unfair and deceptive practices and is a violation of 93A consumer protection statutes. I have attached a formal demand letter and I am asking you to respond within 30 days to try to resolve these issues. Failure to do so will be construed as bad faith and may result in your culpability and liability for causing me harm, injury and multiple damages.

However, it is my intention to have an amicable resolution. If you would like to have a meeting to discuss settlement and resolution. Please let me know. Otherwise, if you have alternative suggestions, I will review it for mutual feasibility.

I look forward to your reply or the reply of anyone cc'd who can assist me with this matter.

Sincerely,

Andre Bisasor

---

-----Original Message-----
From: Lambert, Huntington <lambert@fas.harvard.edu>
To: Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>
Cc: pres_ofc <pres_ofc@harvard.edu>; drew_g_faust <drew_g_faust@harvard.edu>; alan_garber <alan_garber@harvard.edu>; Smith, Michael <mike_smith@harvard.edu>; david_ellwood <david_ellwood@Harvard.edu>; wlee <wlee@law.harvard.edu>; susan.carney <susan.carney@yale.edu>; pfinnegan <pfinnegan@mdcp.com>; bacow <bacow@tufts.edu>; nkeohane <nkeohane@princeton.edu>; twells <twells@paulweiss.com>; jmathews <jmathews@ceip.org>; graham <graham@cs.berkeley.edu>
Sent: Fri, Dec 5, 2014 7:51 pm
Subject: Re: FOLLOW-UP | IMPORTANT COMPLAINTS & CONCERNS ABOUT RACIAL DISCRIMINATION/RETALIATION, ETC| ANDRE BISASOR

Why do you keep sending these emails? We have told you repeatedly that the case was investigated, processed and decided per our policy and is closed here. If you want to pursue the matter further, you already know the paths to follow. Also, what are you including such a huge list of people in these communications? I can't see that more than a couple are relevant to the matter. If you need to contact me further, please do so through our general council's office.

Huntington D. Lambert
Dean, Harvard Division of Continuing Education and University Extension
lambert@fas.harvard.edu
http://www.extension.harvard.edu
617-495-2930, Dean's Office

617-998-8101 Amie Evans, amieevans@fas.harvard.edu


"It is amazing what you can accomplish if you do not care who gets the credit." Harry S Truman

-----Original Message-----
From: Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>
To: abisasor <abisasor@fas.harvard.edu>
Sent: Fri, Dec 5, 2014 4:08 pm
Subject: Re: FOLLOW-UP | IMPORTANT COMPLAINTS & CONCERNS ABOUT RACIAL
DISCRIMINATION/RETALIATION, ETC| ANDRE BISASOR

Dean Lambert:

I would like to point out that I told you previously that I had already contacted the Ombudsman and she told me to
contact the Dean of University Extension or Dean of FAS. So since you recently took over as Dean of University
Extension, I followed up with your office. However, the Ombudsman office is not the appropriate place for this
matter because the Ombudsman office is informal and I am looking for a formal process. Her office also has no
enforcement or adjudicative powers. These are just some of the problems that exist with the Ombudsman. I know
this to be the case because I have had informal contact with her from 2008 when certain acts were beginning to
occur. I also have sought counsel from other Ombudspersons at other Harvard schools and they confirmed
that the Ombuds office is not formal and cannot provide formal process for resolution.

You have stated that you have not closed your ears to my pleas but that the matter has been investigated/now
closed; yet you seem to refuse to consider the fact that the matter was not investigated properly and that it was
investigated by the very office of which I complained of - the Dean of Students Office. How can the Dean of
Students Office investigate itself? You have not addressed this issue and every-time you ignore this point, the
silence is deafening, which is amazing. In recent news we see how the country is reacting to the unfair process of
investigation into the treatment and killings of unarmed black males in Ferguson, New York and elsewhere. There
is a national conversation now ongoing about how the conflict of interest in the prosecutor's office causes a
failure to impartially present the facts to the Grand Jury. In the same way, I have been pointing out that you cannot
ignore the conflict of interest that exists in asking the Dean of Students Office to investigate itself. That simply
does not make sense, and deprives me of fundamental fairness. Are you going to continue to ignore this point?

Furthermore, I have asked you several times about the procedures for discrimination complaints as I have
additional or other concerns, acts and issues to register with you. You have not told me what those procedures are
at Harvard Extension. Are you not going to tell me what those procedures are? Am I barred from having any access
to the procedures at Harvard Extension for any thing going forward forever? What if I was subjected to racial or
religious harassment or other wrongs today by those at Harvard Extension? Would I not be told the process for
addressing such matters? Would you continue to reject my plea to you for relief and assistance? If this is the case,
then I would demand an explanation for why I am being singled out to be treated in this disparate and unfair way.
Without explanation, I would have no choice but to assume this is further evidence of discriminatory and retaliatory
animus towards me. What is there to lose on your end if you are confident that no one has discriminated or
retaliated or wronged me in any way?

No matter what you personally feel towards me (i.e. you could personally dislike me based on skewed hearsay
information or think I'm too vocal in trying to assert my rights, etc), I still have a right to be told what the full process
is for registering concerns about discrimination/retaliation (which I have never been told as yet) and I still have a
right to have my concerns heard/taken seriously and to be allowed a fair and impartial process for the
adjudication/resolution of those concerns.

So, if you have not closed your ears to me, could you please at least answer my process questions as outlined in
my Nov 12, 2014 email?

I look forward to your reply.

Sincerely,

Andre Bisasor

PS: I have asked you for a meeting in person but so far, you have not responded. Could you please let me know if
you will meet with me as a Harvard extension student and member of the Harvard community?

-----Original Message-----
From: Lambert, Huntington <lambert@fas.harvard.edu>
To: Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>
Cc: Hunt Lambert <lambert@dcemail.harvard.edu>
Sent: Wed, Nov 12, 2014 3:07 pm
Subject: Re: FOLLOW-UP | IMPORTANT COMPLAINTS & CONCERNS ABOUT RACIAL
DISCRIMINATION/RETALIATION, ETC| ANDRE BISASOR

I have not closed my ears. Rather the issue has been investigated and closed. I have referred you to the proper
place at Harvard for further concerns to be heard. Plese look at my May 21 email again. Have you worked with the
Ombudsman?

Huntington D. Lambert
Dean, Harvard Division of Continuing Education and University Extension
lambert@fas.harvard.edu
http://www.extension.harvard.edu
617-495-2930, 617-998-8102 direct

"It is amazing what you can accomplish if you do not care who gets the
credit." Harry S Truman

-----Original Message-----
From: Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>
To: lambert <lambert@fas.harvard.edu>
Cc: pres_ofc <pres_ofc@harvard.edu>; drew_g_faust <drew_g_faust@harvard.edu>; alan_garber
<alan_garber@harvard.edu>; mike_smith <mike_smith@harvard.edu>; david_ellwood
<david_ellwood@Harvard.edu>; wlee <wlee@law.harvard.edu>; susan.carney <susan.carney@yale.edu>;
pfinnegan <pfinnegan@mdcp.com>; bacow <bacow@tufts.edu>; nkeohane <nkeohane@princeton.edu>; twells
<twells@paulweiss.com>; jmathews <jmathews@ceip.org>; graham <graham@cs.berkeley.edu>
Sent: Wed, Nov 12, 2014 12:05 pm
Subject: Re: FOLLOW-UP | IMPORTANT COMPLAINTS & CONCERNS ABOUT RACIAL
DISCRIMINATION/RETALIATION, ETC| ANDRE BISASOR

Dear Dean Lambert:

I am totally disappointed in your response. Firstly, in your last email, you sent me back to Dean of Students Robert
Neugeboren, who is the main subject of my complaint, claiming that you have delegated this matter to him to
handle. After I pointed out the folly in having the person who is the main subject of my complaint handle an
investigation of himself, now you say side-step making a proper response, by saying now that your response is the
same as it was on 5/21/14 and thus you thereby have refused to make a proper response. This just does not seem
like a thoughtful, judicious, evenhanded and fair approach. It seems as though you are not taking me seriously and
being dismissive of me or otherwise you just don't want to do the right thing for fear of what will be uncovered. I
can't imagine that anyone could think that this is the appropriate response of a Dean of an entire Harvard school to
a complaint about racial discrimination and such related matters, etc.

Moreover, it appears that you have closed your ears to my plea for help. This is how victims of racial discrimination
become victimized over and over again when those who are charged with the responsibility to ensure that they are
protected make them feel unheard, marginalized and rebuffed. Your response seems to be so flippant as if there is
nothing that I wrote subsequently that requires further response. Even, President Drew Faust's office indicated that
you would or should provide a follow-up with me, after your initial response on 5/21/14. Why would President Drew
Faust's office say such a thing, if you there was no expectation that you should provide further follow up on the
issues I brought to your attention and subsequently to her attention? Was President Drew Faust's office

mistaken?

Yet, even in your response on 5/21/14, you neglected to address a number of pertinent items that I have the right to know as a student. Failure to address these items would constitute a complete breach and breakdown of the school's duty to me as a student. For example, you have not addressed the following:
--------------------------------------------------------------------------
1) What is the process for filing a formal complaint of racial discrimination at Harvard Extension School by a student? [NB: I would like written documentation of this. I have additional information that I would like to file regarding my initial document, which I have said many times before but I need to know the process for doing so in an orderly and transparent manner with the appropriate safeguards for fairness and impartiality. I also have evidence of further acts of racial discrimination and retaliation that have occurred since my initial document. I need to know what the process is so that I may file these additional incidents. If I am not provided this information by the school, then this would constitute further discrimination, retaliation and a breach of contract regarding promises made by the school to provide fair process of the internal adjudication of racial discrimination complaints, etc. If you are hereby refusing to provide me this information, I would like to know the reasons why.]

2) What are the procedures for the adjudication of racial discrimination complaints at Harvard Extension School? [NB: I would like written documentation of this. I have additional information that I would like to file regarding my initial document, which I have said many times before but I need to know the process for doing so in an orderly and transparent manner with the appropriate safeguards for fairness and impartiality. I also have evidence of further acts of racial discrimination and retaliation that have occurred since my initial document. I need to know what the process is so that I may file these additional incidents. If I am not provided this information by the school, then this would constitute further discrimination, retaliation and a breach of contract regarding promises made by the school to provide fair process of the internal adjudication of racial discrimination complaints, etc. If you are hereby refusing to provide me this information, I would like to know the reasons why.]

3) Is there an appeal process for such complaints at Harvard Extension School? I would like to know this so that I can avail myself of any rights of appeal should my complaint be turned down. I also would like to know this so that I can available myself of any appeal rights regarding the initial complaint that you just now told me is now closed.

4) What safeguards are in place to ensure due process if the Dean of Students is the subject of a racial discrimination complaint? NB: If there is no process, then this will only guarantee that the Dean of Students would be not be held accountable should he perpetrate acts of racial discrimination and retaliation. This exposes a serious flaw in the situation at Harvard Extension School.

5) Why was I not informed of a clear process for racial discrimination complaints prior to this? Why have I been left in the dark with no guidance regarding this process? Why does the Extension School have no published process or guidelines on how to go about doing this, so that students such as myself can benefit from a fair and objective process whereby all my evidence, witnesses and corroborating information can be presented and where there is an opportunity to have a redress of grievances in an orderly and productive manner. [NB: Eventhough I have indicated that I have much further information and evidence to provide, no attempt has been made to collect that evidence or to interview all witnesses or to articulate a normalized procedure where I can have full due process and an understanding of that process as well as my rights as a student.]

6) Why was Assistant Dean Shirley Greene asked to handle an investigation of a matter that involved Dean of Students Robert Neugeboren, her boss, especially when I objected to the fairness and impartiality of a subordinate being asked to investigate her boss? [NB: As I have said to you before, I have further evidence that Shirley Greene is conflicted and I can provide evidence of that. Would you like me to provide you such evidence?]

7) For example, Why did Assistant Dean Shirley Greene refuse to allow me to tell her about the bribes/incentives that was offered to me by Harvard administrators to drop the pursuit of my complaint? This is such a serious matter that if you ignore this, it is tantamount to a complete direction of duty.

8) Why was my initial complaint allowed to linger for so long until I brought it to your attention recently in Spring 2014?

9) Why did you not engage me as the complainant and or my witnesses or asked me for information to get both sides of the matter, before making the decision to now close the complaint on 5/21/14? Why was I or my witnesses not interviewed or asked for information by you? BB: I can't imagine that anyone could think that this is the appropriate response of a Dean of an entire Harvard school to a complaint about racial discrimination and such

related matters, etc.

10) Why was there not a response or position statement provided by Dean of Students Robert Neugeboren as the main subject of my complaint? Why is that I have not been told of or given any written report of the findings of Assistant Dean Shirley Greene's investigation including response by witnesses or the subjects? Why have not been asked one follow-up question or asked for witnesses or evidence or documentation by Assistant Dean Shirley Greene?

11) What are the case materials that you referenced when you said in your 5/21 email that I pursue the matter further with Lydia Cummings and that you can forward the case materials to her? and why have I not seen such case materials before?

12) I have asked for an in-person meeting with you either face-to-face or by phone. Are refusing to ever meet with me in person under any circumstances or for any reason? I would like to know if you are denying me the right to meet with you as my Dean, a right that other students have. If so, why?
-----------------------------------------------------------------

I am really concerned about why these questions, that have I asked before more than once, have not been addressed. I am holding out hope that you will hear my plea for assistance and for a proper handling of my concerns.

I feel so strongly that about these matters that I will continue to pursue these matters until I have had a fair opportunity for my concerns to be heard/handled fairly, judiciously, thoroughly and properly, as it deserves.

I cannot believe that a reputable institution such as Harvard University is behaving in this way in 2014. I am totally flabbergasted that this can happen in 2014 after all of the progress that we have made on racial issues in America and after much of academia has recognized the need to internally address these matters in a fair and forthright manner, when they arise especially from students. This is especially concerning given that the US government recently found that Harvard has had a culture of mishandling sexual harassment/sexual assault complaints and given that the President Drew Faust & the university has recently pledged to fix these kind of problems within the university, including ensuring that student's voices are not muzzled and that attention is paid to ensuring a fair and honest process for such complaints.

Why is Harvard now repeating these same mistakes with racial discrimination complaints? Does there need to be a major public outcry or a government intervention in order for the university to not make the same mistakes with racial discrimination as it has made with sexual harassment issues?

I have been reluctant to assume that you would maintain or continue to maintain a completely unreasonable position, but unfortunately, if you continue to refuse to address my concerns, I will be left with no choice but to assume that you are taking adverse action against me once again by denying me a fair process to be heard and are discriminating/retaliating on the basis of my race and because I have brought concerns of racial discrimination to your attention, and I will therefore have to consider other avenues of redress including but not limited to formally escalating this matter to request intervention by the Board of Overseers and the Fellows of the Harvard Corporation and/or other grassroots activity to get my concerns heard. [NB: I am hereby ccing the Board of Overseers and the Harvard Fellows from now, so that they aware of what is going in within the university, so that this matter does not take a wrong turn for the worst at this stage when it can be easily made to be on the right track, and so that I am not victimized by any further retaliation.]

At the end of the day, all I am asking for and have been asking for is a fair and clear process to be heard. That is all.

I look forward to your reply.

Sincerely,

Andre Bisasor

-----Original Message-----

From: Lambert, Huntington <lambert@fas.harvard.edu>
To: Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>
Cc: pres_ofc <pres_ofc@harvard.edu>; drew_g_faust <drew_g_faust@harvard.edu>;
alan_garber <alan_garber@harvard.edu>; Smith, Michael <mike_smith@harvard.edu>;
david_ellwood <david_ellwood@Harvard.edu>
Sent: Wed, Nov 12, 2014 8:57 am
Subject: Re: FOLLOW-UP TO PRIOR EMAILS | IMPORTANT STUDENT COMPLAINTS & CONCERNS
| ANDRE BISASOR

My error, you heard from me on 5/21/14. Our response remains the same.

Huntington D. Lambert
Dean, Harvard Division of Continuing Education & University Extension
617-495-2930, hunt_lambert@harvard.edu
http://www.dce.harvard.edu/
From iPad.

---

On Nov 12, 2014, at 5:09 AM, Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>
wrote:

Dear Dean Lambert:

I am not sure I understand your reply.

First, you said below that "you have heard from Dean Neugeboren on my behalf". Did you mean that to say "you
will hear from Dean Neugeboren on my behalf", because I have not heard anything from Dean Neugeboren at all,
so this would factually incorrect

Secondly, I did not include Dean Neugeboren in any of my email cc's to you because he is one of the subjects of
my complaint(s).

I am not sure if you read my below email carefully (or my past emails for that matter) because I went to great
lengths to identify Dean Neugeboren as the main subject of my concerns. It is unimaginable that he could
investigate himself or handle this matter in any impartial way. The fact that you would delegate this to him is deeply
troubling as it is highly inappropriate to send me back to the very person who has been causing me much distress
for years now at the Extension school. If I were a female and I complained that I was sexually harassed by Dean
Neugeboren, would you send me back to him? I think not.

This underscores the fact, as I have been warning for some time now, that there is no proper process for handling
racial discrimination complaints at Harvard Extension School.

The bottom line is that Dean Neugeboren should not be handling this matter and neither should anyone who
reports to him or that he has an under influence over.

This to me is not only reasonable but is also an ethical requirement.

I look forward to your reply.

Sincerely,

Andre Bisasor

---

-----Original Message-----
From: Lambert, Huntington <lambert@fas.harvard.edu>
To: Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>

Cc: Rob Neugeboren <neugeboren@dcemail.harvard.edu>
Sent: Tue, Nov 11, 2014 11:37 am
Subject: Re: FOLLOW-UP TO PRIOR EMAILS | IMPORTANT STUDENT COMPLAINTS & CONCERNS
| ANDRE BISASOR

You have heard from Dean Neugeboren on my behalf. I have delegated this to him.

Huntington D. Lambert
Dean, Harvard Division of Continuing Education and University Extension
lambert@fas.harvard.edu
http://www.extension.harvard.edu
617-495-2930, 617-998-8102 direct

"It is amazing what you can accomplish if you do not care who gets the
credit." Harry S Truman

_____

-----Original Message-----
From: Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>
To: lambert <lambert@fas.harvard.edu>
Cc: pres_ofc <pres_ofc@harvard.edu>; drew_g_faust <drew_g_faust@harvard.edu>;
alan_garber <alan_garber@harvard.edu>; mike_smith <mike_smith@harvard.edu>;
david_ellwood <david_ellwood@Harvard.edu>
Sent: Tue, Nov 11, 2014 11:18 am
Subject: Re: FOLLOW-UP TO PRIOR EMAILS | IMPORTANT STUDENT COMPLAINTS & CONCERNS
| ANDRE BISASOR
Dear Dean Lambert,

I am writing you today to follow-up on our previous email exchanges.

I received an email from President Drew Faust's office stating that you (as well as Dean Ellwood of Harvard
Kennedy School) would follow-up with me (see below at the end of this email) regarding the concerns I had brought
to your attention. I have not heard back from you as yet (nor from Dean Ellwood).

I had been hoping that the reason for your lack of response is that things were simply busy with preparing for the
Fall and the new academic year, and especially as you settle into your second year as Dean. However, we just
passed the mid-semester and I am concerned that I have not heard back.

I have a number of outstanding issues that I brought to your attention in my prior emails that have not been
answered, addressed or resolved.

These include the issues related to the concerns I raised about how I was treated by other students as well as
actions sanctioned by certain school administrators in terms of: 1) denial of freedom of speech, 2) abuse of
authority, 3) discrimination against students based on national origin, voter suppression and other unethical acts, 4)
unfair targeting of me and others associated with me as it related to certain on-campus student activities, and
5) breach of contract regarding how administrators have failed to follow certain of its own procedures and
guidelines. So far, these concerns seems to have fallen on deaf ears and no-one seems to want to address both
the substantive as well as procedural issues involved in a fair, above-board, honest and thorough way. It feels as if
there is an attempt to marginalize or ignore me or to paint a picture of me as either not being worth the time or
otherwise as being a frivolous person and that I am not to be taken seriously.

(NB: This is in keeping with the campaign of both covert and overt defamation, discrimination, marginalization,
retaliation against me, as one of a few black student leaders to ever emerge at Harvard Extension School, by Dean
Robert Neugeboren who has an intense personal dislike for me because I am an outspoken black male student
leader and who has essentially spoken ill of me almost every chance he gets starting as far back as 2008 or 2009,
and he has continually used the power of his position and his influence to undermine me with students, other
administrators and even alumni. He has also sought to give preferential treatment to white students, especially
those with a Jewish background, over against me apparently to prevent me from outshining them, etc, and this
motive of favoritism has driven much of the animus he has had against me from the very beginning...which I can

prove if given the chance).

In addition, in my emails to you, I have also explicitly referenced issues related to discrimination, retaliation and other wrongs I have suffered and the concerns I have raised about these previously prior to your appointment as Dean. These issues again have either been brushed under the rug in terms of both procedural integrity as well as in terms of a "minimizing" of the substance of these concerns.

For example, I would like to know what are the procedures for filing a discrimination complaint at Harvard Extension School. I would like to know the details because so far I have not been told of a process and thus far it has been an ad hoc and arbitrary process (i.e. one that appears to be made up as it goes along). This is not an adequate system that treats discrimination complaints seriously. It also deters students from bringing complaints for fear that it will be ignored or that they will be rebuffed. If this were a sexual harassment complaint by a white female student, I am certain this would be handled differently.

Moreover, I have told you that I have additional information regarding my complaints, but no one seems to want to hear it. After I gave an initial account in person and after providing an initial document that gave a broad reference to the issues to get the process moving, I specifically told administrators that I had a lot more information to provide as well as witnesses, etc. But no process was provided for that. I also figured that at some point I would have had an opportunity to present these in a formal process but none has been provided. I also thought I would see the response of specific subjects of my complaint such as from Dean Robert Neugeboren, but none has been provided. I have no clue or proper information about what has gone on or has been done by Dean Shirley Green regarding her looking into these matters. Furthermore Assistant Dean Shirley Green works for Robert Neugeboren, yet she is expected to impartially "investigate" him as her boss. This is totally unacceptable and the fact that it was encouraged by both you (and your predecessor Dean Michael Shinagel) indicates unfortunately a total lack of seriousness about investigating impartially and fairly students' complaints about racial discrimination.

Furthermore, why was my initial racial discrimination complaint lingering with no follow-up for so long? Why was Shirley Green tasked with investigating her boss? Why was there no formal process instituted where I could engage the follow-up to my initial complaint more clearly and precisely and why was neither I nor any of my witnesses ever interviewed as part of the process? Why did Dean Shirley Green tell me that she did not want to hear of any thing relating to the fact that I was offered incentives to not pursue my complaint by certain administrators? Why has no one forwarded me a copy of the rules governing racial discrimination complaints even-though I have asked for it several times now?

As you can see, there are a lot of legitimate reasons for why I have concerns about the processes for the handling of my complaints. Thus, I am concerned that there is no process in place to ensure that my concerns are fully, fairly, impartially and thoroughly addressed. So far, my concerns have not been handled properly and the response by the school has been to be heavy-handed with me to try to dissuade me from speaking up about these issues.

Additionally, the fact that you, as the new Dean of Harvard Extension, so quickly closed my initial filing as "done" and "over", in such a short period of time (i.e. what appeared to be a weekend review), without engaging me as the complainant or any of my witnesses or asking me for all the information I had or ensuring a fair and full process had been afforded to me, again seems to indicate a lack of seriousness regarding racism complaints at Harvard Extension School and this represents a significant problematic culture of dismissiveness and a lack of forthrightness and fairness at the same. I do not think that your simply taking a quick look at my last email (as well as any abbreviated/biased summary from Dean Neugeboren and Dean Green) can satisfy a proper investigation into the activities of these same persons who are either subjects of the complaint, work for/report to the subjects of the complaint or otherwise have shown a bias as it relates to the complaint. I am not sure if you know, but there is a long history of racial problems at Harvard Extension School, which was confirmed to me by Ombudsdman Lydia Cummings when I first brought some of my concerns to her starting in 2008. It is time now that these systemic issues are confronted and that a good-faith attempt is made to enact the kind of change to ensure that these issues are uncovered and remedied at every level of the Extension School (see below one of my prior emails to Dean Michael Shinagel about the matter).

However, having said all of that, I would like to take a positive tone at this juncture and look to future resolution for which I am hopeful of. So I am willing to chalk up your initial response to the stress of the moment at the end of Spring semester, as a good faith gesture to you and to suggest that we reset the tone of our exchange.

So, just to be clear, I am coming to you because I believe I (and others associated with me) have been the victim of racial discrimination as well as religious discrimination (as well as a number of other wrongs suffered including

defamation, invasion of privacy, breach of contract, etc) at Harvard Extension School. I have been subjected to a hostile environment and harassment as well. I have also suffered retaliation for bringing these and other concerns to the fore, especially when they involve administrators and staff such as Dean Robert Neugeboren, Dean Michael Shinagel, Dean Sue Shopf, Peter Omalley, Ashley Pollock and others, etc.

I previously brought some (not all) of these concerns to the Ombudsman Lydia Cummings and the last piece of advice she gave me on the matter was that I bring the matter to certain persons who could help me resolve these issues, for example, the Dean of Harvard Extension. So I am coming to you, as the recently appointed Dean of Harvard Extension, one last time asking for your assistance in this matter. As the new Dean, I truly hope that you can step back from the situation, and consider that perhaps might have no idea of what has really gone on regarding the matters that I am bringing to your attention. You can probably tell that I am a person of some degree of intelligence and conviction. I have served the Harvard Extension Community with excellence and have done a lot to improve the student association and student life, not only at HES but across Harvard as well. Please let my record of service to this community stand as a testimony to my credibility.

Assuming your impressions about the matter are largely based on the one-sided/self-preservation accounts of those who are themselves the subjects of my complaints, I can understand the inclination to side with them. I know that it requires special effort from most people to really exercise self-restraint and judgment to err on the side of ensuring full due process in a situation like this. I know you did not sign up for the position, expecting to be dealing with this kind of unpleasant thing so early in your tenure as Dean, and with that I truly empathize with you, putting myself in your shoes. But at the same time, because you are in this position now (and I mean this in a respectful way) it is certainly not unreasonable to expect that someone in your position lives up to these standards of ethics, morality, good conscience and fair-dealing and so, consequently, I am truly relying on you to so act and to try to put yourself in my shoes as well. I simply ask that you not prejudge me based on what anyone has said to you about me. Please give me a fair chance to be heard and I assure you that it will not only show that my concerns are legitimate but it will also be beneficial to the school in being able to address and improve such matters for other similarly situated as me (i.e. the institution itself is larger than any one individual or administrator who may have committed wrong acts).

I really would like to have a resolution to these matters that have been pending for some time now.

Lastly, in a previous email, I suggested that we meet in person. If you would be open to meeting with me, I would be happy to do so, so that you can get a sense for who I am and so that you can, in person, get a better chance to view my credibility and to see that my concerns are legitimate. Perhaps this can help establish a proper cordial and professional rapport between us (which I had with your predecessor Dean Shinagel - see below examples of two emails with him). I am making a good faith effort here to start again on the right footing with you, so that you can properly assist me in ensuring that these matters are addressed internally for the benefit of not only myself but of other students and the school as a whole. The school has made public representations and promises in its handbook and marketing materials, etc, regarding its commitment to fairness and non-discrimination/non-retaliation, etc. I would like for there to be a good faith effort by the school and by you to address/investigate/resolve these matters. If this means, for example, that a special investigator or panel is brought in from another Harvard school or institution, then I would welcome that. These, however, would have to be disinterested persons who would be fair and open to all including me and/or my witnesses.

Either way, I look forward to your thoughtful consideration and reply.

Andre

…………

-----Original Message-----
From: Andre Earl-Clive Bisasor <abisasor@fas.harvard.edu>
To: lambert <lambert@fas.harvard.edu>
Sent: Wed, May 21, 2014 11:20 am
Subject: Re: HIGH PRIORITY | RACIAL DISCRIMINATION COMPLAINT AGAINST DEAN ROBERT NEUGEBOREN AND HARVARD EXTENSION SCHOOL
Dear Dean Lambert:

Please note that I have information that shows that my case was not thoroughly reviewed. I have more information

**Exhibit 6 - Harvard Crimson News Articles (referencing the Battenfield et al v Harvard University et al case in the Massachusetts Suffolk Superior Court (case#: 9181CV05089) and other recent similar cases against Harvard].**

ABOUT US    ADVERTISING    SUBSCRIBE    JOURNALISM PROGRAMS

CAMBRIDGE, MA WEATHER: 51°F



SEARCH

NEWS    OPINION    FEATURES    MAGAZINE    SPORTS    ARTS    MULTIMEDIA    FLYBY

**BREAKING NEWS**    Members of final clubs, Greek organizations will be ineligible for multiple leadership positions and fellowships  Updated 11:04 a.m.    ✕

〈                                                                                                              〉

# Recent Graduate Sues Harvard Over Sexual Harassment Case

By ANDREW M. DUEHREN and DAPHNE C. THOMPSON, CRIMSON STAFF WRITERS  February 18, 2016

57

**UPDATED: February 18, 2016, at 2:15 a.m.**

A recent Harvard College graduate filed a lawsuit against Harvard University, charging that College and University administrators mishandled a response to her sexual harassment case and allowed an alleged perpetrator to live in Cabot House with her.

The federal suit—which was filed in Massachusetts District Court on Tuesday—charts a sexual harassment complaint Alyssa R. Leader '15 filed with Harvard in 2015 against a male College student after what the suit describes as repeated threatening and abusive sexual encounters. The suit alleges that the student, referred to as "John Doe 1," sexually abused Leader during a "dating relationship" and then subsequently intimidated and harassed her in Cabot House after the relationship ended.

Requesting punitive damages for Harvard and compensation, Leader alleges in the lawsuit that Harvard administrators failed to follow federal guidance on university

Case 1:16-cv-10105-DJC Document 24-1 Filed 05/06/16 Page 36 of 54

sexual harassment investigations. In particular, the suit argues that Harvard's handling of the case violated anti-sex discrimination law Title IX and failed to protect her against retaliation.



Massachusetts Hall houses the offices of some of Harvard's top administrators, including University President Drew G. Faust.   THE CRIMSON STAFF

"The acts and failures to act perpetrated against Plaintiff amounted to unlawful sexual harassment and discrimination on the basis of gender," the suit charges against the University. "Defendants acted with deliberate indifference in deviating significantly from the standard of care outlined by the [Department of Education]."

In an emailed statement, Harvard spokesperson Tania deLuzuriaga wrote that Harvard does not comment on pending litigation.

After Leader reported sexual harassment to several administrators, who later opened a formal investigation, she requested that they remove Doe from Cabot during the course of the investigation. According to the suit, administrators did not remove Doe from Cabot until Leader had secured a restraining order from an outside court.

Alex S. Zalkin, the California attorney representing Leader, said he and Leader first began working on filing the suit about a month ago. Leader reached out to Zalkin, who works at a firm that specializes in sexual abuse law, he said.

The suit traces several interactions Leader said she had with University administrators regarding sexual harassment over the course of about two years. According to the suit, Leader first reported Doe's conduct to Harvard's Office of Sexual Assault Prevention and Response in spring 2013, and again in September 2014. On Nov. 6, 2014, the suit states, Leader met with Cabot Resident Dean Tiffanie L. Ting and claimed that Doe had sexually harassed her in Cabot dining hall and cafe, among other places. The suit alleges that Ting discouraged Leader from filing a formal complaint and said Doe could not be moved from Cabot. Ting could not be reached for comment.

"I think that the biggest takeaway from the complaint is that she recorded multiple times not only that she was sexually assaulted, but that there was retaliatory and ongoing harassment from the perpetrator and his friends," Zalkin said. "Notwithstanding, Harvard did nothing to protect her and make her feel safe on campus, which is basically the whole purpose of Title IX."

In an emailed statement, Rakesh Khurana, the Dean of the College and a Cabot House master, wrote that he could not comment on pending litigation. Still, he wrote that Harvard administrators "take seriously and swiftly respond to all allegations of sexual assault and harassment."

"My colleagues and I in the College will continue our efforts to educate our community about the issue of sexual assault, to better prevent it, and to provide the best resources for those who experience it," he wrote.

Leader reported Doe to the Office of Sexual and Gender-Based Dispute Resolution in February 2015, prompting a formal investigation, and updated ODR investigators on Doe's alleged retaliatory conduct—including threatening comments and increased presence at Leader's workplace, Cabot Cafe—according to the suit. She also reported sexual assault to the Harvard University Police Department in April.

The suit claims that, on advice from Miller, the College's Title IX coordinator, ODR, and OSAPR, Leader did not try to secure contact restrictions that could have prevented alleged retaliation against the plaintiff. It also alleges that the defendants—listed as the Harvard Corporation and Board of Overseers—did not provide Leader with adequate information about her legal rights, including her option to pursue a restraining order. When Leader independently obtained a restraining order against Doe on April 27, 2015, College administrators moved Doe to another residential building, according to the suit.

After both Leader and Doe graduated in 2015, the ODR found Doe "Not Responsible" on all claims of rape, assault, abuse, and retaliation; Leader unsuccessfully appealed the finding, according to the suit. The College's Administrative Board then reviewed the

results of the investigation, and voted for a sanction of "Scratch," a ruling that indicates no wrongdoing had occurred.

---

1312909.pdf      ^

☐ ☐ ☐   ViewerJS

☐

☐

Page: 1     of 29

☐

☐

Automatic ▽

---

Case 1:16-cv-10254-DJC   Document 1   Filed 02/16/16   Page 1 of 29

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| ALYSSA LEADER, | |
| Plaintiff | C. A. No. |
| | |
| v. | |
| | |
| HARVARD UNIVERSITY BOARD OF | JURY TRIAL DEMANDED |
| OVERSEERS, and PRESIDENT AND | |
| FELLOWS OF HARVARD COLLEGE, | |
| Defendants | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

COMPLAINT AND JURY DEMAND

Plaintiff, through her attorney, submits this Complaint and states the following:

---

Jessica R. Fournier '17, an organizer for anti-sexual assault advocacy group Our Harvard Can Do Better, said Leader has the full support of the group and called the suit "really tragic and horrifying, but certainly not unique."

"I think Harvard would like to believe and would like to tell the community at large that these issues have been solved, so they've created a new policy and had all these task forces," she said. "I think that Alyssa's case points very clearly to the fact that that is not true; this is still ongoing; this is still systemic."

Zalkin, one of Leader's lawyers, said his team held a press conference on Wednesday at the Sheraton Commander Hotel and anticipates heavy press attention to the case given recent criticisms of Harvard's handling of sexual assault.

A federal investigation into Harvard College's compliance with anti-sex discrimination law Title IX remains ongoing. In July 2014, Harvard unveiled a new approach for handling cases of alleged sexual harassment, creating a centralized, investigatory office. And in December 2014, the federal government found Harvard Law School in violation of Title IX.

—Staff writer Jalin P. Cunningham contributed to the reporting of this story.

—Staff writer Andrew M. Duehren can be reached at andy.duehren@thecrimson.com. Follow him on Twitter @aduehren.

—Staff writer Daphne C. Thompson can be reached at daphne.thompson@thecrimson.com. Follow her on Twitter @daphnectho.

**Want to keep up with breaking news?** Subscribe to our email newsletter.

READ MORE IN COLLEGE NEWS

Our Harvard Can Do Better Outlines Goals For ›
Semester

TAGS    COLLEGE    COLLEGE ADMINISTRATION    CABOT    UNIVERSITY    COLLEGE NEWS
UNIVERSITY NEWS    HIGHLIGHT    NEWS FRONT FEATURE    SEXUAL ASSAULT    TITLE IX

MOST READ

1. Harvard Can't Achieve Safety and Equity for Women If It Ignores Their Voices

2. With End of Year Approaching, Faust Sharpens Final Club Critiques 

3. Six Harvard Football Players Join NFL Teams 

4. Sablière Leaders Charge Admins with Ignoring Female Clubs

5. The Legend of the Z-List 

ADVERTISEMENT

Case 1:15-cv-10105-DJC   Document 24-1   Filed 05/06/16

ABOUT US    ADVERTISING    SUBSCRIBE    JOURNALISM PROGRAMS              CAMBRIDGE, MA WEATHER: 50°F



*Exhibit 6 : Part A*

SEARCH

NEWS    OPINION    FEATURES    MAGAZINE    SPORTS    ARTS    MULTIMEDIA    FLYBY

> **BREAKING NEWS**   Members of final clubs, Greek organizations will be ineligible for multiple leadership positions and fellowships   Updated 11:04 a.m.   ✕

# Sexual Harassment Suit Raises Questions

*Court Documents Show Extension School Officials Knew of Allegations*

By TERRY H. LANSON,  April 25, 1994

o

In May of 1991, L. Dodge Ferruled Jr., the assistant dean of the Extension School, wrote a desperate memorandum to his boss, Michael Shinagel.

"I write...with a sense of despair concerning the work environment of my supervisee, Delise Battenfield," Fernald said in the memo to Shinagel, dean of the Extension School and Quincy House master.

"There has been sexual harassment by a research advisor," the memo continues. "This problem has existed for several months and [Battenfield] has tried to tolerate it."

The memo goes on to ask Shinagel for an investigation of the harassment, but no such probe ever occurred.

Three years later, that memo has become an important piece of a sexual harassment lawsuit field by M. Delise Battenfield, a former Extension School student and employee, against the research advisor--Donald Ostrowski--and Harvard University.

Battenfield, a student and administrative assistant in the Extension School's master's program, alleges that Ostrowski, who coordinated students' research in the program and served as her husbands thesis adviser, sexually harassed her and other women at the school. Ostrowski has denied those charges.

But the memo buttresses an even more damaging contention of the Battenfield case: Extension school officials--including Shinagel--Knew about the allegations of harassment, and did nothing to fix the situation.

The University has fought this charge, using a variety of legal arguments and even Battenfield's medical records from the University health Services. and Harvard won a minor legal victory last year when a Middle-sex County judge dismissed some allegations in the civil suit.

Still, court documents in the case, which is scheduled to go to a trial in Middlesex County Court on June 6, raise questions about how well the school responds to sexual harassment complaints and treats employees and students.

For example, Fernald's memo charges that Sue Weaver Schopf, coordinator of research advisors for the Extension School's master's program, verbally harassed Battenfield and broke promise of confidentiality to the student.

Neither the plaintiffs nor Extension School officials agreed to be interviewed for this story. Ostrowski and Shinagel did not return repeated phone calls to their offices, and Shinagel would not answer questions when reached at his residence yesterday.

But depositions, affidavits, motions and, most of all, internal Extension School memoranda paint a stark--if incomplete--picture of the case.

One document that could become vital to the case's outcome is another memo found in Extension School files. This letter, which was attached to the Fernald memo, is not signed, but the document was sent to Shinagel and appears to have been penned by a school official.

"Is Delise aware that she has grounds to sue Harvard for megabucks?" it reads. "Not just an individual for possible sexual harassment, but the University (Extension School) for fostering a climate of emotional harassment.

"I'd tell her to take a leave-of-absence, rather than leaving the University unconditionally; she needs some good advice (have she and her husband talked with a lawyer?), both to preserve her rights and status as a Harvard employee, as a Harvard degree-candidate, and, frankly, as a human being."

## A Kiss?

In the fall of 1988, Ostrowski more than once propositioned Battenfield and even kissed her against her will, according to her deposition.

After the two had lunch together one day, Ostrowski said, "You know, I lust after you at night, Battenfield testifies in her deposition.

Battenfield testifies that she was particularly offended that he used the word lust because "it was my impression that he was implying that he thought about me while he masturbated."

About a week later, Ostrowski again propositioned her, she charges. Ostrowski allegedly said "something to the effect of 'will you sleep with me' or `are you going to have a sexual relationship with me," according to Battenfield.

Although Battenfield responded that she did not get involved with people with whom she worked, she testifies that he kissed her and then left.

Battenfield describes the kiss as "very offensive and almost violent." Battenfield testifies that she tried to pull away, but that the encounter was over before she could do anything.

During a third incident about a week and a half later, Ostrowski allegedly asked, "Have you decided whether or not you are going to go to bed with me?"

Battenfield says in her deposition that her response to Ostrowski was, "absolutely not. I want to make it very clear that there is no question about it. I'm absolutely not going to sleep with you; and if you continue to ask me this, I'm going to report you."

Despite being rebuffed, Ostrowski kissed her again, according to the deposition.

Although Battenfield did not report these three instances of alleged harassment at the time, a fourth incident three years later prompted her to tell Extension School officials what had happened.

## `Get What I Wanted'

In a May 1991 meeting of Extension School staff, members were asked to evaluate Battenfield's job performance.

During this meeting, Ostrowski said: "When Ifirst started working here, I soon found out thatI couldn't get anything more than a yawn fromDelise; and then after a while, I figured out thatI could get what I wanted from Sarah," accordingto Battenfield's deposition.

Battenfield testifies that Ostrowski'sstatement "was directly referring to my havingrefused his sexual advances." She also calls thestatement retaliation for her decision to refusehis advances.

"The comment was between me and Don," she saysin the deposition. "I knew what he meant by thatcomment, and I knew why he was saying it."

"Sarah" is Sarah Gruppe, who Battenfield andher attorney believe was having an affair withOstrowski. Battenfield writes in an affidavitsubmitted for the case that Gruppe "told me shewas trying to decide whether to sleep with him."

In a phone interview last week, Gruppe deniedthat she had had a relationship with Ostrowski.

## `Expeditiously and Thoroughly'?

Immediately after the May 14 meeting,Battenfield told Fernald what had happened, shesays in her deposition.

At that time Fernald said "I think Mike needsto hear this" and called in Dean Shinagel,according to Battenfield's deposition.

Battenfield testifies that she told Shinagelthe story, and the dean quickly said: "That'ssexual harassment."

Later in the conversation, "[Shinagel]indicated that he would take care of it, and Ithink he did. Oh, he told me that I should go homeand have a drink, and he didn't mean Cool-Aid orsomething like that," Battenfield testifies.

But no investigation followed.

Battenfield says she told John Adams, theExtension School ombudsperson charged withhandling personnel problems, about the allegedharassment, and he told her to put the complaintsin writing. She didn't, and "there," according toFernald's deposition, "the matter ended."

University officials say in court documentsthat they couldn't do an investigation without awritten complaint. But Harvard's policy on sexualharassment makes no such stipulation.

"Individuals who are affected by or aware ofsuspected cases of sexual harassment are urged tobring such situations to the University'sattention through the most comfortable of avariety of routes," the policy says. "They mayselect the informal process available within theirfaculties or departments.... Universityauthorities will explore the allegationsexpeditiously and thoroughly and will takeappropriate corrective action as necessary."

Battenfield alleges in her affidavit thatShinagel "did not want to be bothered with aninvestigation. In any event, he prevented one."

As evidence of such intent, she points to thefact that Shinagel received Fernald's may 1991memo and did not investigate.

"I am deeply distressed by all thesecircumstances," Fernald writes in that memo to thedean. "I expect you are too and hope you will makea careful inquiry."

## Other Women?

Court documents indicate that Battenfieldbelieves Ostrowski sexually harassed at least twoother master's candidates who also happened to behis advisees.

Battenfield writes in her affidavit that one ofthe women told her that Ostrowski sexuallyharassed her.

"[The woman] informed me on the telephone thathe met with her in Washington, D.C., asked her outfor a meal (he claims the opposite), and after themeal, standing in the street, he abruptly grabbedand kissed or tried to kiss her, just as he kissedme without any warning, and that she vigorouslyfended him off," Battenfield writes.

The woman reported the incident to Harvard, butthere was no investigation, according toBattenfield.

In the court documents, Ostrowski denies havingsexually harassed the woman. He says the woman"looks older than her age" and implies that he didnot find her attractive.

Attempts to contact the woman last week wereunsuccessful.

Even before Battenfield complained to theExtension School administration, word ofOstrowski's alleged sexual harassment had leakedto school staffers. In an April 2,1991,

letter toSchopf, the research coordinator, Ostrowski deniedany suggestion of harassment.

The letter suggests there were tensions betweenOstrowski and the school's administration. Hewrites: "Re: Whispering campaign involving chargesof harassment... here are the facts: I have neverharassed any student at any time not has anystudent ever accused me of harassment at anytime... These are charges made up by Dodge Fernaldand John Adams for their own purposes."

Ostrowski's letter does not specify what thosepurposes are. Fernald and Adams have refused tocomment.

### Defamation?

Ostrowski was not the only person in the officewho didn't care for Delise Battenfield.

On April 26 of that same year, Schopf sent anine-page single-spaced letter to several membersof the office describing "Delise's generalincompetence, manipulativeness and dishonesty."

"For weeks Delise did nothing for us," Schopf'sletter says. "She didn't appear to be doing muchof anything else, either."

The letter savages Battenfield's ability as astudent and administrator, and calls her a liarand "an intellectually and professionally inferiorperson."

Schopf allegedly discussed these allegationswith various members of the office who did notreceive the letter.

In another memo circulated to several people inthe office, Schopf refers to a required proseminarfrom which she had excused Battenfield. Shewrites, "Dodge forced me to give Delise a waiverfor the proseminar."

But these memos, which appeared to come withoutwarning or explanation, do not square withSchopf's previous correspondence. In a 1990 memoto Fernald, Schopf writes that "in light of[Battenfield's] work over the last year I wouldmost certainly be willing to grant her theproseminar waiver."

In fact, Shinagel urged Battenfield to takeanother course instead of the proseminar,according to the court documents.

But after hearing Schopf's disparaging remarksabout Battenfield, Fernald based Schopf.

"I never imagined that anyone could feel quiteso resentful and not decide to speak contructivelyabout the problem at a much earlier date," Fernaldwrites in another internal memo.

Other members of the office, however, supportedSchopf. and Shinagel began the May 14 beganmeeting by soliciting comments about Battenfield'sperformance.

Shinagel also told Fernald that Battenfield hadpoor research skills compared to other master'scandidates and that Battenfield's performanceevaluation should be lowered in light of Schopf'sattack, according to court documents.

### Battenfield Falls III

The criticism voiced at the May 14 meeting sodevastated Battenfield that, according touniversity Health services (UHS) records, shebegan suffering from severe stomach problems. Shesoon became too sick to work and May 20 turned outto be her last day on the job.

UHS's Stillman Infirmary admitted her on May21. She remained there for three days. Dr. WaseemaSheikh observed in a written summary ofBattenfield's stay that "she is under extremestress at work because of a very demandingsupervisor." And the doctor's handwritten notes,field May 29, show that Battenfield's conditionwas not temporary.

"Patient looks very anxious,' the notes say."She is still very upset with her dean at work andthe situations which have led to [high]stress andabdominal symptoms, etc."

The medical records appear to indicate that theMay 14 meeting either prompted Battenfield's illhealth or exacerbated some other medical problem.

"She has been under a lot of stress at work,particularly around the May 14 meeting at work,"says a report by Dr. Paul B. Lesser on June 18."About 5 days before the meeting, [symptomsbegan]."

Her symptoms subsided with treatment, but theyrecurred about a month later when the ExtensionSchool began to advertise her position, accordingto a July 10 report by Dr. Irving M. Allen of theUHS mental health services.

"She looked depleted, depressed, beaten down,"Allen writes. "She went into the office to find afew things and discovered that she had beencleaned out. there had been no warning. In apitiful phone call Monday, it sounded as thoughshe was utterly devastated. Her bowel is actingup..."

Battenfield collected disability benefits fromHarvard for her illness at the recommendation ofAllen, who wrote that her "conditions appeared tobe related to employment related problems."

## Battenfield Replaced

Battenfield says in court documents that shedid not intend to give up her job when she becameill. She also says she was very upset when herposition was advertised. Battenfield waseventually replaced by Sarah Gruppe.

"Harvard gave my position away to Sarah Gruppewhile I was taking sick days," Battenfield says inher affidavit, "and there was no job to which Icould return."

Battenfield says Adams had promised that "myjob remained mine and I had no intention ofresigning."

But in her deposition, Battenfield appears tocontradict herself. She says in that testimonythat she told Shinagel, Fernald and personnelofficer teresa Gee, Shinagel that she had nonintention of returning her position.

Shinagel, in fact, phoned Battenfield toconvince her to stay on. "I told him that I didn'tsee how I could continue in that situation,"Battenfield says in the deposition.

But Adams told her that he did not consider herstatement a valid resignation, according to courtdocuments. Because of that, Battenfield explainsin her affidavit, her job should have remainedopen.

In addition, Battenfield says she would havereturned to work if the University had begun aninvestigation of the sexual harassment charge.

"Had Harvard investigated and taken appropriateremedial action, including keeping my job open,"Battenfield writes in the affidavit, "I would havestayed at my job."

## The Lawsuit

Battenfield and her attorney, Peter W. Adler ofNatick, Mass., filed suit later in 1991. The suitaccuses Ostrowski of sexual harassment, assaultand battery; says Shinagel and Harvard had beennegligent in responding to her complaint; andcharges Schopf, Ostrowski and Shinagel withdefamation.

In response, University Attorney Allan A. RyanJr. field a motion for summary judgement in aneffort to get some of the counts dismissed.

Ryan's motion won a partial legal victory for Harvard. Judge Thayer Fremont-Smith ruled that battenfield could not recover damages for the alleged sexual harassment that occurred in 1988--including Ostrowski's uninvited kisses--because a suit must be field within six months of the alleged incidents.

The jury may consider the incidents that occurred in 1988, but only as they relate to Ostrowski's "yawn" comment at the 1991 meeting, the judge said.

Fremont-Smith also ruled that Harvard is liable for its employees' failure to investigate, but that Shinagel may not be individually held responsible for his actions. And he dismissed the claims of defamation against Schopf, Ostrowski and Shinagel on the grounds that the statements were matters of opinion.

**A Great Writer**

Members of the Harvard community who are friends of either Battenfield or Ostrowski remain fiercely loyal. Many of Ostrowski's former students say he is unusually caring and concerned for his students.

And Lowell Professor of the Humanities, Emeritus William Alfred says he developed great respect for Battenfield after she took his playwriting class.

"She is one of the best writers of her generation," Alfred says. "She is one of the deftest masters of characterization I have ever come across."

He calls allegations such as those made against this former student by Schopf "preposterous." And Alfred adds that Battenfield is a "woman of honor" who "wouldn't bring charges unless she felt she had to out of her sense of honor and duty to other women."

But Alfred says he blames the difficult situation, not Shinagel, for what happened. "Shinagel is one of the best administrators at Harvard," he says.

But when there are charges as serious as sexual harassment, "executives in departments tend to pretend to be shocked," Alfred says, "but then try to wait until it blows over." Crimson File Photo

MULTI-PAGE VIEW

**Want to keep up with breaking news?** Subscribe to our email newsletter.

READ MORE IN NEWS        New Hampshire is Only the Beginning ⟩

# Exhibit 7 - Harvard Statement of Values

# Harvard University Statement of Values
**August, 2002**

Dear Members of the Harvard Community:

The attached "Statement of Values," endorsed by the Academic Advisory Group, which includes the President, the Provost, and the Deans of the Faculties, represents an effort to articulate basic values that should be reflected in policy and practice throughout the University. Although we recognize that our various Schools and units have distinctive missions, cultures, and ways of doing business, it is important that we, as a community, embrace certain values as a means of creating and sustaining an environment of trust and mutual understanding.

We are guided in this undertaking by the positive experience of certain of our Schools that have developed values statements and established processes for implementing them, and by the work of the Harvard Committee on Employment and Contracting Policies, chaired by Lawrence Katz. The Committee articulated the significance of dignity and respect for all who work on this campus, and coupled its recommendations concerning tangible compensation for service workers with suggested measures to improve the quality of work life.

The attached statement identifies a set of basic values that should inform work at Harvard. I have asked each Dean and Vice President to initiate a process early in the Fall to make sure that members of their local communities are aware of and understand the shared workplace values stated here, as well as others they may choose to affirm. I have further requested that they identify individuals in their local communities to whom faculty, students, and staff may turn if they perceive a problem.

In addition, we plan to appoint a University ombudsperson whose services will be available to anyone in the University community concerned about workplace conditions. Many universities have found that an ombudsperson can serve as a useful resource on issues relating to the quality of work life. We have examined models for this kind of position, and we will work cooperatively with the schools to ensure an appropriate relation between the ombuds function and the existing mechanisms within Schools and departments.

All who work at Harvard, regardless of rank or position, contribute in vital ways to education and scholarship. The attached statement of values, and the processes to implement them, are designed to ensure that our policies and practices reflect this principle.

With all best wishes,

Sincerely,

Lawrence H. Summers

## Harvard University Statement of Values

**August 2002**

Harvard University aspires to provide education and scholarship of the highest quality — to advance the frontiers of knowledge and to prepare individuals for life, work, and leadership. Achieving these aims depends on the efforts of thousands of faculty, students, and staff across the University. Some of us make our contribution by engaging directly in teaching, learning, and research, others of us, by supporting and enabling those core activities in essential ways. Whatever our individual roles, and wherever we work within Harvard, we owe it to one another to uphold certain basic values of the community. These include: 

- Respect for the rights, differences, and dignity of others
- Honesty and integrity in all dealings
- Conscientious pursuit of excellence in one's work
- Accountability for actions and conduct in the workplace

The more we embrace these values in our daily lives, the more we create and sustain an environment of trust, cooperation, lively inquiry, and mutual understanding — and advance a commitment to education and scholarship, which all of us share.

⊠ Copyright ©2008 by the President and Fellows of Harvard College

- · Utility Menu
- · Search

# Office of the Assistant to the President

Institutional Diversity and Equity

| Calendar | Contact |
|---|---|

Search [          ]     Search

HOME / POLICIES /

## Statement of Equal Opportunity Laws and Policies



## Statement of Equal Opportunity Laws and Policies[1]

Harvard University provides equal opportunity in employment for all qualified persons and prohibits discrimination in employment on the basis of race, color, religion, creed, sex, sexual orientation, gender identity, national origin, ancestry, age, veteran status, disability unrelated to job requirements, genetic information, military service, or other protected status. All personnel actions, including but not limited to those relating to compensation, benefits, transfers, layoffs, return from layoffs, training, education, and tuition assistance are based on the principle of equal employment opportunity. Each administrative officer of the University is responsible for ensuring that individuals are afforded equal opportunity and are not denied access to these benefits.

### Employment Laws

Title VII of the 1964 Civil Rights Act, as amended, and Executive Order 11246, as amended, prohibit discrimination in employment on the basis of race, color, religion, sex, or national origin. In addition, Executive Order 11246 requires certain federal contractors to take affirmative steps to ensure equality of opportunity in all aspects of employment. The Civil Rights Act of 1991 expanded the relief available to employees found to be victims of intentional discrimination based on religion, sex, national origin, or physical or mental disability. The 1991 Act gives plaintiffs seeking redress for intentional discrimination under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act, the right to demand a trial by jury and to recover compensatory and punitive damages. In the Commonwealth, Chapter 151B of the General Laws of Massachusetts, as amended, makes it unlawful to discriminate in employment on the basis of race, color, religious creed, national origin, ancestry, sex, sexual orientation, age, genetic information, military service, or disability.

The Equal Pay Act of 1963 prohibits discrimination on the basis of sex in the payment of wages. The Age Discrimination in Employment Act of 1967, as amended, prohibits discrimination in employment on the basis of age.

Section 504 of the Rehabilitation Act of 1973 prohibits discrimination against an otherwise qualified individual with a disability by any program or activity that receives federal financial assistance. Section 503 of that Act further requires certain federal contractors to provide for the employment and advancement of qualified workers with disabilities. In 1990, Congress enacted the Americans with Disabilities Act ("ADA"), a bill that prohibits private employers with 15 or more employees from discrimination against disabled individuals. The ADA expands the protections available to persons with disabilities, and prohibits discrimination

against the disabled in employment (Title I) and public accommodations and services (Title III). Consistent with these two laws, Harvard University does not discriminate on the basis of mental or physical disability and provides reasonable accommodations for all qualified individuals with documented disabilities.

The Vietnam Era Veterans Readjustment Assistance Act of 1974 and the Jobs for Veterans Act of 2002 impose affirmative action obligations on certain government contractors with respect to special disabled veterans, veterans of the Vietnam era, recently separated veterans, armed forces service medal veterans, and other protected veterans. Harvard University actively encourages applications for employment from disabled and covered veterans and does not discriminate against disabled or covered veterans in hiring, promotion, or other personnel decisions.

The Immigration Reform and Control Act of 1986 ("IRCA") makes it unlawful for an employer in hiring, discharging or recruiting to discriminate against any individual who is authorized to work in the United States because of that individual's national origin, or, if the individual is a "protected individual" as defined by the Act, because of that individual's citizenship status. Under anti-discrimination provisions enacted as part of the Immigration Act of 1990, additional unfair immigration-related employment practices are prohibited. Harvard's employment policies and procedures are consistent with these provisions of the IRCA.


## Other Equal Opportunity Laws

Title VI of the Civil Rights Act of 1964, as amended, prohibits discrimination on the basis of race, color, or national origin in programs receiving federal financial assistance. Title IX of the Education Amendment of 1972 ("Title IX") and its regulations apply to employment in and admission to the educational programs and activities of recipients of federal funding. Section 504 of the Rehabilitation Act of 1973, as amended, and the Americans with Disabilities Act of 1990 prohibits discrimination on the basis of disability in admissions or access to educational programs and activities. The Massachusetts Equal Rights Law (M.G.L. 93, Section 102 et seq.) also provides that all persons in Massachusetts "regardless of sex, race, color, creed, or national origin, shall have, except as otherwise provided or permitted by law, the same rights enjoyed by white male citizens, to make and enforce contracts... and to the full and equal benefit of all laws and proceedings for the security of persons and property." A 1990 amendment to this law extends this protection to individuals over forty and persons with disabilities. The Massachusetts Fair Educational Practices Law also protects applicants from discrimination on the basis of sex, race, color, religion, creed, or national origin. The University does not discriminate on the basis of race, color, religion, creed, sex, sexual orientation, gender identity, national origin, ancestry, disability, or other protected status in the administration of its educational policies, admission policies, scholarship and loan programs, athletic, social, recreational and other University-administered programs.

Any person who believes himself or herself to have been subjected to unlawful discrimination is encouraged to bring the matter to the attention of his/her supervisor or other appropriate University official at the earliest practical opportunity. No person will be punished, retaliated against, or limited in educational, employment, or other opportunity for exercising any rights protected under the laws, regulations or policies set out above, or for filing a complaint, furnishing information for, or participating in an investigation, compliance review, hearing, or any other activity related to the administration of these laws, regulations, and policies.

---------------------------------

[1]*The following is a summary of equal opportunity laws and Harvard polices currently in force. As such, it is not meant to be definitive or comprehensive, and persons seeking complete information in any of the areas discussed should consult an attorney (with respect to nondiscrimination and Affirmative Action laws) or Harvard's Office of the Assistant to the President for Institutional Diversity and Equity (with respect to Harvard policies).*

# Exhibit 8 - Screenshot of Harvard's Motion to Remand on the electronic filing system with indication of 166 pages filed by Harvard

